FILED

**ROSMAN & GERMAIN LLP**
Daniel L. Germain (CA Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
Email: germain@lalawyer.com

11 JUN 17 PM 2: 40

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

*Counsel for Plaintiff*

*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CHRISTOPHER GUSTAFSON, individually and on behalf of all others similarly situated,

      Plaintiff,

      v.

BAC HOME LOAN SERVICES, LP, BANK OF AMERICA, N.A., and BALBOA INSURANCE COMPANY

      Defendants.

Civil Action No.

**SACV11-00915 JST**

(ANx)

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

## INTRODUCTION

1.     This is a proposed class action brought by Plaintiff Christopher Gustafson (referred to herein as "Plaintiff") on behalf of himself and all other similarly situated homeowners who have or had residential mortgage loans owned and/or serviced by Defendants Bank of America, N.A. ("Bank of America") or BAC Home Loans Servicing, LP ("BAC Home Loans Servicing") between June

16, 2007 and the present (the Class Period") and, in connection therewith, were required to pay for "force-placed" hazard insurance policies.

2.     In the event that borrowers fail to maintain their hazard insurance policies, rather than attempt to maintain delinquent borrowers' *existing* policies, mortgage loan servicers choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed" insurance policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to servicers and/or their affiliates. Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss.

3.     Throughout the Class Period, Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including, among others and as described in further detail below: (a) providing force-placed insurance from their own affiliates at a substantial high cost to the borrower; (b) receiving fees, payments, commission and/or other things of value from providers of force-placed insurance; and (c) forcing borrowers to pay for unnecessary insurance.

4.     Defendants' unlawful actions include, *inter alia*, purchasing unconscionably high-priced insurance policies, having pre-arranged agreements to purchase force-placed insurance from a single company without seeking competitive bids on the open market to maximize their own profits, backdating the force-placed policies to charge for retroactive coverage, and giving and receiving "commissions" or "kickbacks" for the procurement of the force-placed policies. These actions constitute a pattern of exploitative profiteering and self-dealing against the interest of Plaintiff and the Class members.

5.      This scheme constitutes disguised, unlawful referral fees in violation of RESPA's anti-kickback provisions, as well as a violation of RESPA's ban on accepting a percentage of settlement-service fees other than for services actually performed.   Further, this scheme constitutes unfair, unlawful and fraudulent business acts and practices in violation of California Business & Professions Code §§ 17200, et seq., and is in violation of the mortgage contracts of Plaintiff and the Class members.

6.      In this action, Plaintiff challenges Defendants' unlawful conduct and seeks statutory and compensatory damages, as well as restitution for Defendants' unjust enrichment.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

8.      This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff is a citizen of the State of Illinois.   Defendants are citizens of different states.  The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the class.

9.      In addition, this Court has diversity jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a). The matter in controversy is greater than $75,000 and this matter is between citizens of different states.  This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

10.      Venue is proper in this district under 28 U.S.C. § 1391(b) and 12 U.S.C. § 2614 because Defendants regularly conduct business in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

### Plaintiff

11.    Plaintiff Christopher Gustafson is a resident of Silvis, IL.  On or about August 15, 2007, Mr. Gustafson obtained a refinance mortgage loan from American Bank & Trust ("ABT").

12.    Mr. Gustafson's hazard insurance was paid through an escrow account.  In mid-2010, Mr. Gustafson's loan was taken over by Bank of America Home Loans and serviced by BAC Home Loans Servicing.  Mr. Gustafson fell behind on his mortgage payments and his homeowner's insurance policy lapsed.

13.    Bank of America sent to Mr. Gustafson a notice dated January 3, 2011, stating that it would force-place insurance, back-dated to December 6, 2010, if it did not receive proof of insurance by February 7, 2011.  *See* Exhibit A, attached hereto.  Mr. Gustafson later received a notice, dated February 10, 2011, stating that force-placed insurance had placed on the property, back-dated to December 6, 2010.  *See* Exhibit B, attached hereto.

14.    The force-placed policy was with Defendant Balboa Insurance Company ("Balboa") for a premium of $1,045—nearly twice Mr. Gustafson's prior premium of $614—charged to Mr. Gustafson's escrow account.  Additionally, the force-placed policy provided protection for the lender only and covered only the structure itself.  Unlike Mr. Gustafson's prior insurance policy, for instance, the force-placed insurance policy does not provide coverage for liability, personal property, etc.

15.    Further, the amount of coverage for the force-placed insurance policy greatly exceeded the lender's interest in the property, in that it exceeded the outstanding principal balance on the loan.  The coverage was $76,300, whereas the outstanding loan balance was only $47,946.  The notice stated that in order lower

the amount of coverage to the lender's interest in the property, Mr. Gustafson had affirmatively opt to do so by returning to Bank of America a written form within.

**Defendants**

16.     Defendant Bank of America, a subsidiary of Bank of America Corporation, is a Delaware corporation with its principal place of business located in Charlotte, North Carolina.   Bank of America directly and/or through its subsidiaries, owns and services loans secured by mortgages on real estate located throughout the United States, including California.

17.     Defendant BAC Home Loans Servicing (formerly known as Countrywide Home Loans Servicing, LP), a subsidiary of Bank of America Corporation, is a Texas limited partnership with its principal place of business in Calabasas, California.  BAC Home Loans Servicing services mortgage loans and provides mortgage services, including conducting foreclosures on mortgages, on behalf of holders of residential mortgages and mortgage loan asset-backed certificates.

18.     Defendant Balboa, formerly a subsidiary of Bank of America Corporation, is a California corporation headquartered in Irvine, California. Balboa provides force-placed insurance policies on real estate located throughout the United States, including California.

**FACTUAL ALLEGATIONS**

**Defendants' Operations**

19.     Bank of America Corporation describes itself as one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk management products and services. *See*

*http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irol-homeprofile.*

20.     Bank of America originates mortgage loans and acquires loans from other lenders.  Each such loan is secured by a deed of trust on the underlying property.  BAC Home Loans Servicing services such loans.

21.     Through its subsidiaries and affiliates, Bank of America Corporation operates through 5,900 retail offices, has approximately 5,300 mortgage loan offices and is the No. 1 mortgage loan servicer in the Untied States.   *See* Bank of America Corporation, Annual Report (Form 10-K), at 1 (February 25, 2011).

22.     Until approximately June 1, 2011, Bank of America and BAC Home Loans Servicing were affiliates of Balboa.  On June 1, 2011, Bank of America Corporation announced the completion of the sale of Balboa and affiliated entities to QBE Insurance Group ("QBE").  Notably, the terms of the sale included an agreement that QBE will maintain long-term distribution agreements with Bank of America for force-placed insurance.  *See* Press Release, Bank of America Corporation, *Bank of America Completes Sale of Balboa Insurance Business to QBE* (June 1, 2011), attached as Exhibit C hereto.

23.     Balboa maintains relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide.  *See* http://www.balboainsurance.com/LenderProducts/LenderPlacedHazard/tabid/169/Default.aspx.

**Force-placed Insurance**

24.     In order to protect the mortgagee's interest in the secured property, mortgage loan contracts typically allow the lender or third party servicer to "force-place" insurance when the homeowner fails to maintain the insurance.

25.     The mortgage contract does not disclose, however, that the lender or other servicer will receive a financial benefit in connection with the force-placed

insurance policy.  Instead, the contract misrepresents to borrowers that the cost passed on them is necessary to protect the lender's interest in the secured property.

26.    These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage.  Reportedly, such policies can cost as much as ten times more than standard policies.  While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower (or passed on to holders of mortgage-backed securities).  *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (November 10, 2010), available at: http://www.americanbanker.com/issues/175_216/ties-to-insurers-servicers-in-trouble-1028474-1.html (referred to herein as "Ties to Insurers").

27.    The force-placed policy often covers only the loan amount, rather than the full value of the home.  Because most forced placed insurance policies do not insure the contents of the property, the borrower could sustain a substantial loss if the home is damaged or destroyed.  *See Id*.

28.    Once a servicer receives evidence that a borrower has obtained his/her own insurance policy, the forced placed coverage is (or should be) fully or partially canceled.

**Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

29.    The force-placing of insurance policies can be a very business lucrative for servicers.  Commonly, the servicer selects the provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit.  The servicer benefits by placing the policy either: (a) with an affiliate or (b) with a third party provider who has already agreed to share revenue with the servicer in the form a direct commission payment or through

"reinsurance" premiums ceded to a subsidiary/affiliate of the servicer (a "captive reinsurance arrangement").

30.    Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent."   Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

31.    Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer.   In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.

32.    Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





## Sharing in the Profits
How servicers make money arranging force-placed coverage

### Commissions

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer

Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

### Reinsurance

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

33.    Borrowers have no opportunity to comparison-shop for force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

34.    For their part, servicers have no incentive to comparison shop for the best rate.  Rather, servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

35.    Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.    Upon information and belief, Defendants Bank of

America and BAC Home Loan Servicing are parties to such an agreement with Defendant Balboa.

36.    Force-placed insurance policies are not underwritten on an individual policy basis.  Rather, servicers' contracts with force-placed insurance providers require or at least permit the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

37.    Servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider.  Balboa, for instance, provides Bank of America and BAC Home Loan with "state of the art insurance tracking." *See* http://www.balboainsurance.com/LenderProducts/LenderPlacedHazard/tabid/169/Default.aspx.  The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property.  In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer.  Thus, where these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral.  *See* Ties to Insurers, *supra.*

38.    While servicers profit greatly from the business of force-placed insurance, upon information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance.  However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."  *See* Ties to Insurers, *supra*. (noting that servicers demand generous commissions and other payments in return for their referrals).

39.   Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting.  However, as *American Banker* noted.

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry — even after accounting for the generous commissions and other payments that servicers demand.

*See* Ties to Insurers, *supra*.

40.   Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property.  However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.  *See Id.*

**Defendants Often Charge Borrowers for Redundant or Otherwise Unnecessary Insurance**

41.   Unnecessary or inappropriately priced hazard insurance arises when a servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative and/or in amounts greater than required by law or their mortgage agreements.

42.   Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants have commonly required borrowers to pay for unnecessary insurance coverage.  Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed

and no risk of loss exists for such period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

43.    Simply put, force-placed hazard insurance policies should not be backdated. The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature."  *See*, *e.g.*, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "'should not be back-dated to collect premiums for a time period that has already passed'").  Requiring borrowers to pay for backdated insurance coverage to cover time periods during there is already no risk of loss is improper.

44.    Moreover, upon information and belief, many hazard insurance policies contain a "Lender's Loss Payable Endorsement."  This endorsement typically protects the lender for a period of at least ten days after the termination of the insurance policy.  Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage.

**Government Response**

45.    State attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of all 50 state attorneys general proposed a settlement agreement with servicers to address numerous problems that have surfaced during the foreclosure crisis.  *See* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (March 11, 2011), available at:  http://www.americanbanker.com/issues/176_48/ags-force-placed-insurance-1034213-1.html.

46.    Among other terms, the proposed settlement would essentially prohibit servicers from profiting from force-placed insurance.  Specifically, under the proposed settlement, mortgage servicers: (a) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) are prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting anything of value in relation to the purchase or placement of the force-placed insurance; (e) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (f) must purchase the force-placed insurance for a commercially reasonable price.  *See* Proposed Settlement Agreement, attached as Exhibit D hereto.

**RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Forced-placed Insurance Policies**

47.    As Brian Sullivan, spokesman for the Department of Housing and Urban Development ("HUD"), has opined, "It is clear that RESPA prohibits fee splitting and unearned fees for services that are not performed."  *See* Ties to Insurers, *supra*.

48.    RESPA is the primary federal law regulating residential mortgage settlement services.  HUD is charged with enforcing RESPA and has promulgated the implementing rules for RESPA.  See Regulation X, 24 C.F.R. § 3500.

49.    RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers.  "It is the purpose of this chapter to effect certain changes in the

settlement process for residential real estate that will result…in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

50.    A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

51.    The term "settlement service" is liberally defined in RESPA and Regulation X and includes the provision of services involving hazard, flood, or other casualty insurance.  24 C.F.R. § 3500.2(b).

52.    RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

53.    RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

54.    Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

55.    The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise

royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity…The term payment is used as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

56.    Force-placed insurance business referred to insurers by a lender or servicer constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).   Under RESPA, therefore, Defendants are prohibited from: (a) referring force-placed insurance business to an affiliate without complying with the requirements 12 U.S.C. § 2607(c)(4); and (b) accepting commissions or other things of value from force-placed insurance providers.

57.    Further, Defendants Bank of America and BAC Home Loan Servicing failed to provide adequate disclosure and failed to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policy provided by an insurer from whom Defendants would receive a financial benefit.

**Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance**

58.    As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business."   *See* Ties to Insurers, *supra*.   These costs are ultimately paid by the borrowers.

59.    Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is

ultimately passed on to borrowers, is higher — implying paydays for servicers amounting to hundreds of millions of dollars per year. *Id.*

60.   Bank of America's and BAC Home Loan Servicing's practices of referring force-placed insurance business to affiliates or otherwise profiting from the force-placement of insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks. Amounts paid to servicers as commissions have become a part of the cost of doing business for force-placed insurance providers. As a result, force-placed insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

61.   Defendants' conduct has threatened and, indeed, stifled competition. As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction." *See* Ties to Insurers, *supra.*

## CLASS ACTION ALLEGATIONS

62.   Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of the following Class:

> of all persons who have or had a residential mortgage loan or line of credit with Bank of America or BAC Home Loans Servicing and had hazard insurance force-

placed upon the secured property between June 16, 2007[1]
and the date of final disposition of this action.

63.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

64.     The Class is so numerous that joinder of all members is impracticable.

65.     A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

66.     Plaintiff's claims are typical of the claims of the Class.

67.     There are questions of law and fact common to the Class, including but not limited to:

(a)     Whether Defendants Bank of America and BAC Home Loan Servicing maintained a policy of referring force-placed insurance business to affiliates;

(b)     Whether Defendants Bank of America and BAC Home Loan Servicing received commission payments from force-placed insurance providers;

(c)     Whether Defendants Bank of America and BAC Home Loan Servicing received payments in connection with force-placed insurance that exceeded the value of any services actually performed;

---

[1] Plaintiff reserves his right to seek modification of the Class Period definition in the likely event that further investigation/discovery reveals a more appropriate and broader time period.

(d)     Whether Defendants wrongfully backdated forced-placed insurance policies;

(e)     Whether Defendants' conduct constituted an unfair business practice;

(f)     Whether Defendants violated their implied covenant of good faith and fair dealing;

(g)     Whether Defendants have been unjustly enriched; and

(h)     Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages.

68.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

69.     The same common issues predominate with respect to all Class members, regardless of whether their loans were originated by or merely serviced by Defendants.

70.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.   Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.  Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

71.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

72.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the

Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

73.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

74.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**CLAIMS FOR RELIEF**
**COUNT ONE**
**(Against all Defendants)**
**VIOLATION OF RESPA, 12 U.S.C. § 2607**

75.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

76.     Throughout the Class Period, Defendants provided "settlement services" in respect of "federally-related mortgage loans," as such terms are defined by RESPA §§ 2602(1) and (3).

77.     Defendants unlawfully received "things of value," within the meaning of RESPA § 2602(2), in connection with the referral of force-placed insurance business.

78.     Such amounts constituted fees, kickbacks or things of value pursuant to agreements with force-placed insurance providers that business incident to real estate settlement services involving federally-related mortgage loans would be referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).

79.   Plaintiff and the Class members were, in fact, harmed by Defendants' unlawful scheme.

80.   First, Plaintiff and the Class members were, as a matter of law, entitled to purchase settlement services from providers that did not participate in unlawful kickback and/or fee-splitting schemes.  Congress has expressly provided for private enforcement of this protected right by empowering consumers to recover statutory damages from offending parties without proof of an overcharge. The plain, unambiguous language of RESPA section 8(d)(2) indicates that damages are based on the settlement service amount with no requirement that there have been an overcharge.  Plaintiff alleges that Defendants have accepted unlawful kickback payments and/or an unearned portion of settlement service charges in violation of RESPA—allegations and claims completely distinct and separate from whether the price they paid for settlement services was excessive.

81.   Second, through not necessary to prevail on their claims, Plaintiff and the Class members were, in fact, overcharged for force-placed insurance. Congress has already determined that the *aggregate* effect of an unlawful kickback/referral arrangement is to unnecessarily inflate the costs consumers pay for real estate settlement services and/or reduce competition among settlement service providers.  Thus, kickbacks and unearned fees unnecessarily and artificially inflate settlement service charges.

82.   Defendants therefore violated RESPA, 12 U.S.C. 2607.  Pursuant to RESPA, 12 U.S.C. 2607(d), Defendants are liable to Plaintiff and the Class members in an amount equal to three times the amounts they have paid or will have paid for force-placed insurance as of the date of judgment.

83.   In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiff also seeks attorneys' fees and costs of suit.

**COUNT TWO**

**(Against Defendants Bank of America and BAC Home Loan Servicing)**

**BREACH OF CONTRACT**
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

84.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

85.     Every contract contains an implied covenant of good faith and fair dealing.

86.     The mortgage contracts of Plaintiff and the Class members contained an implied covenant of good faith and fair dealing, pursuant to which Defendants were bound to perform their obligations in good faith and to deal fairly with Plaintiff and the Class members.

87.     In all of its actions described herein, BAC Home Loans Servicing acted on its own behalf and as the duly authorized agent of Bank of America or other owner or assignee of the mortgage agreements of Plaintiff and the Class members.  Defendants Bank of America and BAC Home Loan Servicing were contractually obligated to service the loans of Plaintiff and the Class members pursuant to the terms of mortgage agreements.

88.     To the extent that the mortgage contracts of Plaintiff and the Class members permitted Defendants to unilaterally "force-place" insurance, Defendants were obligated not to exercise their discretion to do so capriciously and in bad faith for their own financial gain for the purposes of maximizing profits at borrowers' expense.

89.     Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

(a)     Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing borrowers to pay for insurance policies from providers of Defendants' choice, such as Balboa.  These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b)     Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c)     Failing to seek competitive bids on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

(d)     Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiff and the Class members and misrepresenting the reason for the cost of the policies;

(e)     Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f)     Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss Payable Endorsement;

(g)     Procuring force-placed insurance policies to cover time periods during the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

(h)     Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had an affiliate relationship or commission arrangement.

90.     As direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class members have suffered damages.

91.     Plaintiff and the Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

## COUNT THREE

### (Against Defendants Bank of America and BAC Home Loan Servicing)

### BREACH OF CONTRACT

92.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

93.     Defendants have serviced loans evidenced by substantially similar standard form notes and mortgage contracts.

94.     In all of its actions described herein, BAC Home Loans Servicing acted on its own behalf and as the duly authorized agent of Bank of America or other owner or assignee of the mortgage agreements of Plaintiff and the Class members.  Defendants Bank of America and BAC Home Loan Servicing were contractually obligated to service the loans of Plaintiff and the Class members pursuant to the terms of mortgage agreements.

95.     To the extent that the mortgage contracts of Plaintiff and the Class permitted Defendants to unilaterally "force-place" insurance, Defendants were contractually permitted to do so only to the extent necessary to protect the mortgagee's interest in the secured property.

96.     Nonetheless, Defendants have imposed or collected amounts that exceeded the amounts necessary to protect the mortgagee's interest in the policy. Such practices have included, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured; (b) backdating force-placed insurance policies, thus requiring borrowers to pay for retroactive coverage despite the fact that the time has lapsed and no loss occurred during the lapsed period; and (c) requiring borrowers to pay for force-placed insurance policies despite the existence of a Lender's Loss Payable Endorsement that already protects the lender's interest in the property.

97.     Defendants have thus breached their contracts with Plaintiff and the Class members.

98.     Plaintiff and the Class members have been damaged as a direct and proximate result of Defendants' breach and are entitled to damages.

### COUNT FOUR
### (Against Defendants Bank of America and BAC Home Loan Servicing)

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (VIOLATION OF BUSINESS AND PROFESSIONAL CODE §§ 17200 *ET SEQ.*)

99.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

100.    Throughout the Class Period, Defendants have regularly conducted business throughout the State of California.

101.    Defendants' scheme was devised, implemented and directed from BAC Home Loan Servicing's and Balboa's offices in California.  Accordingly, California's unfair competition law applies to a class of borrowers, both within and outside of California, who have been harmed as a result.  Moreover, California has

1   a substantial interest in preventing fraudulent practices within the State which may

2   have an effect both in California and throughout the rest of the country.

3       102.   California Business & Professions Code §§ 17200 *et seq.* prohibits

4   acts of unfair competition, including any "unlawful, unfair or fraudulent business

5   act or practice."

6       103.   Defendants engaged in unfair, unlawful or fraudulent business acts

7   and practices in violation of California Business & Professions Code §§ 17200, et

8   seq., in that: (a) Defendants' conduct is unlawful in that it is in violation of

9   RESPA; (b) Defendants' practices and conduct are immoral, unethical, oppressive

10  and substantially harmful to Plaintiff and the members of the Class; (c) the

11  justification for Defendants' practices and conduct is outweighed by the gravity of

12  the injury to Plaintiff and the Class; (d) Defendants' practices constitute unfair,

13  fraudulent, untrue or misleading actions in that such conduct is likely to deceive

14  and, in fact, did deceive members of the public.

15      104.   Defendants' unlawful, unfair, and/or fraudulent business practices are

16  described herein and include, without limitation:

17          (a)   Failing to make any effort whatsoever to maintain

18  borrowers' existing insurance policies and, instead—for the sole purpose of

19  maximizing their own profits—forcing borrowers to pay for insurance policies

20  from providers of Defendants' choice, such as Balboa.  These policies needlessly

21  came with substantially greater premiums, while providing less coverage than

22  borrowers' existing policies;

23          (b)   Using their discretion to choose a force-placed insurance

24  provider and policy in bad faith and in contravention of the parties' reasonable

25  expectations, by purposefully forcing borrowers to pay for more than the cost of

26  protecting the lender's interest in the secured property;

27

28

(c)     Failing to seek competitive bids on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

(d)     Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiff and Class and misrepresenting the reason for the cost of the policies;

(e)     Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f)     Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a Lender's Loss Payable Endorsement;

(g)     Procuring force-placed insurance policies to cover time periods during the mortgagee is already covered pursuant to a Lender's Loss Payable Endorsement; and

(h)     Failing to provide borrowers with any opportunity whatsoever to opt out of having their force-placed insurance policies provided by an insurer with whom Defendants had an affiliate relationship or commission arrangement; and

(i)     Engaging in other unfair and/or unlawful conduct as described in this Complaint.

105.   The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiff and the members of the Class. Plaintiff has suffered injuries in fact and has lost money or property as a result of Defendants' conduct.

106.   By reason of the foregoing, Defendants should be required to pay damages in an amount to be proven at trial, disgorge their illicit profits and/or make restitution to Plaintiff and the members of the Class, and/or be enjoined from continuing in such practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

### COUNT FIVE
### (Against all Defendants)

### UNJUST ENRICHMENT/DISGORGEMENT

107.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

108.   Plaintiff and the Class members have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums paid by Plaintiff and the Class members.

109.   These payments were accepted and retained by Defendants under circumstances such that it would be inequitable for Defendants to retain the benefit without payment to Plaintiff and the members of the Class.

110.   As a result of Defendants' unjust enrichment, Plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

111.   Further, Plaintiff and the Class members, individually and on behalf of the public, seek restitution and disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## COUNT SIX

**(Against Defendants Bank of America and BAC Home Loan Servicing)**

### DECLARATORY AND INJUNCTIVE RELIEF

112.   Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

113.   On each cause of action stated above, Plaintiff and the Class will be irreparably injured in the future by the Defendants' misconduct.

114.   Plaintiff, on behalf of himself and all Class members, seeks a judgment declaring that Defendants must cease the activities described herein, provide Class members with adequate remedies, including, without limitation, refunds and/or credits of all unfair, unlawful or otherwise improper force-placed insurance premiums and provide for adequate procedures and policies to ensure that Defendants' unlawful conduct does not continue.   Such policies and procedures include, without limitation, that Defendants: (a) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the mortgaged property; (c) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) are prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting anything of value in relation to the purchase or placement of the force-placed insurance; (e) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (f) must purchase any force-placed insurance for a commercially reasonable price.

115.   Plaintiff and the Class members do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and

will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

116.   By reason of the foregoing, Plaintiff and the Class members are entitled to declaratory and injunctive relief as set forth herein.

## PLAINTIFF'S RESPA CLAIMS ARE TIMELY

117.   Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule.   To the extent that Plaintiff or the putative Class members' RESPA claims accrued prior to one year preceding the commencement of this action, equitable tolling is available under RESPA and should apply.   Plaintiff and the members of the putative Class could not, despite the exercise of due diligence, have discovered the underlying basis for their claims.   Further, Defendants knowingly and actively concealed the basis for Plaintiff's claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing.   For these reasons, any delay by the members of the putative Class whose claims accrued prior to one year preceding the commencement of this action was excusable.

118.   Due to the complex, undisclosed and self-concealing nature of Defendants' scheme, Plaintiff and the putative Class members whose claims accrued prior to one year preceding the commencement of this action did not possess sufficient information or possess the requisite expertise in order to enable them to discover the true nature of Defendants' unlawful kickback arrangements.

119.   Plaintiff was able to discover the underlying basis for the claims alleged herein only with the assistance of counsel and only following the well-publicized American Banker exposé first published on November 10, 2010.   *See* Ties to Insurers, *supra*.   Prior to November 10, 2010, Plaintiffs and the putative Class members had no basis upon which to investigate the validity of Defendants' force-placed insurance arrangements.

120.   Indeed, Plaintiff's and the putative Class members' delay was excusable because they did not discover, and reasonably could not have discovered Defendants' conduct as alleged herein absent specialized knowledge and/or assistance of counsel until, at the very earliest, November 10, 2010, when the basis for Plaintiff's claim was exposed by American Banker.  Indicative of this is the fact that American Banker recently won a Society of American Business Editors and Writers award for its investigative story published on November 10, 2010, exposing mortgage servicers' previously secret force-placed insurance practices. *See*, *e.g.*, *American Banker Wins Investigative Journalism Award*, American Banker (March 21, 2011), attached as Exhibit E hereto.

121.   Information concerning Defendants' collection of kickbacks from force-placed insurance providers has not been publicly available.  As American Banker noted, "banks do not report how much they collect from such payments," and, further, force-placed insurance has been "historically an overlooked niche in the mortgage servicing industry."  *See Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, *supra*.

122.   Because of Defendants' actions and because of the nature of the reinsurance scheme, the absent putative Class members were not put on notice of Defendants' wrongdoing despite exercising due diligence.

123.   Any delay by the absent putative Class members is excusable and, accordingly, Plaintiff and the Class contend that it would be inequitable for the Court to apply the one-year limitation period set forth in RESPA § 16, 12 U.S.C. § 2614 in a way that would preclude the claim of Plaintiff or any Class member.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

A.     That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as representative of the Class and Plaintiff's counsel as counsel for the Class;

B.     That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.     Plaintiff and the Class be awarded statutory damages pursuant to RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2);

D.     Compensatory, consequential, and general damages in an amount to be determined at trial;

E.     Costs and disbursements of the action;

F.     Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the Class;

G.     Pre- and post-judgment interest;

H.     Reasonable attorneys' fees; and

I.     Such other and further relief as this Court may deem just and proper.

Dated:  June 16, 2011                    Respectfully submitted,

**ROSMAN & GERMAIN LLP**

_____
            /S
Daniel L. Germain (CA Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Edward W. Ciolko
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
**NIX PATTERSON & ROACH, LLP**
Jeffery J. Angelovich
Michael B. Angelovich
Brad Seidel
205 Linda Drive
Daingerfield, TX  75638
Tel:  (903) 645-7333
Fax:  (903) 645-4415

*Attorneys for Plaintiff and the Proposed*
*Class*

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all claims in this action.

Dated:  June 16, 2011                    ROSMAN & GERMAIN LLP


_____
/S
Daniel L. Germain (CA Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA  91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

KESSLER TOPAZ
MELTZER & CHECK, LLP
Edward W. Ciolko
Terence S. Ziegler
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**NIX PATTERSON & ROACH, LLP**
Jeffery J. Angelovich
Michael B. Angelovich
Brad Seidel
205 Linda Drive
Daingerfield, TX  75638
Tel:  (903) 645-7333
Fax:  (903) 645-4415

***Attorneys for Plaintiff and the Proposed
Class***

# Exhibit A

9046
023858072

**Bank of America** 

**Home Loans**

P.O. BOX 961206
FORT WORTH, TX 76161-0206

000744 - 002955
CHRISTOPHE GUSTAFSON
115 27TH AVE
EAST MOLINE, IL 61244-2656

Notice Date:      JANUARY 3, 2011
Bank of America Loan #:      023858072
Property Address: 519 14TH AVE
                        SILVIS IL 61282

---

**IMPORTANT MESSAGE ABOUT YOUR LOAN**

Despite a prior notification, we have not received verification of acceptable hazard (homeowner's) insurance information on the above-referenced property. According to your loan agreement, acceptable insurance coverage must be maintained on your home at all times. To avoid further action from BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans"), we must receive evidence of insurance no later than 02/07/2011 providing coverage effective 12/06/2010.

If proof of acceptable coverage **is not received** by 02/07/2011, BAC Home Loans will purchase Lender-Placed Hazard (homeowner's) Insurance at your expense and charge you for the cost of the insurance. The approximate cost of the Lender-Placed Insurance will be $1,045.00, if purchased by BAC Home Loans. This estimate is based, in part, upon our knowledge that the location above is in Forclosure and a Unknown year old home and other rating factors.  If this information is incorrect, please contact us at (866) 265-3321. Additionally, if the occupancy of your property changes the premium charged may differ from the amount stated in this letter.  The coverage period will be effective from 12/06/2010 until 12/06/2011.

---

**WHAT YOU NEED TO DO**

We offer several options to update your insurance:

·      You can provide policy information on our website at **bankofamerica.com;**
·      Your agent can provide policy information on our business partner's website at **homeloanbusiness.bankofamerica.com;**
·      You may **fax** a copy of your homeowner's insurance declaration page with your loan number to:  (800) 293-8158;
·      You may **call** the customer service automated system at (866) 265-3321; or,
·      You can **mail** a copy of your homeowner's insurance declaration page with your loan number to the return address above.

Please note, if you live in a condominium complex insured under a master policy issued to your condominium association, please send to us, using the mailing instructions shown above, evidence of insurance from the association's master policy demonstrating proof of adequate hazard insurance coverage.

Once you have updated your insurance information through one of the options listed above, you may confirm our records have successfully been updated by visiting our website at **bankofamerica.com,** or viewing your monthly statement.

---

**PURCHASING LENDER-PLACED INSURANCE**

If we purchase Lender-Placed Insurance, the cost of that coverage will be charged to you and may become an additional debt secured by your mortgage or deed of trust. If you have an escrow account, the annual cost for this insurance will be paid from it. If you do not have an escrow account, BAC Home Loans may establish one and charge the cost of the

Please write your loan number on all correspondence.

ARW4U1F7

RE:  CHRISTOPHE GUSTAFSON
     BAC Home Loans Loan #:  023858072

Lender-Placed Insurance to it. Charging the annual cost for this insurance to your escrow account will likely cause your monthly payment to increase.

Additional items to consider include;

·    This insurance will provide less coverage than was previously in effect and it may duplicate existing coverage.

·    This insurance may be more expensive than your previous coverage.

·    If purchased, the coverage amount for Lender-Placed Insurance will be based on the replacement value, which we believe is the last known amount of coverage you purchased, and if we do not have that information, it will be your current principal balance. If purchased, it is estimated that your hazard coverage amount would be $76,300.00.

·    This insurance provides no coverage for: loss or damage to personal property (such as personal contents of your home), loss from theft, injury to persons or property for which you may be liable, additional living expenses, or flood.

·    The insurance may not be sufficient to fully restore or repair your property to its previous condition, and may not protect any equity that you may have built up on your property.

·    This insurance may have other restrictions, exclusions and limitations specifically described in the coverage that we acquire.

·    In the event of a claim, all payments will be due to BAC Home Loans except amounts in excess of BAC Home Loans' interest which will be forwarded to you.

**ADDITIONAL INFORMATION**

Additional information regarding the requirements of hazard insurance may also be found in your loan documents. Lender-Placed Hazard Insurance may be purchased from an affiliate of Bank of America, N.A.. Bank of America, N.A. may receive a commission or other compensation in connection with obtaining this coverage.

**THANK YOU FOR YOUR BUSINESS**

We look forward to resolving this matter quickly and appreciate the opportunity to service your loan.

## BAC HOME LOANS CUSTOMERS
## HAZARD INSURANCE REQUIREMENTS

In order to protect the property, BAC Home Loans requires that you maintain hazard insurance. At a minimum, your hazard insurance must be a fire and extended coverage policy. The insurance must not limit or exclude from coverage (in whole or in part) damage from windstorm, hurricane, hail damages, or any other perils that are a part of the extended coverage endorsement. Insurance coverage must be on a replacement cost basis, where available, and be in an amount at least equal to the lower of: 1) 100% of the insurable value of the improvements as established by the property insurer; or (2) the unpaid balance of the loan. Notwithstanding the foregoing, if the unpaid principal balance is less than 80% of the insurable value of the improvements, the coverage amount must be at least 80% of the insurable value. Rent loss coverage is required for non-owner-occupied properties. For coverage amounts of $252,700 or less, the maximum deductible is the higher of $1,000 or 1% of the policy's dwelling coverage. For coverage amounts greater than $252,700, the maximum deductible is the higher of $2,500 or 1% of the policy's dwelling coverage.

The insurance policy must be issued by an insurance company acceptable to BAC Home Loans and licensed, or otherwise authorized by law, to conduct business in the jurisdictions in which the property is located. Your policy must be written by an insurance company with either an A.M. Best Rating of "B" or an A.M. Best's Financial Performance Rating of "VI" or better. The named insured on the policy must be the same as the mortgagor/trustor/grantor on your security instrument, or current owner if there has been a loan assumption. The policy must include a Lender's Loss Payable Endorsement or standard mortgagee/loss payee clause naming BAC Home Loans Servicing, LP and its successors and assigns.

To help us maintain accurate records on your account, your loan number must be included on all policies, billings (if you have an escrow account), and correspondence with your insurer or insurance agent. You may provide us with any of the following: an original policy; a certified copy of an original policy; a certificate of insurance; a binder (only for coverage of less than $1,000,000) that complies with state law requirements; and for a non-escrowed loan, a paid receipt of premium paid for a 12-month policy term (6-month term in Florida only), or continuous coverage indicated in lieu of expiration date with 6 months prepaid.

Due to changes in federal or state laws or regulations, BAC Home Loans may modify its insurance requirements to include additional types or amounts of coverage. If BAC Home Loans makes a change, we will notify you so that you may purchase the required coverage.

If we do not receive proof of insurance, or a bill to enable us to pay your policy premium if you have an escrowed loan, BAC Home Loans may obtain insurance to protect the property at your expense. The cost of insurance we purchase to protect the property will become an additional obligation secured by your security instrument. The coverage we purchase will insure for damage to your dwelling, but not its contents. It will be different than your current policy, will in most cases be more expensive, may have higher deductibles, and will not protect you from risks typically included in a homeowners policy. For example, it will not cover loss, damage or theft to personal property; or injuries to persons or damage to property for which you may be liable. It also does not cover worker's compensation or damage due to flood or earthquake. Our lender-placed coverage may not be enough to fully replace or repair your property in the event of damage or destruction. This insurance may **not** protect any equity that you have built up on your property.

WE URGE YOU TO REPLACE ANY LENDER-PLACED INSURANCE WITH YOUR PREFERRED POLICY, WHICH WILL PROBABLY BE LESS EXPENSIVE FOR YOU AND PROVIDE BROADER PROTECTION. If BAC Home Loans receives a replacement policy that complies with our insurance requirements, we will cancel our lender-placed coverage effective the date that your preferred policy takes effect. If there is a lapse in coverage between your new preferred policy and the policy you or we had obtained before, you will be charged a prorated premium and state-imposed fee (if any) for the period that no borrower-placed coverage was in place. If you provide us with proof that you had adequate insurance on your property as of the date our lender-placed coverage was effective, (i.e., no lapse in coverage) and that you continue to have the insurance that you purchased yourself, you will not be charged any premium, costs, interest or other charges in connection with lender-placed insurance.

Lender-Placed Hazard Insurance may be purchased from an affiliate of Bank of America, N.A.. Bank of America, N.A. may receive a commission or other compensation in connection with obtaining this coverage.

# Exhibit B

9046
023858072


**Home Loans**

P.O. BOX 961206
FORT WORTH, TX 76161-0206

000275 - 002111
CHRISTOPHE GUSTAFSON
115 27TH AVE
EAST MOLINE, IL 61244-2656

Notice Date:  FEBRUARY 10, 2011
Bank of America Loan #:  023858072
Property Address: 519 14TH AVE
SILVIS IL 61282

---

## IMPORTANT MESSAGE ABOUT YOUR LOAN

We previously notified you that we had not received evidence of existing and acceptable hazard (homeowner's) insurance on the above referenced property. According to your loan agreement, acceptable insurance coverage must be maintained on your home at all times. Therefore, as provided for in the loan agreement, we have purchased Lender-Placed Insurance at your expense in the amount of $1,045.00. This amount is based, in part, upon our knowledge that the location above is in Foreclosure and a Unknown year old home and other rating factors. If this information is incorrect, please contact us at (866) 265-3321. Additionally, if the occupancy of your property changes, the premium charged may differ from the amount stated in this letter.

## IMPORTANT INFORMATION ABOUT YOUR LENDER-PLACED INSURANCE

The cost of this coverage will be charged to you and has become an additional debt secured by your mortgage or deed of trust. If you do not have an escrow account, BAC Home Loans Servicing, LP, a subsidiary of Bank of America, N.A. ("BAC Home Loans") will establish one and charge the cost of the Lender-Placed Insurance to it. Charging the annual cost for this insurance to your escrow account will likely cause your monthly payment to increase.

Additional items to consider include;

- This insurance will provide less coverage than was previously in effect and it may duplicate existing coverage.
- This insurance may be more expensive than your previous coverage.
- The coverage amount for Lender-Placed Insurance is based on the replacement value, which we believe is the last known amount of coverage you purchased, and if we do not have that information, it is based on your current principal balance.
- This insurance provides no coverage for: loss or damage to personal property (such as personal contents of your home), loss from theft, injury to persons or property for which you may be liable, additional living expenses, or flood. Lender-Placed insurance does not provide guaranteed replacement cost coverage.
- The insurance may not be sufficient to fully restore or repair your property to its previous condition, and may **not** protect any equity that you may have built up on your property.
- This insurance may have other restrictions, exclusions and limitations specifically described in the coverage that we acquire.
- In the event of a claim, all payments will be due to BAC Home Loans, except amounts in excess of BAC Home Loans' interest which will be forwarded to you.

## WHAT YOU NEED TO DO

We encourage you to obtain your own preferred hazard (homeowner's) insurance coverage. In the event that you have your own policy:

Please write your loan number on all correspondence.

ARW4U1F7

RE:   CHRISTOPHE GUSTAFSON
      BAC Home Loans Loan #:  023858072

- You will receive a full refund of the recent Lender-Placed Insurance payment, provided that your insurance coverage dates back to the expiration date of your previous policy. Please allow 14 business days for any Lender-Placed Insurance refund to apply back to your loan.
- If there is a lapse, the charges for the lapse will be charged to your escrow account.
- If you do not have an escrow account, you are obligated by your loan documents to reimburse us for the insurance charges during the lapse period.

We offer several options to update your insurance:

- You can provide policy information on our website at **bankofamerica.com;**
- Your agent can provide policy information on our business partner's website at **homeloanbusiness.bankofamerica.com;**
- You may **fax** a copy of your homeowner's insurance declaration page with your loan number to:  (800) 293-8158;
- You may **call** the customer service automated system at (866) 265-3321; or,
- You can **mail** a copy of your homeowner's insurance declaration page with your loan number to the return address above.

Please note, if you live in a condominium complex insured under a master policy issued to your condominium association, please send to us, using the mailing instructions shown above, evidence of insurance from the association's master policy demonstrating proof of adequate hazard insurance coverage.

Once you have updated your insurance information through one of the options listed above, you may confirm our records have successfully been updated by visiting our website at **bankofamerica.com,** or viewing your monthly statement.

## ADDITIONAL INFORMATION

Additional information regarding the requirements of hazard insurance may also be found in your loan documents. Lender-Placed Hazard Insurance may be purchased from an affiliate of Bank of America, N.A.. Bank of America, N.A. may receive a commission or other compensation in connection with obtaining this coverage.

If your loan balance is below the amount of your last known hazard insurance coverage amount, then you may submit a written request to reduce the coverage to the amount of the outstanding principal balance of your loan. By doing so, however, you will be requesting coverage in an amount that may not be adequate to rebuild your home in the event of a large or total loss and may not cover your equity interest in your home. You should contact your insurance agent to review your insurance needs and to help you determine the coverage amount that is right for you. To request the lower, unpaid principal balance coverage amount, you will need to complete all items on the enclosed form, sign it, and then mail the form to the address shown on the form. We must receive the completed form within 35 days from the date posted on this letter or the coverage amount will remain as shown above.

## THANK YOU FOR YOUR BUSINESS

We look forward to resolving this matter quickly and appreciate the opportunity to service your loan.

**BAC HOME LOANS CUSTOMERS**
**HAZARD INSURANCE REQUIREMENTS**

In order to protect the property, BAC Home Loans requires that you maintain hazard insurance. At a minimum, your hazard insurance must be a fire and extended coverage policy. The insurance must not limit or exclude from coverage (in whole or in part) damage from windstorm, hurricane, hail damages, or any other perils that are a part of the extended coverage endorsement. Insurance coverage must be on a replacement cost basis, where available, and be in an amount at least equal to the lower of: 1) 100% of the insurable value of the improvements as established by the property insurer; or (2) the unpaid balance of the loan. Notwithstanding the foregoing, if the unpaid principal balance is less than 80% of the insurable value of the improvements, the coverage amount must be at least 80% of the insurable value. Rent loss coverage is required for non-owner-occupied properties. For coverage amounts of $252,700 or less, the maximum deductible is the higher of $1,000 or 1% of the policy's dwelling coverage. For coverage amounts greater than $252,700, the maximum deductible is the higher of $2,500 or 1% of the policy's dwelling coverage.

The insurance policy must be issued by an insurance company acceptable to BAC Home Loans and licensed, or otherwise authorized by law, to conduct business in the jurisdictions in which the property is located. Your policy must be written by an insurance company with either an A.M. Best Rating of "B" or an A.M. Best's Financial Performance Rating of "VI" or better. The named insured on the policy must be the same as the mortgagor/trustor/grantor on your security instrument, or current owner if there has been a loan assumption. The policy must include a Lender's Loss Payable Endorsement or standard mortgagee/loss payee clause naming BAC Home Loans Servicing, LP and its successors and assigns.

To help us maintain accurate records on your account, your loan number must be included on all policies, billings (if you have an escrow account), and correspondence with your insurer or insurance agent. You may provide us with any of the following: an original policy; a certified copy of an original policy; a certificate of insurance; a binder (only for coverage of less than $1,000,000) that complies with state law requirements; and for a non-escrowed loan, a paid receipt of premium paid for a 12-month policy term (6-month term in Florida only), or continuous coverage indicated in lieu of expiration date with 6 months prepaid.

Due to changes in federal or state laws or regulations, BAC Home Loans may modify its insurance requirements to include additional types or amounts of coverage. If BAC Home Loans makes a change, we will notify you so that you may purchase the required coverage.

If we do not receive proof of insurance, or a bill to enable us to pay your policy premium if you have an escrowed loan, BAC Home Loans may obtain insurance to protect the property at your expense. The cost of insurance we purchase to protect the property will become an additional obligation secured by your security instrument. The coverage we purchase will insure for damage to your dwelling, but not its contents. It will be different than your current policy, will in most cases be more expensive, may have higher deductibles, and will not protect you from risks typically included in a homeowners policy. For example, it will not cover loss, damage or theft to personal property; or injuries to persons or damage to property for which you may be liable. It also does not cover worker's compensation or damage due to flood or earthquake. Our lender-placed coverage may not be enough to fully replace or repair your property in the event of damage or destruction. This insurance may **not** protect any equity that you have built up on your property.

WE URGE YOU TO REPLACE ANY LENDER-PLACED INSURANCE WITH YOUR PREFERRED POLICY, WHICH WILL PROBABLY BE LESS EXPENSIVE FOR YOU AND PROVIDE BROADER PROTECTION. If BAC Home Loans receives a replacement policy that complies with our insurance requirements, we will cancel our lender-placed coverage effective the date that your preferred policy takes effect. If there is a lapse in coverage between your new preferred policy and the policy you or we had obtained before, you will be charged a prorated premium and state-imposed fee (if any) for the period that no borrower-placed coverage was in place. If you provide us with proof that you had adequate insurance on your property as of the date our lender-placed coverage was effective, (i.e., no lapse in coverage) and that you continue to have the insurance that you purchased yourself, you will not be charged any premium, costs, interest or other charges in connection with lender-placed insurance.

Lender-Placed Hazard Insurance may be purchased from an affiliate of Bank of America, N.A.. Bank of America, N.A. may receive a commission or other compensation in connection with obtaining this coverage.

**Bank of America** 

**Home Loans**

P.O. BOX 961206
FORT WORTH, TX  76161-0206

9046
023858072

Date: 02/10/2011

Control Number: B8699243

000275 - 002117
CHRISTOPHE GUSTAFSON
115 27TH AVE
EAST MOLINE, IL 61244-2656

RE:   Loan Number:        9046-023858072
      Property Address    519 14TH AVE
                          SILVIS IL  61282

Dear Christophe Gustafson:

The amount of lender-placed insurance coverage we obtained is based on the homeowners insurance coverage amount you last purchased or, if we did not have that information, then your outstanding principal loan balance at that time was used.  If your loan balance is below the amount of homeowners insurance coverage you last purchased, then you may reduce the lender-placed insurance coverage amount to the outstanding principal balance of your loan. By doing this, the coverage amount will be less than what could be provided using the amount of homeowners insurance coverage you last purchased.

    A.  Current Amount of Dwelling Coverage: $76,300.00

    B.  Optional Amount of Dwelling Coverage (based on outstanding principal balance): $47,946.00

**If you wish to lower the lender-placed insurance coverage amount to your loan balance (if your loan balance is less than the last known amount of homeowners insurance coverage), check the box below, sign this form and mail the entire form to the address shown in the top left corner of this letter.  You have up to 35 days from the date posted on this letter to mail your request or it shall be conclusively presumed that you have elected not to change the coverage amount.**

Upon receipt of your request, we will cancel the current lender-placed insurance coverage and reissue with a coverage amount equal to your outstanding principal loan balance at the time your last insurance policy lapsed.  We will then bill you the appropriate insurance charges for a one year term. If you request this coverage amount change, it will be effective as of the date your last insurance policy lapsed.

\*\* PLEASE NOTE, YOU MUST RETURN THIS ENTIRE LETTER
TO LOWER THE COVERAGE AMOUNT.

YOU ARE NOT OBLIGATED TO LOWER THE COVERAGE AMOUNT, AND
WE WILL NOT CHANGE THE COVERAGE AMOUNT UNLESS WE HEAR
FROM YOU.\*\*

_____  Yes, please lower the Coverage Amount to be equal to my outstanding principal loan balance of $47,946.00.  I am aware that by lowering the amount of coverage, the coverage amount will be less than what could be provided using the amount of homeowners insurance coverage I last purchased and may not be enough to fully replace or repair the property in the event of damage or destruction.

Signature: _____          Date: _____

AR80772

## NOTICE OF LENDER-PLACED INSURANCE

Residential Property Fire Insurance
Risk Based Protection

## BALBOA INSURANCE COMPANY

(A Stock Company)
Home Office
3349 Michelson Drive, Suite 200, Irvine, CA 92612-8893

Date: 02/10/2011

Control Number: B8699243

Master Policy Number: 4800-0100

Loan Number: 9046-0000-023858072

NAMED INSURED:
BAC HOME LOANS SERVICING, LP
P.O. BOX 961206
FORT WORTH, TX 76161-0206

BORROWER:
CHRISTOPHE GUSTAFSON
115 27TH AVE
EAST MOLINE, IL 61244-2656

COVERAGE PERIOD: From: 12/06/2010 Until: 12/06/2011, beginning and ending at 12:01 am Standard time at the DESCRIBED LOCATION.

| DESCRIBED LOCATION: | LIMIT OF LIABILITY FOR RESIDENTIAL PROPERTY: | |
|---|---|---|
| 519 14TH AVE | | |
| SILVIS IL 61282 | $76,300.00 | |
| DEDUCTIBLES: | $1,000.00 | Occupied |
| | $1,000.00 | Vacant |
| PREMIUM: Insurance premium: | $1,045.00 | |
| Total premium: | $1,045.00 | |

The NAMED INSURED has purchased insurance on the DESCRIBED LOCATION for the amount and premium indicated above.

The contract of insurance is only between the NAMED INSURED and Balboa Insurance Company. There is no contract of insurance between the BORROWER and Balboa Insurance Company. The insurance purchased is intended for the benefit and protection of the NAMED INSURED, insures against LOSS only to the dwelling and OTHER STRUCTURES on the DESCRIBED LOCATION, and may not sufficiently protect the BORROWER'S interest in the property. No coverage is provided for contents, personal effects, additional living expense, fair rental value or liability. NO COVERAGE IS PROVIDED FOR LOSS CAUSED BY EARTHQUAKE OR FLOOD or any other cause of loss that is excluded by the Residential Property Fire Insurance Form. The NAMED INSURED may cancel the insurance coverage at any time.

This NOTICE is for information purposes only. It does not amend, extend, or alter the insurance contained in the Residential Property Fire Insurance Form. Any coverage provided is subject to the terms, conditions, limitations and exclusions contained in the Residential Property Fire Insurance Form.

To report a claim, call: (800) 323-7466
For other inquiries, call: (866) 265-3321

01A09-MFNT0003-E0504      1

# Exhibit C



Print Page | Close Window

## Bank of America Completes Sale of Balboa Insurance Business to QBE

CHARLOTTE, N.C., Jun 01, 2011 (BUSINESS WIRE) -- Bank of America Corporation today announced that it has completed the sale of the lender-placed and voluntary property and casualty insurance assets and liabilities of Balboa Insurance Company and affiliated entities to QBE Insurance Group. The companies first announced the sale agreement in February.

The sale is consistent with Bank of America's strategy to focus on businesses that directly serve customers and clients around the world, while continuing to strengthen its balance sheet.

QBE has purchased substantially all of the insurance liabilities and certain other assets of the Balboa business in exchange for QBE's acquisition of an equivalent amount of cash and other assets through a reinsurance transaction with Balboa. The transaction includes long-term distribution agreements with Bank of America in connection with lender-placed insurance and real estate owned programs and certain other voluntary consumer insurance lines and associated services.

Balboa Insurance was acquired by the former Countrywide Financial Corporation in 1999. Bank of America acquired Countrywide in 2008.

Bank of America

Bank of America is one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk management products and services. The company provides unmatched convenience in the United States, serving approximately 58 million consumer and small business relationships with approximately 5,800 retail banking offices and approximately 18,000 ATMs and award-winning online banking with 30 million active users. Bank of America is among the world's leading wealth management companies and is a global leader in corporate and investment banking and trading across a broad range of asset classes, serving corporations, governments, institutions and individuals around the world. Bank of America offers industry-leading support to approximately 4 million small business owners through a suite of innovative, easy-to-use online products and services. The company serves clients through operations in more than 40 countries. Bank of America Corporation stock (NYSE: BAC) is a component of the Dow Jones Industrial Average and is listed on the New York Stock Exchange.

**www.bankofamerica.com**

SOURCE: Bank of America

Reporters May Contact:
Jerry Dubrowski, Bank of America, 1.980.388.2840
jerome.f.dubrowski@bankofamerica.com

# Exhibit D

<u>SETTLEMENT TERMS</u> (03/03/11)

The Remedies outlined below are intended to apply to loans secured by owner-occupied properties that serve as the primary residence of the borrower. References to Servicers shall include Servicers' agents, successors, and assignees. References to Third Parties shall include Servicer affiliates.

I.    **Foreclosure and Bankruptcy Information and Documentation**

These provisions apply to non-judicial foreclosure states to the maximum extent possible. In states where foreclosure affidavits are not required by law, Servicer shall provide borrowers with a sworn statement setting forth facts supporting Servicer's or holder's right to foreclose and containing the information required in paragraphs I.B.12 (account statement), I.C.1 and 2 (ownership certification), and II.B.4 (loss mitigation affidavit) herein. Servicer shall provide this statement to the borrower as part of the first notice of foreclosure. These provisions also apply to bankruptcy proceedings to the maximum extent possible, including proofs of claim and motions for relief from stay filed by or on behalf of Servicer. The terms "affidavit" and "sworn statement" shall apply to foreclosure affidavits, sworn statements in non-judicial foreclosure states, and affidavits and sworn statements filed in bankruptcy proceedings.

A.    <u>Standards for Affidavits and Sworn Statements in Foreclosure and Bankruptcy Proceedings</u>

1.    Affidavits and sworn statements shall set forth a detailed description of the basis of affiant's claimed personal knowledge of information contained in the affidavit or sworn statement, including sources of all information recited and a statement as to why the sources are accurate, complete and reliable.

2.    All affidavits and sworn statements shall be based on the affiant's review and personal knowledge of the accuracy and completeness of the assertions in the affidavit or sworn statement, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Affiants shall confirm that they have reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including the borrower's loan history and required ownership documentation, and that Servicer has investigated the borrower's complaints. If a document or part of a document is referred to in an affidavit or sworn statement, a sworn or certified copy of the document shall be attached to or served with the affidavit or sworn statement (if filed with a court, redacted to delete personally identifiable information consistent with applicable law, rules and court procedure).

1

3.    Separate affidavits or sworn statements shall be used where one affiant does not have requisite personal knowledge of all required information.

4.    Servicer shall have standards for qualifications, training, and supervision of employees and agents who prepare or execute affidavits and sworn statements. Employees shall sign a certification that he or she has received the training and Servicer shall certify in writing that the employee has completed the training and the subjects covered by the training. These standards and certifications, along with training materials, videotaped copies of standard training sessions, and related operational manuals, shall be made available to the Attorneys General, the CFPB, and their designated third-party monitors.

5.    Servicer shall review and approve template affidavits and sworn statements prepared by foreclosure counsel, bankruptcy counsel, and foreclosure trustees to ensure compliance with applicable law, rules, court procedure, and the terms of the Agreement with the States ("the Agreement").

6.    All affidavits and sworn statements shall accurately identify the affiant's employer and his or her position or title with the employer. If the affiant is executing the document on behalf of a party other than the affiant's employer, the affiant shall identify his or her authority to execute the affidavit or sworn statement.

7.    Affidavits and sworn statements, including their notarization, shall fully comply with all state law requirements.

8.    Affidavits and sworn statements shall not contain information that is false or unsubstantiated.

9.    Servicer shall maintain adequate staffing to ensure reasonable time to prepare, verify, and execute affidavits and sworn statements.

10.    Servicer shall not use incentives that encourage robo-signing, undue haste or lack of due diligence by employees or third-party agents or trustees.

11.    Affiants shall be individuals, not entities, and affidavits and sworn statements shall be signed by hand signature of the affiant. Signature stamps and any other means of electronic or mechanical signature are prohibited.

12.    When using a form affidavit or sworn statement, affiants shall not leave blanks or incomplete statements in the affidavit or sworn statement.

13. Affiants shall date their signatures on affidavits or sworn statements.

14. Notaries utilized by Servicer and, if applicable, foreclosure trustees, shall maintain a log or other written record that identifies all notarizations executed by each notary.

15. In any pending judicial foreclosure proceeding (prior to confirmation of sale) or bankruptcy court proceeding, Servicer shall notify the borrower in writing if Servicer has knowledge that any filing or document presented in court, including any affidavit, sworn statement, or proof of claim, contained inaccurate information, or that state laws or regulations may have been violated during the preparation, signing, notarization or filing of the document. Servicer shall wait 30 days after notifying borrower before proceeding.

16. Servicer shall be required, at Servicer's expense, to take appropriate action, consistent with state law and court procedure, to correct robo-signed or other improper filings or documents presented in a judicial foreclosure proceeding or bankruptcy court proceeding, including affidavits, sworn statements and proofs of claim, by withdrawing and, if appropriate, resubmitting such filings or documents, or, as to foreclosure cases, dismissing the cases where such affidavits were submitted.

B. Requirements for Accuracy and Verification of Borrower's Account Information

1. Servicer shall maintain procedures to ensure accuracy and timely updating of borrower's account information, including posting of payments and imposition of fees. Servicer shall also maintain adequate documentation, including maintenance of the original loan files.

2. For any loan on which interest is calculated based on a daily accrual or daily interest method, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, and payments by or on behalf of a borrower in bankruptcy to cure any pre-petition default and to maintain payments while the case is pending, as well as non-conforming payments. Payments shall be posted no more than two business days after receipt and credited as of the date received to borrower's account. Each monthly payment shall be applied first to interest and then to principal, provided that where mortgage insurance premiums, taxes and insurance or other payments must, statutorily or contractually, be paid prior to interest and principal, such application shall continue.

3

3.    For all other loans, Servicer shall promptly accept and apply all borrower payments, including cure payments (where authorized by law or contract), trial modification payments, and payments by or on behalf of a borrower in bankruptcy to cure any pre-petition default and to maintain payments while the case is pending, as well as non-conforming payments to the extent provided in the next paragraph.  Payments shall be posted no more than two business days after receipt and credited as of the date received to borrower's account.  Each monthly payment shall be applied as of the scheduled due date and will be applied first to interest and then to principal, provided that where mortgage insurance premiums, taxes and insurance or other payments must, statutorily or contractually, be paid prior to interest and principal, such application shall continue.

4.    Except to the extent prohibited by existing agreements, Servicer shall accept and apply non-conforming payments when the payment, whether on its own or when combined with a payment from another source, comes within $50.00 of the scheduled principal and interest amount.

5.    For payments that are not within $50.00 of the scheduled principal and interest payment amount, Servicer may post such payment to a suspense or unapplied funds account, provided that Servicer (1) discloses to the borrower the existence of and any activity in the suspense or unapplied funds account; (2) credits the borrower's account with a full payment of principal and interest as of the date that the funds in the suspense or unapplied funds account are sufficient to cover such full payment; and (3) applies payments from the suspense or unapplied funds account as outlined above.  Servicer shall not take funds from suspense or unapplied funds accounts to pay fees until all unpaid contractual interest, principal, and escrow amounts are paid and brought current.

6.    Notwithstanding the provisions above, Servicer shall not be required to accept payments which are insufficient to pay the full balance due after the borrower has been provided written notice that the contract has been declared in default and the remaining payments due under the contract have been accelerated.

7.    Servicer shall provide adequate information on monthly billing and other account statements to show in clear and conspicuous language:

a.   total amount due;

b.   allocation of payments, including to any suspense or unapplied funds account;

4

    c.  unpaid principal;

    d.  itemization of any fees and charges;

    e.  current escrow balance;

    f.  protective advances, *e.g.*, taxes and force placed insurance;

    g.  reasons for any payment changes, including an interest rate or escrow account adjustment, no later than 21 days before the new amount is due; and

    h.  for borrowers in bankruptcy, continuing to provide the annual escrow statement, including showing any escrow shortage or deficiency.

8.    With respect to borrowers in bankruptcy, Servicer shall:

    a.  Document proofs of claim by attaching:
      i.  a copy of the loan instruments;
      ii.  a detailed itemization of all amounts claimed, including any amounts required to cure a default;
      iii.  the attachment prescribed by the official bankruptcy form; and
      iv.  if appropriate, an escrow statement as of the petition date.

    b.  Transmit notices to  borrowers in bankruptcy and bankruptcy trustees in accordance with the provisions of paragraph 12 below; and

9.    Collect only those charges, fees, and claims incurred or assessed during a borrower's bankruptcy case that are timely allowed by the bankruptcy court or noticed to the borrower during the bankruptcy case.Servicer shall adopt enhanced billing dispute procedures, including:

    a.  Establishing readily available methods for customers to lodge complaints, resolve disputes, and pose questions, such as by providing toll-free numbers and accepting disputes by email;

    b.  Providing adequate and competent staff to answer and respond to consumer disputes promptly, and shortening time lines for responses from those mandated by RESPA;

    c.  Establishing an ombudsman's office for dispute escalation; and

    d.  Tracking the resolution of complaints.

10.   Servicer shall take appropriate action to promptly remediate any
      inaccuracies in borrowers' account information, including:

   a.   Correcting the account information;

   b.   Compensating injured borrowers; and

   c.   Correcting inaccurate reports to consumer credit reporting agencies.

11.   Servicer's systems to record account information shall be audited for
      accuracy and completeness by Servicer's independent auditor with results
      available to the Attorneys General and CFPB upon request.  Service
      Organizations Controls Reports (formerly SAS 70) and all Reg AB
      compliance statements and attestations shall be provided to the Attorneys
      General and CFPB upon request.

12.   No later than 45 days prior to the filing of a foreclosure pleading,
      issuance of a notice of trustee's sale (whether in an acceleration notice,
      default notice, or by separate notice), or motion for relief from stay in a
      bankruptcy proceeding, Servicer shall provide borrowers with an itemized,
      plain language account summary identifying payments made, period of
      delinquency, late fees, and advances assessed to a borrower's account for
      at least the previous 36 months, along with a statement of the total amount
      needed to reinstate or bring the account current.  Any fee assessed or
      incurred more than 45 days prior to the filing of a foreclosure pleading or
      issuance of a notice of trustee's sale or a motion for relief from stay in a
      bankruptcy proceeding but not listed on this account summary shall be
      deemed to be waived and shall not be claimed in a foreclosure, bankruptcy
      proceeding, or any subsequent collection action, or submitted for credit
      reporting purposes.

C.   Documentation of Note, Holder Status and Chain of Assignment

   1.   Servicer shall set forth in a pleading, motion in a bankruptcy proceeding
        for relief from stay, or affidavit the basis for asserting that the foreclosing
        party has the right to foreclose.  Servicer shall attach a copy of the note
        with all required endorsements.  If no court process is required, Servicer
        shall set forth this information in a separate certification to be provided to
        the borrower with the notice of foreclosure, along with the note with all
        required endorsements.

   2.   In the same manner as in the preceding paragraph, Servicer shall also
        identify the holder, custodian and location of the original note, mortgage,
        and any interim assignments and/or allonges.  Servicer shall identify all

6

custodians or recording systems used to identify the holder of the note and assignments of the mortgage or deed of trust. Servicer shall attach documentation of all assignments of mortgage (if filed with a court, redacted to delete personally identifiable information consistent with applicable law, rules and court procedure), with all employment affiliation of the parties executing such assignments clearly identified. The requirements of this paragraph shall also apply to proofs of claim filed in a bankruptcy proceeding.

3. If the original note or any interim assignment or allonge is lost or otherwise unavailable, Servicer shall comply with applicable law in any attempt to establish ownership of the note and the right to enforcement. In addition, Servicer shall recite the good faith efforts it has made to obtain or locate the note or interim assignment(s) or allonge(s).

4. Servicer shall be prohibited from intentionally destroying or disposing of original notes or other like documents.

5. If requested by a borrower at any time, Servicer shall identify the trust or other entity in which the borrower's loan is held, and provide contact information for such entity.

D. Mortgage Electronic Registration Systems (MERS)

Issues relating to the use and performance of MERS are reserved for further discussion.

E. Quality Assurance Systems/Audits

1. Servicer shall conduct regular audits of a statistically valid sample of documents prepared by staff and agents in furtherance of foreclosure and in bankruptcy proceedings to ensure that the documents and their preparation comply with the loan instruments, prevailing law and the Agreement. The audit reviews shall also verify the accuracy of each factual allegation in each affidavit or sworn statement, account summary described in paragraph I.B.12, ownership certification described in paragraph I.C.1, loss mitigation affidavit described in paragraph II.B.4, adverse action notice described in paragraph II.D.3, and other pleading, filing or document, by reviewing the underlying documentation/information. Servicer shall take appropriate remedial steps if any deficiencies are identified, including remediation in individual cases, revision of procedures, retraining, and disciplinary action.

2.   Servicer shall adopt policies and processes to oversee and manage foreclosure firms, law firms, foreclosure trustees, and other agents, independent contractors, entities and third parties (including subsidiaries and affiliates) that provide foreclosure or bankruptcy processing services ("Third-Party Providers"), including:

a.   Servicer shall perform appropriate due diligence of Third-Party Providers' qualifications, expertise, capacity, complaints, information systems, quality assurance plans, and financial viability.  Servicer shall ensure that attorneys are licensed to practice in the relevant jurisdiction, have the experience and competence necessary to perform the services requested, and that their services comply with applicable rules and regulations (including prohibitions on fee splitting);

b.   Servicer shall amend agreements or engagement letters with Third-Party Providers to require them to comply with their contractual obligations to Servicer, Servicer's policies and procedures, the loan instruments, the Agreement, and local laws and rules;

c.   Servicer shall conduct regular reviews of a sample of the foreclosure and bankruptcy documents prepared by each foreclosure firm, law firm, foreclosure trustee and other Third-Party Providers it uses to ensure compliance.  Servicer shall take appropriate remedial steps if any problems are identified through this review or otherwise, including terminating its relationship with the firm or trustee;

d.   Servicer shall track any instance where an adversary requests the imposition of sanctions against a law firm, foreclosure firm, trustee or other Third-Party Provider, or where the court imposes such sanctions, and shall take appropriate action, including termination of its relationship with any Third-Party Provider that has been sanctioned by a court on multiple occasions;

e.   Servicer shall adopt standards for documentation of Third-Party Providers' fees and charges;

f.   Servicer shall adopt processes for reviewing customer complaints about Third-Party Providers; and

g.   Servicer shall adopt and provide to Third-Party Providers escalation procedures to allow attorneys and other Third Party Providers to communicate directly with Servicer.

8

3.     The quality assurance steps set forth above shall be conducted by a division of Servicer that is separate and independent of the division(s) that prepares foreclosure or bankruptcy affidavits, sworn statements, or other foreclosure or bankruptcy documents, subject to review by an independent third party.

4.     Servicer shall regularly review and assess the adequacy of internal controls and procedures, and implement appropriate procedures to address deficiencies.

5.     Servicer shall provide the Attorneys General and CFPB with confidential quarterly reports describing audits conducted, results, and any remedial actions taken.

## II.     Loss Mitigation Requirements

These requirements are intended to apply to both government-sponsored and proprietary loss mitigation programs.

### A.     Loss Mitigation Duty

1.     Servicer shall have an affirmative duty to thoroughly evaluate borrowers for all available loss mitigation options prior to foreclosure referral. Servicer shall also have an affirmative duty to promptly offer and provide appropriate loss mitigation options to all eligible borrowers, including borrowers in bankruptcy, and to assist borrowers in the preparation of loss mitigation applications.

2.     Servicer shall offer and facilitate loan modifications rather than initiate foreclosure when such loan modifications result in a greater net present value (NPV) than foreclosure.  The NPV formula used by Servicer shall be made available to CFPB upon request.

3.     If a borrower requests a modification and Servicer believes that a pooling and servicing agreement (PSA) prohibits modification, Servicer shall nevertheless perform the appropriate NPV test.  If the NPV test is positive, Servicer shall send the NPV test results to the trustee or any other parties authorized under the terms of the PSA in order to obtain the necessary consent(s) allowing Servicer to offer the modification.

4.     For all borrowers enrolled in a trial period plan under prior HAMP guidelines (where borrowers were not pre-qualified) and who made all required trial period payments, but were later denied a permanent modification, Servicer shall suspend any foreclosure-related activity, including the filing of a motion for relief from stay in a bankruptcy

proceeding, and re-evaluate such borrowers for a HAMP or proprietary loan modification using current financial information.

5.  All borrowers enrolled in a trial period plan under current HAMP guidelines or similar proprietary modification programs and who have made three timely trial period payments shall immediately be converted by Servicer to a permanent modification under the applicable program guidelines, absent evidence of fraud in the modification application. The effective conversion date of the permanent modification shall be the first month following receipt of the third trial period payment. For borrowers in bankruptcy who subsequently enter into a trial period plan, Servicer shall work with borrower to obtain any required court or trustee approvals.

B.  Dual Track Prohibited

1.  Servicer shall not refer or initiate foreclosure, file a motion for relief from stay in a bankruptcy proceeding, object to confirmation of the borrower's chapter 13 bankruptcy plan, or move to dismiss the borrower's bankruptcy case while a good faith HAMP or proprietary trial modification evaluation is in process or the borrower's application for any loss mitigation program is pending. Servicer shall not make a referral to foreclosure or file a motion for relief from stay in a bankruptcy proceeding until borrower/applicant has been sent a written denial by registered mail of all loss mitigation programs for which the borrower is potentially eligible.

2.  Where borrower submits a substantially completed application for loss mitigation relief after foreclosure has been initiated, Servicer shall not schedule or conduct a sale, obtain a judgment, file a motion from stay in a bankruptcy proceeding, object to confirmation of the borrower's chapter 13 bankruptcy plan, or move to dismiss the borrower's bankruptcy case until Servicer has reviewed and made a decision on the request, and has communicated the result to the borrower in writing. Servicer shall provide written notice of any required documents that are missing from the borrower's written submission within 10 business days of receiving the submission. The notice shall list all the specific documents that are missing and describe any deficiencies in the documents included in the borrower's initial submission.

3.  If a foreclosure or trustee's sale is continued (rather than canceled) to provide time to evaluate loss mitigation options, Servicer shall immediately upon each continuance notify borrower in writing of the new date of sale.

4.  In judicial foreclosure states or where any foreclosure filing is required, Servicer shall submit an affidavit summarizing all loss mitigation efforts

10

offered and undertaken prior to the foreclosure filing and the results of such efforts, including the basis for denying a request for a loan modification. In non-judicial foreclosure states, Servicer shall send such an affidavit or sworn statement to the borrower prior to recording notice of the foreclosure or trustee's sale, or, if the initial notice was previously recorded, at least 30 days prior to holding a foreclosure or trustee's sale. If no loss mitigation efforts were offered or if there was no communication with the borrower, Servicer shall state the reasons for such lack of loss mitigation or contact with the borrower.

5.   Servicer shall ensure timely and accurate communication of loss mitigation status and changes in status to its foreclosure attorneys, bankruptcy attorneys and foreclosure trustees and, where applicable, to court-mandated mediators.

C.   Single Point of Contact (SPOC) and Single Electronic Record (SER)

1.   Servicer shall provide borrower with an email address and direct toll-free telephone number with a voicemail box for a single point of contact (SPOC), a designated employee(s) with primary responsibility to handle all loss mitigation communications with such borrower. Servicer shall promptly provide updated contact information to the borrower if the designated employee is reassigned, no longer employed by Servicer, or otherwise not able to act as the primary point of contact.

2.   Servicer shall allow borrowers to speak with a supervisory or management level employee if a borrower makes that request to his/her SPOC.

3.   Servicer shall designate a specific management level employee to be the primary contact for the Attorneys General, state financial regulators, and CFPB for communication regarding complaints and inquiries from individual borrowers who are in default and/or have applied for loan modifications, including borrowers in bankruptcy. Servicer shall provide a substantive written response to all such inquiries within 10 business days. Servicer shall provide loan file information for such borrowers if requested by an attorney general or state financial regulator.

4.   Servicer shall create a Single Electronic Record (SER) for each account, the contents of which shall be accessible throughout the servicer, including to the SPOC, all loss mitigation staff, all foreclosure staff, and all bankruptcy staff.

11

D.    Loss Mitigation Communications with Borrowers

1.    Servicer shall commence outreach efforts to communicate loss mitigation
options to all delinquent borrowers beginning on timelines that are in
accordance with HAMP borrower solicitation guidelines, Directive 10-2,
regardless of whether the borrower is eligible for a HAMP modification.
Servicer shall provide borrowers with notices that include contact
information for national or state foreclosure assistance hotlines and state
housing counseling resources, as appropriate.  The use of recorded auto-
dialed messages alone in loss mitigation communications with borrowers
shall not be sufficient in those instances in which it fails to result in
contact between the borrower and one of Servicer's loss mitigation
specialists.

2.    Servicer shall disclose and provide accurate information to borrowers
relating to the qualification process and eligibility factors for loss
mitigation programs.

3.    When a trial or permanent loan modification is denied, Servicer shall send
a written adverse action notice to the borrower identifying specific reasons
for denial, the calculations made and factual information used, including,
but not limited to, disclosure of property value and discount rate.  The
notice shall inform the borrower that he or she has 30 days from the date
of declination to provide evidence that the NPV or eligibility calculation
was in error.  If the internal review designated in Section II.H below has
not occurred, the notice shall also state that the denial will be reviewed
before initiation of foreclosure or continuation of any foreclosure activity.
No foreclosure sale or other foreclosure activity, including the filing of a
motion for relief from stay in a bankruptcy proceeding, an objection to
confirmation of the borrower's chapter 13 bankruptcy plan, or a motion to
dismiss the borrower's bankruptcy case shall occur prior to expiration of
this 30 day period or while the internal review is pending.  If Servicer is
required to request approval from investors for a loan modification, and
such approval is not provided within the required timeframe, Servicer
shall notify the borrower in writing within the required timeframe that a
request for approval has been submitted to the investor and provide the
name of the relevant investor.  If the modification is denied because
disallowed by investor, Servicer shall disclose the name of the investor,
state reasons for investor denial, and cite to and provide documentation
showing investor denial, including a copy of the limiting language in the
PSA and, if requested, electronic access to a complete and unaltered copy
of the PSA.

12

4.    After the review, Servicer shall send a final denial notice to the borrower that shall explain all available alternative loss mitigation options such as short sale, deed in lieu, and cash for keys. The notice shall also explain when foreclosure proceedings, or the filing of a motion for relief from stay in a bankruptcy proceeding, will be initiated or resumed and the new date of sale if the sale has been rescheduled. The new sale date shall not be scheduled earlier than 30 days from the final denial notice.

5.    Servicer's communications with borrowers shall include a duty to communicate with the borrower's authorized representatives, including housing counselors and representatives from state attorneys general and financial regulatory agencies acting upon a complaint filed by the borrower.

6.    Servicer shall cease all collection efforts, including the filing or prosecution of a motion for relief from stay in a bankruptcy proceeding, an objection to confirmation of the borrower's chapter 13 bankruptcy plan, or a motion to dismiss the borrower's bankruptcy case while the borrower is making timely payments under a trial loan modification or has a pending trial or permanent loan modification application.

7.    Servicer shall extend a trial loan modification period as necessary to accommodate delays in obtaining bankruptcy court approvals or receiving a full remittance of the borrower's trial period payments when they are made to a bankruptcy trustee. In the event of a trial period extension, the borrower in bankruptcy shall make a trial period payment for each month of the trial period including any extension month.

8.    When a borrower in an active Chapter 13 bankruptcy is in a trial period plan and the borrower has made post-petition payments on the first lien mortgage in the amount required by the trial period plan, Servicer shall not object to confirmation of a borrower's Chapter 13 plan, move for relief from the automatic bankruptcy stay, or move for dismissal of the Chapter 13 case on the basis that the borrower paid only the amounts due under the trial period plan, as opposed to the non-modified mortgage payments.

E.    Protections for Military Personnel

1.    Servicer shall comply with all applicable provisions of the Servicemembers Civil Relief Act (SCRA), 50 U.S.C. Appx. § 501 *et seq.*, and any applicable state law offering protections to servicemembers, and shall engage an independent consultant to conduct an independent review of a sample of foreclosure actions to determine whether the foreclosures were in compliance with the SCRA. Servicer shall provide the results of

13

that review and supporting information to the Attorney General of the United States and shall remediate all direct or indirect financial injury to borrowers caused by any such violations.

2. Servicer shall designate special employees who have been trained about the protections in the SCRA to act as points of contact for borrowers who are in military service.

3. Servicer shall determine whether the secured property is owned by a servicemember covered under SCRA, including through use of the Defense Manpower Data Center (DMDC), before initiating foreclosure.

4. Whenever Servicer has reason to believe that the secured property is owned by a servicemember covered under SCRA, either as the result of the required DMDC search or other indicia of military service, Servicer shall inform the borrower that the borrower may be entitled to certain protections under the SCRA regarding the borrower's interest rate and foreclosure.

5. Whenever Servicer has reason to believe that the secured property is owned by a servicemember either as the result of the required DMDC search or other indicia of military service, Servicer shall refer the borrower to Military OneSource, Armed Forces Legal Assistance, a HUD-certified housing counselor, or other entity known to provide appropriate assistance to military personnel.

F. Development of Comprehensive Loan Portals

1. Direct to Borrower Loan Portal: Servicer shall develop or contract with a third-party vendor to implement loan servicing technology to enhance tracking of, and to provide a direct borrower link to, loss mitigation information. This portal system shall:

   a. Operate in real time;

   b. Allow borrowers to submit documents electronically;

   c. Accept and confirm receipt of documents;

   d. Provide information and eligibility factors for proprietary loss mitigation programs; and

   e. Operate at no cost to the borrower.

14

2.  Housing Counselor Loan Portal:  Servicer shall cooperate in the development, funding and implementation of a neutral, nationwide loan portal system such as Hope LoanPort to enhance communications with housing counselors.  This portal system shall:

    a.  Be the primary method of submission of borrower documents by housing counselors;

    b.  Automate and significantly decrease loan modification decision time frames for HAMP applications;

    c.  Provide an opportunity for standardization and streamlining of proprietary modifications, including decreased decision time frames;

    d.  Operate in real time;

    e.  Accept and confirm receipt of documents;

    f.  Provide information and eligibility factors for proprietary loss mitigation programs; and

    g.  Operate at no cost to the housing counselor.

3.  Servicer shall update the status of each pending loan modification on these portals at least every 10 days.

4.  Servicer shall respond promptly to escalation requests made through these portals.

G.  Loss Mitigation Timelines

1.  Servicer shall provide written acknowledgement of the receipt of documentation submitted by the borrower in connection with a loan modification application within 10 days.  In its initial acknowledgment, Servicer shall briefly describe the loan modification process and identify deadlines and expiration dates for submitted documents.  If any additional documents are required, Servicer shall identify such documents and notify the borrower within 30 days of the receipt of the initial application documentation.

2.  Continued applicability of borrower financial information: for all proprietary loan modification programs, Servicer shall allow properly

15

submitted borrower financials to be used for 120 days, unless there is a material change in circumstances.

3. Servicer shall make the initial loan modification decision within 30 days of receiving all required documentation from the borrower.

4. If a HAMP modification is denied and the review process has been completed, Servicer shall evaluate and determine the borrower's eligibility for a proprietary loan modification within 15 days of the HAMP denial.

5. Servicer shall notify borrowers of the denial of any loss mitigation request within ten business days of the denial decision. The notification shall be in the form of the adverse action notice required in paragraph II.D.3 above.

H.   Independent Review of Loss Mitigation Denials

1. Servicer shall implement an automatic internal review process to review all loss mitigation denials, which shall include review by an ombudsman or review panel that is independent of the group that conducted the loss mitigation evaluation and that has authority to obtain files with servicing notes and overrule Servicer's decision.

2. Borrowers shall have the opportunity to provide evidence that the NPV or eligibility calculation was in error. If a borrower disagrees with the property value used by Servicer in the NPV test, the borrower can request that a full appraisal be conducted of the property by an independent licensed appraiser consistent with HAMP directive 10-15 and that such value be used in the NPV calculation.

3. Initiation or advancement of foreclosure shall await outcome of the internal review process.

4. Servicer shall promptly make available account history notes to the borrower upon request.

5. The internal review process shall be subject to monitoring by the Attorneys General and CFPB.

I.   Support of State-Based Foreclosure Prevention Hotlines

1. Servicer shall support and assist in the development and funding of state efforts to create and maintain consumer hotlines that would provide information on foreclosure relief options and/or link borrowers with housing counselors.

16

J.   Consideration of FHA Short Refinance Program

    1.   Where warranted based on facts and circumstances, including borrower eligibility, Servicer shall utilize this program and apply it to agency and non-agency loans.

K.   General Loss Mitigation Requirements

    1.   Servicer shall maintain adequate staffing and systems for tracking borrower documents and information that are relevant to foreclosure, loss mitigation, bankruptcy, and other servicer operations.

    2.   Servicer shall maintain adequate staffing and caseload limits for employees responsible for handling foreclosure, loss mitigation, bankruptcy, and related communications with borrowers and housing counselors.  (Specific standards reserved for further discussion.)

    3.   Servicer shall set reasonable minimum experience, educational and training requirements for loan modification staff.

    4.   Servicer shall document electronically each action taken on a foreclosure, loan modification, bankruptcy, or other servicing file, including all communications with the borrower and other parties.

    5.   Servicer shall adopt incentives and compensation plans that encourage appropriate loss mitigation over foreclosure.

    6.   Servicer shall not make inaccurate payment delinquency reports to credit reporting agencies when the borrower is making timely reduced payments pursuant to a trial or other loan modification agreement.  Servicer shall provide the borrower, prior to entering into a trial loan modification, with clear and conspicuous written information about any adverse credit reporting consequences that may result from the borrower making reduced payments during the trial period.

    7.   Servicer shall provide the borrower with a copy of a fully executed loan modification agreement no later than 10 days from receipt of an executed copy submitted by the borrower.

    8.   Servicer's employees shall not instruct, advise or recommend that borrowers go into default in order to qualify for loss mitigation relief.

    9.   Servicer shall not discourage borrowers from working or communicating with legitimate non-profit housing counseling services.

17

L.     Proprietary Loan Modifications

     1.     Transparency:  Servicer shall disclose qualification processes and eligibility factors for all proprietary loan modifications.

     2.     Servicer shall standardize inputs for NPV analysis at least to the extent required by HAMP.

     3.     Servicer shall design proprietary loan modifications that are sustainable. Servicer shall offer rate reductions for at least five years and any rate adjustments after the initial five year period shall not exceed comparable HAMP rate adjustment standards.  Servicer shall not impose any balloon payment requirements until the end of the loan payment period.

     4.     Servicer shall not charge any application or processing fees for proprietary loan modifications.

M.     Principal Reduction Loan Modifications

Note:  the provisions in this subsection are in addition to the loan modification initiative that is referenced in Section VI and reserved for further discussion.

     1.     Servicer shall consider and apply principal reductions in appropriate circumstances to provide for sustainable modifications.

     2.     Performance-based reductions:  In lieu of forbearance of principal, Servicer shall implement conditional forgiveness of principal based on the borrower's performance under the loan modification.  Standard shall be that one-third of forborne amount is forgiven for each successive year that the borrower complies with loan modification terms over a three year period.

     3.     If principal is forborne, Servicer shall not charge servicing fees on the forborne amount.

     4.     Servicer shall evaluate all delinquent mortgages with a loan to value ratio (LTV) of greater than 100%, or a combined LTV (CLTV) of greater than 115% using both a standard modification waterfall and a waterfall that includes principal reduction as the required first or second step in the waterfall.  Where the NPV test result is better using the principal reduction waterfall than that realized using the standard modification waterfall, Servicer shall offer the borrower a modification that includes a principal reduction.

18

5. The parties will discuss and agree upon the terms of Servicer's principal reduction modification waterfall as well as the values used by Servicer in its NPV test for the principal reduction modification waterfall, including the redefault rate.

6. Servicer shall consider implementation of a special loan modification process for bankruptcy cases where the borrower (a) is considered for voluntary principal reduction to fair market value of property while other unsecured debt is discharged; or (b) as part of a Chapter 13 plan, the interest on the borrower's first lien is reduced to zero for five years and then reamortized at a market rate for 25 years at the conclusion of the five year payment plan.

N. Second Lien Relief

1. Servicer's loan modification programs, including principal reductions, shall cover second liens so that second liens are modified at least proportionately to the first lien or extinguished at the time of the offer of the permanent loan modification.

O. Initiatives to Assist Borrowers in Submission of Documents

1. Servicer shall consider partnering with national chain retailers such as FedEx Kinko's, Staples, Office Depot, and Wal-Mart, or through use of bank branches affiliated with Servicer, to allow borrowers to copy, fax, scan and mail or email documents to Servicer free of charge.

P. Consideration of Borrower's Ability to Pay and Sustainability

1. Servicer shall review the borrower's total debt situation (*i.e.*, back-end DTI) when considering a loan modification application.

Q. Short Sales

1. Servicer shall consider appropriate monetary incentives to underwater borrowers to facilitate short sale options,

2. Servicer shall develop a cooperative short sale process which allows the borrower to engage with Servicer and obtain a short sale evaluation prior to putting home on the market.

3. Servicer shall provide written confirmation of the borrower's submission of the first document in support of any request for a short sale within 30

19

days of receipt. The confirmation shall include basic information about the short sale process and Servicer's requirements, and shall state clearly and conspicuously whether Servicer or any investor will demand a deficiency and the approximate amount of that deficiency.

4.   Servicer shall provide written notice of any required documents that are missing from the borrower's written short sale submission within 10 business days of receiving the submission. The notice shall list all of the specific documents that are missing and describe any deficiencies in, and required updates to, the documents included in the borrower's initial submission.

5.   Servicer shall make a decision on any short sale request and provide written notice of approval or denial of the short sale to the borrower within 30 days following receipt of all required information. If the short sale request is denied, Servicer shall provide reasons for the denial in the written notice.

6.   If Servicer is required to request approval from investors for a short sale, and such approval is not provided within the required timeframe, Servicer shall notify the borrower in writing within the required timeframe that a request for approval has been submitted to the investor and provide the name of the relevant investor.

7.   Servicer shall waive deficiencies from short sales unless contractually prohibited from doing so and shall not require monetary contributions from borrowers as a condition of approving a short sale. If the deficiency cannot be waived, Servicer shall clearly and conspicuously disclose to the borrower that the borrower may be liable for the deficiency, the amount of the deficiency, and the contractual provision that prevents waiver. Servicer shall ensure that the investor has waived all rights to a deficiency judgment.

R.   <u>Other Loss Mitigation-Related Relief</u>

1.   Ordinary Transfer of Servicing to Successor Servicer or Subservicer

a.   At time of transfer, Servicer shall inform successor servicer (including a subservicer) whether a loan mod is pending.

b.   Servicer shall ensure, by contract or otherwise, that successor servicer shall accept and continue processing prior loan modification requests.

20

      c.     Servicer shall ensure, by contract or otherwise, that successor servicer shall honor trial and permanent loan modification agreements entered into by prior servicer.

      d.     Any successor servicer shall agree to the loss mitigation requirements of this Agreement.

2.     Transfer of Default Servicing

      a.     Servicer shall consider referral on a pilot basis of loans 60 plus days delinquent to an independent, performance-based special servicer or subservicer.

      b.     Any special servicer shall agree to the loss mitigation requirements of this Agreement and have the ability to make independent loss mitigation decisions.

3.     Investors' access to loss mitigation information:  Servicer shall honor the contractual rights of investors to obtain servicing and loss mitigation performance information and to obtain access to loan files.

4.     Servicer Conflict of Interest in Residual Interest in the MBS Trust

Servicer shall disclose to investors and the third-party monitor on a quarterly basis any private-label mortgage-backed security (MBS) transaction in which Servicer, its parent company or an affiliate holds an equity interest or other investment position in the certificates, notes or bonds issued by the trust.  Investments held in a "street name" on behalf of unaffiliated entities are exempt from such reporting.

## III.   Restrictions on Servicing Fees

A.     <u>General Requirements</u>

1.     All default and foreclosure-related service fees, including third-party fees, assessed on the borrower by Servicer shall be bona fide, reasonable in amount, and disclosed in detail to the borrower as provided in paragraphs I.B.12 and III.B.1.

2.     Servicer shall not assess any default, foreclosure-related or bankruptcy-related fees while a completed loan modification application is under consideration or being performed as a trial modification.

3.     Servicer shall not impose its own mark-ups on any third-party fees.

B.    Specific Fee Provisions

1.    Schedule of Fees.  Servicer shall maintain and keep current a schedule of standard or common fees, such as nonsufficient fund fees.  Servicer shall make its schedule available on its website and to the borrower or borrower's authorized representative upon request. The schedule shall identify each fee, provide a plain language explanation of the fee, and state the amount of the fee or range of amounts or, if there is no standard fee, how the fee is calculated or determined.

2.    Authorized Fees.  Servicer shall collect a fee only if the fee is for reasonable and necessary services actually rendered and one of the following conditions is met:  (1) the fee is expressly authorized and clearly and conspicuously disclosed by the loan instruments and not prohibited by law; (2) the fee is expressly permitted by law and not prohibited by the loan instruments; or (3) the fee is not prohibited by law or the loan instruments and is a reasonable fee for a specific service requested by the borrower that is assessed only after clear and conspicuous disclosure of the fee is provided to the borrower and the borrower expressly consents to pay the fee in exchange for the services.

3.    Attorneys' Fees.  In addition to the limitations in paragraph III.B.2 above, attorneys' fees charged in connection with a foreclosure action shall only be for work actually performed and shall not exceed reasonable and customary fees for such work.  In the event a foreclosure action is terminated prior to the final judgment and/or sale for a loss mitigation option, a reinstatement, or payment in full, the borrower shall be liable only for reasonable and customary fees for work actually performed.

4.    Late Fees.

      a.    No pyramiding of late fees:  Servicer shall not impose any late fee or delinquency charge when the only delinquency is attributable to late fees or delinquency charges assessed on an earlier payment, and the payment is otherwise a full payment for the applicable period and is paid on or before its due date or within any applicable grace period.  For purposes of this provision, and solely to determine whether a late fee may be assessed, Servicer shall apply payments first to current installments, then to delinquent installments and then to delinquency and other charges.

      b.    Servicer shall not assess or attempt to collect late fees (1) based on an amount greater than the past due amount; (2) collected from the

22

escrow account or from escrow surplus without the approval of the borrower; or (3) deducted from any regular payment. Servicer shall not impose late charges more than once with respect to a single delinquent installment.

c.   Servicer shall not impose late fees when the borrower makes timely trial modification payments calculated by Servicer, even though these trial modification amounts are less than the full payment amount under the terms of the loan.

C.   Third-Party Fees

1.   Servicer shall limit the amounts and frequency of third-party fees imposed on the borrower, including, but not limited to, the following:

a.   No property preservation or inspection fees shall be imposed unless Servicer has a reasonable belief that the property is vacant after making good faith attempts to determine whether it is occupied (*e.g.* calling the homeowner, etc.); and

b.   Servicer shall be limited to imposing property valuation fees (*e.g.* BPO) to once every 12 months (unless other valuations are required by Servicer's Primary Federal Regulator or requested by the borrower to facilitate a short sale or to support a loan modification as outlined in paragraph II.H.2).

2.   Servicer shall ensure that foreclosure and bankruptcy attorneys and foreclosure trustees are permitted to integrate their systems with those of any outsourcing companies and third-party vendors utilized by Servicer without any cost to the attorneys, trustees, or borrowers.

3.   Subsidiaries or affiliates of Servicer (or other entities where Servicer or related entity has an interest in such third party) shall be prohibited from collecting third-party fees.

4.   Servicer shall be prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting anything of value in relation to third-party default or foreclosure-related services.

23

IV.    **Force-Placed Insurance**

    A.    <u>General Requirements for Force-Placed Insurance</u>

        1.    Servicer shall be prohibited from placing hazard, homeowner's or flood insurance on the mortgaged property when Servicer knows or has reason to know that the borrower has a policy in effect for such insurance that meets the minimum requirements of the loan documents.

        2.    Servicer shall provide written notice to a borrower upon taking action to place hazard, homeowner's or flood insurance on the mortgaged property, including a clear and conspicuous statement of the procedures by which the borrower may demonstrate that he or she has the required insurance coverage and by which Servicer shall terminate the insurance coverage placed by it and refund or cancel any insurance premiums and related fees paid by or charged to the borrower.  Servicer shall provide the borrower reasonable time to demonstrate that he or she has the required insurance coverage.

        3.    Servicer shall not place hazard, homeowner's or flood insurance on a mortgaged property, or require a borrower to obtain or maintain such insurance, in excess of the replacement cost of the improvements on the mortgaged property.

        4.    Servicer shall provide the borrower with a refund of unearned premiums paid by a borrower or charged to the borrower for hazard, homeowner's or flood insurance placed by a mortgage lender or Servicer if the borrower provides reasonable proof that the borrower has obtained coverage such that the forced placement of insurance is not necessary and the property is insured.  Servicer shall pay to the borrower any refunds Servicer receives as a result of duplicative or unnecessary force-placed insurance.

        5.    Servicer shall be prohibited from placing force-placed insurance with a subsidiary or affiliated company or any other entity in which Servicer has an ownership interest.  Servicer shall be prohibited from splitting fees, giving or accepting kickbacks or referral fees, or accepting anything of value in relation to purchase or placement of force-placed insurance.

    B.    <u>No Force-Placed Insurance where Borrower's Policy Can Be Maintained</u>

        1.    Servicer shall make reasonable efforts to continue or reestablish the existing homeowner's policy if there is a lapse in payment.

    2.    Servicer may require borrower to provide updated premium payment information to Servicer, so Servicer can continue the existing policy if there is a lapse.

    3.    Servicer shall advance the premium fee if there is no escrow or insufficient escrow.

    4.    If Servicer cannot maintain borrower's existing policy it shall purchase force-placed insurance for a commercially reasonable price.

## V.    General Servicer Duties and Prohibitions

### A.    Servicer Duties to Borrowers

    1.    Servicer shall have a general duty of good faith and fair dealing in its communications, transactions, and course of dealing with each borrower in connection with the servicing of the borrower's mortgage loan.

### B.    Servicer Duties to Communities

    1.    Servicer shall develop and implement policies and procedures to ensure that vacant, abandoned, REO, and charged-off properties do not become blighted.

    2.    If Servicer knows that the borrower's property has been abandoned and the borrower has either indicated an intent to permanently vacate the property or has been nonresponsive to Servicer's efforts to communicate with the borrower, Servicer shall not unreasonably delay the final foreclosure disposition and subsequent recordation of the transfer of title.

### C.    Prohibited Conduct

    1.    Servicer shall be prohibited from:

        a.    Engaging in unfair or deceptive business practices or misrepresenting or omitting any material information in connection with the servicing of the loan, including, but not limited to, misrepresenting the amount, nature or terms of any fee or payment due or claimed to be due on a loan, the terms and conditions of the servicing agreement, loss mitigation options, or the borrower's obligations under the loan;

b.   Requiring funds to be remitted by means more costly to the consumer than a bank or certified check or attorney's check from an attorney's account; and

c.   Refusing to communicate with an authorized representative of the borrower who provides a written authorization signed by the borrower, provided that Servicer may adopt procedures reasonably related to verifying that the representative is in fact authorized to act on behalf of the borrower.

## VI.   Monetary Relief

Servicer shall provide monetary relief as compensation or penalties for unlawful conduct, to settle claims owed to the government, and/or to fund programs to help homeowners avoid foreclosure, including support of non-profit housing counseling, legal aid assistance, hotlines, web portal access, borrower education and outreach, mediation, post-foreclosure relocation assistance and similar efforts.

Servicer shall establish and fund a process to provide compensation for borrowers who have been victims of servicer misconduct.

A substantial portion of monetary relief shall be dedicated by Servicer to support an enhanced program of sustainable loan modifications including principal reductions. (Reserved for further discussion.)

## VII.   Compliance Review and Monitoring

A.   Data Reporting

1.   Servicer shall adopt enhanced corporate governance procedures to monitor and coordinate Servicer's compliance with the Agreement. These procedures may include establishment of a compliance committee comprised of members of Servicer's board of directors, a majority of which are independent and not employees or officers of Servicer or its subsidiaries or affiliates. In addition, Servicer's board of directors or executive level management shall have timely and complete access to relevant information.

2.   Servicer shall provide the Attorneys General and CFPB with regular state-specific data reports on compliance with this Agreement, particularly on loan modification efforts, including remedial actions taken.

26

3.     Servicer shall report in the compliance report or in a separate report, all instances (and provide copies of all rulings/opinions) where a court: (1) determined that Servicer submitted faulty affidavits or other submissions in a foreclosure, or other judicial proceeding; (2) dismissed the foreclosure or ruled in favor of the borrower in a foreclosure proceeding or other judicial proceeding because Servicer or Servicer's third-party principal or agent bringing the foreclosure did not have the legal right to foreclose; or (3) dismissed the foreclosure or ruled in favor of the borrower in a foreclosure proceeding or other judicial proceeding because Servicer failed to initiate or complete loss mitigation efforts before foreclosing.

B.     <u>Third-Party Monitoring</u>

1.     Servicer's compliance with this Agreement shall be monitored by an independent third party selected by the Attorneys General and CFPB funded by Servicer with authority to access records and audit Servicer's performance.  The monitor's findings shall be included in Servicer's regular reporting to the Attorneys General and CFPB.

C.     <u>Penalties for Non-Compliance</u>

1.     The Agreement will set forth specific, quantitative target performance measures that Servicer shall be required to meet to be in compliance with the Agreement.  A failure to meet these performance measures shall result in monetary penalties and additional remedial actions, including possible revisions to this Agreement.

2.     Servicer shall be subject to automatic penalties for material failure to meet timelines, as documented by the third-party monitor.

3.     The parties shall consider a special master or referee to resolve violations, including assessment of penalties.

4.     Servicer shall establish procedures in cooperation with the Attorneys General and CFPB to resolve borrowers' complaints about alleged noncompliance with the Agreement.

5.     A material violation of this Agreement constitutes an unfair and deceptive trade practice and a breach of the duty of good faith and fair dealing.

# Exhibit E



On Focus and In Depth

## Ties to Insurers Could Land Mortgage Servicers in More Trouble

*Force-placed policies impose costs on both homeowner, investor*

American Banker | Wednesday, November 10, 2010

By Jeff Horwitz

**Correction:** *An earlier version of this story incorrectly stated that Bank of America did not comment for the record. The bank's comment is now included.*

When banks buy insurance on the homes of borrowers whose policies have lapsed, they get a great deal. Just not for the homeowners and investors who have to pay for it.

Nominally purchased to protect the owners of mortgage-backed securities, such "force-placed" insurance can be 10 times as costly as regular policies, raising struggling homeowners' debt loads, pushing them toward foreclosure — and worsening the loss to investors on each defaulted loan.

Evidence of abuses and self-dealing in the force-placed insurance industry suggests that there may be far larger problems in how servicers are handling distressed loans than the sloppy document recording that has been the recent focus of industry woes.

Behind banks' servicing insurance practices lie conflicts of interest that align servicers and their insurer partners against borrowers and investors. Bank of America Corp. owns a force-placed insurance subsidiary, and most other major servicers receive commissions or reinsurance fees on the very same policies they purchase on investors' and borrowers' behalf.

"There's no arm's-length transaction here, and that creates all sorts of incentives for the servicer to force-place excessive insurance and overcharge consumers for policies that provide minimal benefit," said Diane Thompson, of counsel for the National Consumer Law Center. "Servicers and insurers have turned this into a gravy train."

Sometimes the arrangements resemble simple kickbacks: Court documents show that a subsidiary of the country's largest specialty insurer paid undisclosed "commissions" for the rights to a servicer's force-placed business.

State court filings show alleged abuse in which banks charged borrowers for unnecessary insurance and backdated policies providing coverage retroactively. Often the insurance was acquired only after banks stopped advancing the premiums of delinquent borrowers' escrowed policies, causing those cheaper and more comprehensive policies to expire. In response to questions from American Banker, federal and state officials said that some practices that industry trade groups defend may not be legal.

"It is clear that [the Real Estate Settlement Procedures Act] prohibits fee splitting and unearned fees for services that are not performed," said Brian Sullivan, spokesman for the Department of Housing and Urban Development. Foreclosure defense and legal aid attorneys say force-placed insurance is found on most of the severely delinquent loans in this country. If so, the cost to investors may well be in the billions of dollars.

"This is clearly not in the investors' interest," said Amherst Securities analyst Laurie Goodman, who in May noted the potential for misconduct with Bank of America's force-placed-insurer subsidiary, Balboa Insurance Group. "Servicers are getting a huge chunk of money from force-placed insurance, and investors pay for it by higher loss severity at the liquidation of the loan."

With little regulatory oversight or even private investor awareness, force-placed insurance has helped make drawn-out foreclosures lucrative for servicers — far more so, in some cases, than helping a borrower return to performing status. As the intermediary between borrower and investor, servicers appear to be benefiting themselves at the expense of both.

**Backdated Coverage**

When attorney Jeffrey Golant took on his first forced-placement case, he thought he was looking at an administrative mistake.

A solo practitioner in Pompano Beach, Fla., Golant splits his time between foreclosure defense and insurance cases. He had been referred his first forced-placement case by his mother, Margery Golant — also a longtime foreclosure defense attorney — in May of 2008 when the dispute veered into insurance territory.

The problems should have been quick to sort out, Golant recalls. His client was current on her mortgage and claimed the lapse of insurance coverage on her home was the result of her previous insurer's error. Much of the new policy's coverage was redundant, Golant said, duplicating flood and wind policies that had remained in place. Moreover, billing her for expensive retroactive hurricane protection, for a year when there had been no significant storms, struck Golant as inherently ridiculous.

"I really thought they'd added an extra digit," he said.

But the servicer that had requested the policy — nominally Zions Bancorp., though like many regional banks, the company outsources its servicing and does not involve itself in loan-level decisions — wouldn't back down. The backdating was appropriate because "Had there been damage to your property during the uninsured time … you would have benefited significantly," the servicer said in one letter.

The Mortgage Bankers Association told American Banker that retroactive coverage is necessary to prevent gaps in insurance. But asked for an opinion on backdating a policy by nine months, the National Association of Insurance Commissioners told American Banker that insurance is "prospective in nature." Therefore, policies "should not be back-dated to collect premiums for a time period that has already passed," the trade group for state insurance regulators said.

The case got stranger when Golant's client visited the address listed for the insurer in an unsuccessful attempt to sort things out, he said. While the people there claimed to represent the servicer, they were operating out of an office belonging to a force-placed policy insurer since acquired by QBE Insurance Group.

Golant didn't understand why the insurer would be speaking on behalf of the servicer. But shortly after he began asking questions about the relationship between servicer and insurer, the case settled. Confidentially. At the insurer's request.

With the matter resolved, it would have made sense for a Florida solo practitioner who handles as many as 50 cases at any one time to move on. Golant, however, started investigating the connections between multibillion-dollar banks and specialty insurers.

"Frankly, it was their speed and willingness to settle that made me think they were not at all confident about the arrangement," Golant said. "I was still in the dark. But I got curious."

Collaborating with his mother, Golant says he began to take on more force-placed insurance cases, often agreeing to bill the borrower only if he won. Cases he pointed out to American Banker show no shortage of questionable alleged practices. In some instances, servicers force-placed insurance on borrowers in excess of their mortgage's face value and property's overall worth. (A representative of the Mortgage Bankers Association said the industry often is required to reinsure a property up to the cost of its replacement value, even if that's in excess of the mortgage.)

In other instances, servicers force-placed duplicative insurance on residents of condominium associations that insured their members' properties. In yet more, servicers had stopped advancing the premiums for a delinquent borrower's escrowed private insurance, allowing it to expire. When it did, they bought far more expensive force-placed insurance to replace it, and began advancing the premiums on that. This — a common practice, Golant says — was not just harmful to borrowers. It was inexplicable from the point of view of protecting investors.

What all the cases had in common was astronomically priced force-placed insurance, he said. There is no doubt that borrowers who aren't paying for their own insurance pose a heightened insurance risk. But servicers were billing Golant's clients for policies that cost as much as 10 times as much as the insurance they replaced. In one example confirmed by American Banker, an $80,000 property standing on a $40,000 lot was force-placed with a policy costing $10,000. Put another way, one year of insurance payments would strip away 13% of the structure's total value.

It wasn't just off-brand and subprime servicers who were tacking the high-priced policies on to borrowers' mortgage bills. It was the country's biggest banks, from JPMorgan Chase & Co. to Wachovia, now part of Wells Fargo & Co. Why did they seem so eager to purchase high-priced insurance on the homes of already struggling borrowers?

Golant got his answer in a case in which EverBank Financial Corp's servicing arm had allegedly allowed a borrower's $4,000 escrowed insurance to lapse in error and then replaced it with a policy costing more than $33,000. In response to written questions, a subsidiary of Assurant, one of the country's biggest specialty insurers, revealed that it hadn't kept all the money that EverBank's servicing operation had paid it. Instead it immediately paid EverInsurance, the servicer's subsidiary, a $7,100 "commission" and left the door open to further compensation.

For Golant, this set off alarm bells: instead of trying to place affordable insurance on his client's home, EverBank had taken what was at minimum a $7,100 cut. That was more money than EverBank would ever collect from actually servicing the loan, and EverBank had done nothing to earn it — except let Assurant write a high-priced policy on his client's house. (According to the MBA data cited by MortgageDaily.com, servicers earned on average $51 per loan last year.)

"The 'commissions' that [Assurant] paid … were in fact kickbacks," the attorney wrote in a complaint still being litigated. "This incentivized EverHome to select the most expensive force-placed coverage available, and to force-place insurance as frequently as possible."

EverBank is in the process of going public, and could not comment because of SEC restrictions on its public statements, a spokeswoman for the bank said. But, at least in substance, its relationship with an insurer is hardly unique. Agreements providing banks with commissions on force-placed insurance appear to be standard for many players, including one of the country's largest — Wells Fargo.

Wells declined an on-record interview for this story, though it acknowledged relationships with three force-placed insurers and provided other guidance. JPMorgan Chase did not speak on record with *American Banker*. A spokesman for Bank of America said by email it buys forced-placed insurance only "after several attempts have been made to notify borrowers that their insurance has lapsed and to remind them of their obligation to maintain continuous coverage." B of A is seeking a buyer for Balboa, which it inherited with its 2008 acquisition of Countrywide Financial Corp.

But the MBA defended commissions on force-placed business. It is common practice for an insurer to pay fees for business referrals, said Vicki Vidal, a vice president at the trade group. Asked if those commissions inflated the price that homeowners or investors ultimately paid, she said they did not.

"The rate is separate from the commission," Vidal said, adding that state insurance regulators can set limits on what premiums are allowed.

### Circular Arrangement

Commission fees aren't the only way major servicers profit on the force-placed policies in their portfolio. Some, including JPMorgan Chase, have adopted a roughly equivalent if slightly more sophisticated method of profiting from force-placed reinsurance: They reinsure it.

Evidence of the practice comes from Assurant's Securities and Exchange Commission filings as well as the banking companies' boilerplate language for notifying borrowers of their intent to bill them for a force-placed policy.

JPMorgan Chase's force-placed insurance "will have significantly higher premiums than standard insurance premiums," the banking company noted in one letter to a borrower last year, and "Some or all of these premiums will be reinsured through an insurance company that is an affiliate of Chase."

JPMorgan Chase declined to specify what insurer it typically works with, but Assurant's annual report describes precisely such a relationship from an insurer's perspective. In an effort to align its interests with its servicer customers, the company will often reinsure the policies it writes with the same servicer that requested them.

"Such arrangements allow significant flexibility in structuring the sharing of risks and profits on the underlying business," Assurant notes.

The interests of the two parties are so aligned, in fact, that in many cases there ceases to be a clear difference between the entity purchasing insurance and the entity selling it.

According to both Assurant's SEC filings and the marketing materials of a subsidiary of rival QBE Insurance Group, the insurers don't just write policies on request — they also enter into long-term agreements to detect uninsured properties in their clients' servicing portfolios and perform other back-office functions. It was precisely such an arrangement that Golant's first client ran into when she tried to visit her servicer, he says — the insurance company employees had taken over the servicer's role.

Like the direct commission payments that Golant discovered, reinsurance deals cut servicers in on insurer profits. They also come with another potential advantage for the insurer: they provide an incentive for the servicer not to pursue claims, creating an apparent conflict of interest. As a representative of investors, the servicer should vigorously pursue any and all claims arising from its forcibly insured portfolio. But because the servicer reinsures the policies it purchases, any claims it brings could potentially come out of its own profits.

For insurers, opening the door to this circular arrangement has its drawbacks. Assurant warns in investor filings that having reinsuring business with the client that provided the policy, rather than a reinsurer of the company's own choosing, can pose a credit risk: the bank fails to eat its share of claims. Assurant mitigates this danger, it says, by requiring some of its client-counterparties to obtain letters of credit from other financial institutions.

The more vexing issue for Assurant, however, seems to be that giving the servicers part of the deal leaves less for the company. In a section discussing risks arising from servicer industry consolidation, Assurant warns that giant servicers are compressing margins and that it may receive a lower share of premiums if it provides them with bigger reinsurance deals.

Nonetheless, Assurant sees force-placed insurance as its future. The unit handling force-placed insurance has accounted for $811 million of its $879 million in profits during the last two years, and its "business strategy is to pursue long-term growth in creditor-placed homeowners insurance" as well as expand that business into auto insurance and related areas.

Assurant declined to be interviewed for this story, and did not address questions on conflict of interest concerns. But the company, which also provides health, corporate and other types of insurance, issued a statement defending its general force-placed business practices.

"Lender-placed insurance programs are regulated in all states and we comply with those regulations," the statement reads in part. "We believe our rates to be among the lowest in the industry."

QBE Insurance, the parent of the insurer involved in Golant's first force-placed case, did not respond to requests for comment.

The MBA's Vidal denied that reinsurance deals posed a conflict of interest, suggesting they may only cover catastrophic losses.

"Don't get the impression that everyone has reinsurance capacity," she said. "But to the extent they do, they're obviously getting paid for absorbing a portion of the risk."

**"No Incentive" To Shop**
Force-placed insurance isn't inherently objectionable. It makes sense that the coverage's price must be higher than on voluntarily purchased insurance to account for a higher risk — if a hurricane comes through, a homeowner with a stake in a property is more likely to board up the windows than one in foreclosure. In many states regulators provide at least some oversight and limits on acceptable rates. Moreover, force-placing insurance isn't optional for servicers: investor contracts usually require it.

"Realistically, we're doing whatever investors are telling us to do," Vidal said.

But it would be possible for servicers to treat force-placing as a last-ditch form of investor protection conducted at the lowest cost possible. Instead, they have consistently chosen force-placed insurance deals that reward themselves at the expense of their clients — and have sometimes given insurers unfettered access to write policies on their portfolios. Banks have put little effort into justifying their force-placed practices because they were rarely asked about them.

"[T]he cost may be considerably more expensive than insurance you can obtain," says a September letter from SunTrust Banks Inc.'s mortgage unit to a borrower, which cites the baffling — but often repeated — line that high prices are necessary because the policy is underwritten "without inspection." (As a general matter, insurers do not routinely inspect residential properties in the course of underwriting, according to Thompson of the National Consumer Law Center, though

a representative of one large insurer told American Banker that it always reserves the right to.) SunTrust declined to comment for this story.

Such practices have been in place for years, yet force-placed insurance has received very little attention outside of the servicing industry. Given the current volume of foreclosure activity and the unprecedented attention that ground-level servicing operations are now receiving, however, that could change.

The Dodd-Frank Act stipulates that charges for force-placed insurance must be "bona fide and reasonable," and correspondence with the National Association of Insurance Commissioners suggest that state regulators are aware of the potential for conflicts of interest in insurer selection. Asked whether pricing in the field is competitive, a representative of the NAIC responded that servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction."

In response to a query by American Banker on possible interest in the force-placed insurance market, the Office of the U.S. Trustee, which oversees bankruptcy trustees and the administration of cases, referred without comment to an Indiana bankruptcy case in which it has asked Wells Fargo to produce documents "that support the belief that Debtors had failed to maintain insurance" and "premium notices; invoices; canceled checks; policies of insurance; insurance binders; and, requests for quotes or bids for insurance."

Wells is obligated to respond later this month.

Neither the U.S. Trustee's query of Wells nor the views of other regulators have filtered down to ground-level servicing practices, said consumer advocates like Thompson.

Golant, who hopes to begin deposing insurance industry officials in his force-placed cases within a few months, said he didn't believe the industry would willingly accept change.

"The banks' profits aren't connected to the performance of the loan," he said. "The people making policy, thinking the servicers are part of the solution to the foreclosure problem, need to understand that."

© 2011 American Banker and SourceMedia, Inc. All Rights Reserved.
SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.

For information regarding Reprint Services please visit:
http://www.americanbanker.com/aboutus/reprint-services-rates.html

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV11- 915 JST (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

---

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [X] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

---

Daniel L. Germain (State Bar No. 143334)
Rosman & Germain LLP
16311 Ventura Blvd., Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christopher Gustafson, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>BAC Home Loan Services, LP, Bank of America, N.A., and Balboa Insurance Company,<br><br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV11-00915 JST (ANx)**<br><br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, _Daniel L. Germain_____, whose address is _Rosman & Germain LLP, 16311 Ventura Blvd., Suite 1200, Encino, CA 91436-2152___. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:  JUN 1 7 2011 _____

By: _____
      CHRISTOPHER POWERS
      Deputy Clerk
      (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself □)

Christopher Gustafson,
individually and on behalf of all others similarly situated

**DEFENDANTS**

BAC Home Loan Services, LP, Bank of America, N.A., and Balboa Insurance Company

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Daniel L. Germain, Rosman & Germain LLP
16311 Ventura Blvd, Suite 1200, Encino, CA 91436-2152
Telephone: (818) 788-0877

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

□ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

□ 2 U.S. Government Defendant   □ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place of Business in this State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   □ 2 Removed from State Court   □ 3 Remanded from Appellate Court   □ 4 Reinstated or Reopened   □ 5 Transferred from another district (specify):   □ 6 Multi-District Litigation   □ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes  □ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  □ No   ☑ **MONEY DEMANDED IN COMPLAINT: $** In excess of $5,000,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
12 U.S.C. Section 2607-violations of RESPA

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| □ 400 State Reapportionment | □ 110 Insurance | □ 310 Airplane | □ 370 Other Fraud | □ 510 Motions to Vacate Sentence Habeas Corpus | □ 710 Fair Labor Standards Act |
| □ 410 Antitrust | □ 120 Marine | □ 315 Airplane Product Liability | □ 371 Truth in Lending | □ 530 General | □ 720 Labor/Mgmt. Relations |
| ☑ 430 Banks and Banking | □ 130 Miller Act | □ 320 Assault, Libel & Slander | □ 380 Other Personal Property Damage | □ 535 Death Penalty | □ 730 Labor/Mgmt. Reporting & Disclosure Act |
| □ 450 Commerce/ICC Rates/etc. | □ 140 Negotiable Instrument | □ 330 Fed. Employers' Liability | □ 385 Property Damage Product Liability | □ 540 Mandamus/ Other | □ 740 Railway Labor Act |
| □ 460 Deportation | □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 340 Marine | **BANKRUPTCY** | □ 550 Civil Rights | □ 790 Other Labor Litigation |
| □ 470 Racketeer Influenced and Corrupt Organizations | □ 151 Medicare Act | □ 345 Marine Product Liability | □ 422 Appeal 28 USC 158 | □ 555 Prison Condition | □ 791 Empl. Ret. Inc. Security Act |
| □ 480 Consumer Credit | □ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | □ 350 Motor Vehicle | □ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| □ 490 Cable/Sat TV | | □ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | □ 610 Agriculture | □ 820 Copyrights |
| □ 810 Selective Service | □ 153 Recovery of Overpayment of Veteran's Benefits | □ 360 Other Personal Injury | □ 441 Voting | □ 620 Other Food & Drug | □ 830 Patent |
| □ 850 Securities/Commodities/ Exchange | □ 160 Stockholders' Suits | □ 362 Personal Injury-Med Malpractice | □ 442 Employment | □ 625 Drug Related Seizure of Property 21 USC 881 | □ 840 Trademark |
| □ 875 Customer Challenge 12 USC 3410 | □ 190 Other Contract | □ 365 Personal Injury-Product Liability | □ 443 Housing/Acco-mmodations | □ 630 Liquor Laws | **SOCIAL SECURITY** |
| □ 890 Other Statutory Actions | □ 195 Contract Product Liability | □ 368 Asbestos Personal Injury Product Liability | □ 444 Welfare | □ 640 R.R. & Truck | □ 861 HIA (1395ff) |
| □ 891 Agricultural Act | □ 196 Franchise | **IMMIGRATION** | □ 445 American with Disabilities - Employment | □ 650 Airline Regs | □ 862 Black Lung (923) |
| □ 892 Economic Stabilization Act | **REAL PROPERTY** | □ 462 Naturalization Application | □ 446 American with Disabilities - Other | □ 660 Occupational Safety /Health | □ 863 DIWC/DIWW (405(g)) |
| □ 893 Environmental Matters | □ 210 Land Condemnation | □ 463 Habeas Corpus-Alien Detainee | □ 440 Other Civil Rights | □ 690 Other | □ 864 SSID Title XVI |
| □ 894 Energy Allocation Act | □ 220 Foreclosure | □ 465 Other Immigration Actions | | | □ 865 RSI (405(g)) |
| □ 895 Freedom of Info. Act | □ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| □ 900 Appeal of Fee Determination Under Equal Access to Justice | □ 240 Torts to Land | | | | □ 870 Taxes (U.S. Plaintiff or Defendant) |
| □ 950 Constitutionality of State Statutes | □ 245 Tort Product Liability | | | | □ 871 IRS-Third Party 26 USC 7609 |
| | □ 290 All Other Real Property | | | | |

SACV11-00915

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)   CIVIL COVER SHEET   Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)    ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                     ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                     ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                     ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Rock Island County, Illinois |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| BAC Home Loans Services, LP - Los Angeles County, California<br>Balboa Insurance Company - Orange County, California | Bank of America, N.A. - North Carolina |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
     Note: **In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, California | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _~~signature~~_    Date June 17, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |