**ROSMAN & GERMAIN LLP**
Daniel L. Germain (Bar No. 143334)
16311 Ventura Boulevard, Suite 1200
Encino, CA 91436-2152
Telephone: (818) 788-0877
Facsimile: (818) 788-0885
E-mail: Germain@Lalawyer.com

*Counsel for Plaintiff and the Proposed Class*
*[Additional counsel listed on signature page]*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER GUSTAFSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BAC HOME LOANS SERVICING, LP, BANK OF AMERICA, N.A., and BALBOA INSURANCE COMPANY<br><br>Defendants. | Case No.: SACV-11-00915-JST-AN<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.     This is a proposed class action brought by Plaintiff Christopher Gustafson (referred to herein as "Plaintiff") on behalf of himself and all other persons who have or had a residential mortgage loan or line of credit owned and/or serviced by Defendants Bank of America, N.A. ("Bank of America") or BAC Home Loans Servicing, LP ("BAC Home Loans Servicing") and, in connection therewith, were required to pay for "force-placed" hazard insurance on the secured property between June 16, 2007 and the present (the Class Period").

2.     In the event that borrowers fail to maintain their hazard insurance policies, rather than attempt to maintain delinquent borrowers' *existing* policies, mortgage loan servicers choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed" insurance policies. Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to servicers and/or their affiliates. Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss.

3.     Throughout the Class Period, Defendants have engaged in unlawful, abusive and unfair practices with respect to force-placed insurance, including, among others and as described in further detail below: (a) providing force-placed insurance from their own affiliates at a substantial high cost to the borrower; (b) receiving fees, payments, commission and/or other things of value from providers of force-placed insurance; and (c) forcing borrowers to pay for unnecessary insurance.

4.     Defendants' unlawful actions include, *inter alia*, purchasing unconscionably high-priced insurance policies, entering into pre-arranged agreements to acquire force-placed insurance without any regard whatsoever for competitive pricing, entering into pre-arranged agreements that yield exorbitant force-placed insurance prices in order to maximize their own profits to the detriment of borrowers, backdating the force-placed insurance policies to charge for retroactive coverage, and giving and receiving "commissions" or "kickbacks" for the procurement of the force-placed policies. These actions constitute a pattern of exploitative profiteering and self-dealing against the interest of Plaintiff and the Class.

5.     This scheme constitutes disguised, unlawful referral fees in violation of the Real Estate Settlement Procedures Act's ("RESPA") anti-kickback

1  provisions, as well as a violation of RESPA's ban on accepting a percentage of
2  settlement-service fees other than for services actually performed.  Further, this
3  scheme constitutes unfair, unlawful and fraudulent business acts and practices in
4  violation of California Business & Professions Code §§ 17200, et seq., and is in
5  violation of the mortgage contracts of Plaintiff and the Class members.

6      6.    In this action, Plaintiff challenges Defendants' unlawful conduct and
7  seeks statutory and compensatory damages, as well as restitution for Defendants'
8  unjust enrichment.

9  **JURISDICTION AND VENUE**

10     7.    This Court has subject matter jurisdiction over this action pursuant to
11  28 U.S.C. §§ 1331 and 1367 and 12 U.S.C. § 2614.

12     8.    This Court also has original diversity jurisdiction pursuant to the Class
13  Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff is a citizen of the
14  State of Illinois.  Defendants are citizens of different states.  The amount in
15  controversy in this action exceeds $5,000,000, and there are more than 100
16  members in the Class.

17     9.    In addition, this Court has diversity jurisdiction over Plaintiff's state
18  law claims pursuant to 28 U.S.C. § 1332(a).  The matter in controversy is greater
19  than $75,000 and this matter is between citizens of different states.  This Court also
20  has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28
21  U.S.C. § 1367.

22     10.   Venue is proper in this district under 28 U.S.C. § 1391(b) and 12
23  U.S.C. § 2614 because Defendants regularly conduct business in this district,
24  and/or a substantial part of the events giving rise to the claims occurred in this
25  district.

26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT

**PARTIES**

**Plaintiff**

11.    Plaintiff Christopher Gustafson resides in Rock Island County, IL.

Plaintiff Gustafson's Mortgage Transactions[1]

12.    On or about July 10, 2002, Plaintiff Christopher Gustafson purchased a property located at 519 14th Avenue, Silvis, IL with a first-lien mortgage loan provided by American Bank & Trust Company ("ABT"), securing the principal indebtedness of $53,700.00.  *See* Plaintiff Gustafson's 2002 ABT First Mortgage ("First Mortgage"), attached as Exhibit A hereto.  On that same day, the First Mortgage was purchased by the Illinois Housing Development Authority.  *See* Assignment, attached as Exhibit B hereto.

13.    The First Mortgage is the operative mortgage for the claims asserted in this Complaint.  The First Mortgage required Plaintiff Gustafson to maintain hazard insurance on the secured property for closing and as a condition of the loan and, further, required that all insurance policies include a "standard mortgage clause."[2]  *See* First Mortgage at ¶ 5.

14.    Also on July 10, 2002, Plaintiff Gustafson obtained a second mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the principal indebtedness of $3,500.00.  *See* Plaintiff Gustafson's 2002 ABT

_____

[1]    As the purpose of this Amended Complaint is to provide clarification and additional detail with respect to Plaintiff Gustafson's mortgage transactions, Plaintiff Gustafson hereby provides a detailed history of his mortgage transactions with respect to the subject property in order to eliminate any factual discrepancies raised in Defendants' initial motion to dismiss filed on August 8, 2011.

[2]    A standard mortgage clause or lender's loss payable endorsement typically continues coverage for the lender even after the insured has failed to pay premiums.  *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 2-3, 18-23 (1997).

FIRST AMENDED CLASS ACTION COMPLAINT

Second Mortgage ("Second Mortgage"), attached as Exhibit C hereto.

15.    On or about May 17, 2004, Plaintiff Gustafson obtained a mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the principal indebtedness of $5,072.00.  *See* Plaintiff Gustafson's 2004 ABT Third Mortgage ("Third Mortgage"), attached as Exhibit D hereto.  Plaintiff Gustafson's Second Mortgage was subordinated to the Third Mortgage.  *See* Plaintiff Gustafson 2004 Subordination Agreement, attached as Exhibit E hereto.

16.    On or about September 19, 2005, Plaintiff Gustafson obtained a mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the principal indebtedness of $23,638.65.  *See* Gustafson 2005 ABT Fourth Mortgage ("Fourth Mortgage"), attached as Exhibit F hereto.  On or about September 23, 2005, ABT released the Second Mortgage and the Third Mortgage.  *See* Exhibits G and H respectively, attached hereto.

17.    Plaintiff Gustafson subsequently encountered financial difficulties, relocated from his residence located at 519 14th Avenue, Silvis, IL to the residence of his parents, located at 115 27th Avenue, East Moline, IL, and rented his property located at 519 14th Avenue, Silvis, IL to a tenant.

18.    Subsequently, on or about August 15, 2007, Plaintiff Gustafson obtained a mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the principal indebtedness of $42,067.45.  *See* Gustafson 2007 ABT Fifth Mortgage ("Fifth Mortgage"), attached as Exhibit I hereto[3].  In connection with the Fifth Mortgage, Plaintiff Gustafson executed in favor of ABT an Assignment of Leases and Rents.  *See* Exhibit J hereto.  On or about August 30,

---

[3]    On September 4, 2007, the Fifth Mortgage was re-recorded, as the initial recorded mortgage incorrectly listed the property address as being that of Plaintiff Gustafson's parents.  For purposes of clarity, both recorded copies of the Fifth Mortgage are included in the attached exhibit.

FIRST AMENDED CLASS ACTION COMPLAINT

1  2007, ABT released the Fourth Mortgage. *See* Exhibit K hereto.

2      19.   Plaintiff Gustafson fell behind on his mortgage payments and, on
3  January 12, 2011, the Illinois Housing Development Authority filed a *lis pendens*
4  notice of foreclosure with respect to the First Mortgage. *See* Exhibit L, attached
5  hereto.

6      20.   Unable to catch up on his mortgage payments and seeking to avoid
7  foreclosure, on or about June 13, 2011, Plaintiff Gustafson refinanced the First
8  Mortgage and the Fifth Mortgage with a mortgage from IH Mississippi Valley
9  Credit Union on the property located at 519 14th Avenue, Silvis, IL, securing the
10 principal indebtedness of $63,177.60. *See* Gustafson 2011 Sixth Mortgage ("Sixth
11 Mortgage"), attached as Exhibit M hereto; Release of First Mortgage, attached as
12 Exhibit N hereto; Release of Fifth Mortgage, attached as Exhibit O hereto; and
13 Release of Assignment of Leases and Rents, attached as Exhibit P hereto.

14     21.   On or about August 10, 2011, Plaintiff Gustafson sold the property
15 located at 519 14th Avenue, Silvis, IL. *See* Warranty Deed, attached hereto as
16 Exhibit Q.

17     Plaintiff Gustafson's Force-Placed Insurance Policy

18     22.   In connection with his First Mortgage, Plaintiff Gustafson obtained a
19 homeowner's insurance policy from State Farm with a policy number of
20 73TK43223 ("State Farm Policy"). The premium for the policy for the period
21 from July 10, 2010 through July 10, 2011 was $614.00, paid through Plaintiff
22 Gustafson's escrow account. *See* Renewal Certificate, attached hereto as
23 Exhibit R.

24     23.   Upon information and belief, the State Farm Policy included a
25 standard mortgage clause, as required by the mortgage.

26     24.   Beginning in or about July 2010, Plaintiff Gustafson began receiving
27 correspondence from "Bank of America Home Loans," a division of Bank of
28 America, identifying BAC Home Loans Servicing as the new servicer for the loan.

-6-

FIRST AMENDED CLASS ACTION COMPLAINT

1      25.    A Bank of America "Home Loan Summary" providing a "Home
2  loan overview as of 8/11/2010" and detailing "Escrow account expenses" reflects
3  an escrow account expense for "Homeowners insurance" to "State Farm Ins
4  Group" due annually, with a "next due date" of "07/10/2011."  *See* Exhibit S
5  hereto.

6      26.    Despite the existence of the State Farm Policy, Bank of America sent
7  Plaintiff Gustafson a notice dated January 3, 2011, stating, in part, that it would
8  force-place insurance, back-dated to December 6, 2010, if it did not receive proof
9  of insurance by February 7, 2011.  *See* Notice, attached hereto as Exhibit T.  The
10  notice also stated, in part: "Lender-Placed Hazard Insurance may be purchased
11  from an affiliate of Bank of America, N.A.  Bank of America, N.A. may receive a
12  commission or other compensation in connection with obtaining this coverage."
13  *See id.*

14      27.    Plaintiff Gustafson later received a Notice of Lender-Placed Insurance
15  from Bank of America, dated February 10, 2011, stating that force-placed
16  insurance had indeed been placed on the property through Defendant Balboa
17  Insurance Company, back-dated to December 6, 2010.  *See* Notice of Lender-
18  Placed Insurance, attached as Exhibit U hereto.   At the time of the force-
19  placement, Balboa was a subsidiary and/or affiliate of Bank of America.  Balboa,
20  along with one other force-placed insurance titan, Assurant Inc., writes
21  approximately 99% of residential force-placed insurance.  *See* July 28, 2011
22  Testimony of Birny Birnbaum, Executive Director of the Center for Economic
23  Justice, Before the U.S. House of Representatives Subcommittee on Insurance,
24  Housing   and   Community   Opportunity   Committee   on   Financial   Services
25  ("Birnbaum Testimony"), attached hereto as Exhibit V.

26      28.    The force-placed insurance policy was provided by Defendant Balboa
27  Insurance Company ("Balboa") with a premium of $1,045.00—nearly twice
28  Plaintiff Gustafson's prior premium of $614.00—charged to Plaintiff Gustafson's

escrow account on or about February 8, 2011. *See* Plaintiff Gustafson's Escrow Account Statement, attached as Exhibit W hereto. Additionally, the force-placed insurance policy provided substantially less coverage than Plaintiff Gustafson's State Farm Policy, in that the force-placed insurance policy was intended for the protection of BAC Home Loans Servicing only and covered only the structure itself. *See* Notice of Lender-Placed Insurance, attached as Exhibit U hereto.

29. Further, the amount of coverage for the force-placed insurance policy greatly exceeded the lender's interest in the property, in that it exceeded the outstanding principal balance on the loan. The coverage was $76,300.00, whereas the outstanding loan balance was only $47,946.00. The Notice of Lender-Placed Insurance stated that in order to lower the amount of coverage to the lender's interest in the property, Plaintiff Gustafson had to affirmatively opt to do so by returning to Bank of America a written form within thirty-five days from the date posted on the Notice. *Id.*

30. While Plaintiff's mortgage contract, a standard form contract, allows the lender and, therefore, its servicing agent, to pay for property insurance costs when necessary and appropriate, and to be reimbursed by the borrower, *see* First Mortgage, attached hereto as Exhibit A, the mortgage contract does not authorize either the lender or the servicer to mark-up the actual costs of those services in order to make a profit at the borrower's expense.

**Defendants**

31. Defendant Bank of America, N.A., a subsidiary of Bank of America Corporation, is a Delaware corporation with its principal place of business located in Charlotte, North Carolina. Bank of America directly and/or through its subsidiaries, owns and services loans secured by mortgages on real estate located throughout the United States, including California.

32. Defendant BAC Home Loans Servicing, LP (formerly known as Countrywide Home Loans Servicing, LP), a subsidiary of Bank of America

- 8 -

1  Corporation, is a Texas limited partnership with its principal place of business in
2  Calabasas, California.  BAC Home Loans Servicing services mortgage loans and
3  provides mortgage services, including conducting foreclosures on mortgages, on
4  behalf of holders of residential mortgages and mortgage loan asset-backed
5  certificates.

6      33.   Defendant Balboa Insurance Company, formerly a subsidiary and/or
7  affiliate of Bank of America, is a California corporation headquartered in Irvine,
8  California.  Balboa provides force-placed insurance policies on real estate located
9  throughout the United States, including California.  The relationship between Bank
10 of America and its former subsidiary and/or affiliate Balboa Insurance Company
11 was a non-competitive and exclusive relationship whereby both parties benefitted
12 at the expense of the consumer by forcing consumers to pay for excessively-priced
13 force-placed insurance policies well in excess of the actual cost of comparable
14 policies in the open market.   The excessive mark-up in price of the Balboa
15 Insurance Company force-placed insurance policy did not represent the actual cost
16 of providing the insurance, but instead represented fees and commissions (or
17 kickbacks) to Bank of America, N.A, BAC Home Loans Servicing and Balboa
18 Insurance Company.

19 **FACTUAL ALLEGATIONS**

20     **Defendants' Operations**

21     34.   Bank of America describes itself as one of the world's largest
22 financial institutions, serving individual consumers, small- and middle-market
23 businesses and large corporations with a full range of banking, investing, asset
24 management and other financial and risk management products and services.  *See*
25 http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irol-homepro file.

26     35.   Bank of America originates mortgage loans and acquires loans from
27 other lenders.  Each such loan is secured by a deed of trust on the underlying
28 property. BAC Home Loans Servicing services such loans.

-9-

36.     Through its subsidiaries and affiliates, Bank of America operates through 5,900 retail offices, has approximately 5,300 mortgage loan offices and is the No. 1 mortgage loan servicer in the United States.  *See* Bank of America Corporation, Annual Report (Form 10-K), at 1 (February 25, 2011).

37.     Until approximately June 1, 2011, Bank of America and BAC Home Loans Servicing were affiliates of Balboa.  On June 1, 2011, Bank of America announced the completion of the sale of Balboa and affiliated entities to QBE Insurance Group ("QBE").  Notably, the terms of the sale included an agreement that QBE will maintain long-term distribution agreements with Bank of America for force-placed insurance.  *See* Press Release, Bank of America Corporation, *Bank of America Completes Sale of Balboa Insurance Business to QBE* (June 1, 2011), attached as Exhibit X hereto.

38.     Balboa maintains relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide.  *See*   http://www.balboainsurance.com/LenderProducts/LenderPlacedHazard/tabid/ 169/Default.aspx.

**Force-placed Insurance**

39.     In order to protect the mortgagee's interest in the secured property, mortgage loan contracts typically allow the lender or third party servicer to "force-place" insurance when the homeowner fails to maintain the insurance.

40.     The mortgage contract does not disclose, however, that the lender or other servicer will receive a financial benefit in connection with the force-placed insurance policy.  Instead, the contract misrepresents to borrowers that the cost passed on them is necessary to protect the lender's interest in the secured property.

41.     These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage.  Reportedly, such policies can cost as much as ten times more than standard policies.  While the force-placed insurance policy is for the benefit of the lender, the cost is passed on

to the borrower (or passed on to holders of mortgage-backed securities). *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (November 10, 2010), attached hereto as Exhibit Y (referred to herein as "Ties to Insurers").

42.   Once a servicer receives evidence that a borrower has obtained his/her own insurance policy, the force-placed coverage is (or should be) fully or partially canceled.

**Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

43.   The force-placing of insurance policies can be a very lucrative business for servicers. Commonly, the servicer selects the provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit. The servicer benefits by placing the policy either: (a) with an affiliate or (b) with a third party provider who has already agreed to share revenue with the servicer in the form a direct commission payment or through a "captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary/affiliate of the servicer.

44.   Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

45.   Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss,

- 11 -
FIRST AMENDED CLASS ACTION COMPLAINT

the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.

46.   Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:

# Sharing in the Profits

How servicers make money arranging force-placed coverage

### Commissions

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer

Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

### Reinsurance

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale






47.   Borrowers have no say or input into the carrier or terms of the force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer

48.   For their part, servicers have no incentive to comparison shop for the best rate.  Rather, servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

49.   Commonly, a mortgage loan servicer enters into an agreement with a

FIRST AMENDED CLASS ACTION COMPLAINT

1  provider, pursuant to which it refers borrowers exclusively to the provider for
2  force-placed insurance.   Upon information and belief, Defendants Bank of
3  America and BAC Home Loans Servicing (both subsidiaries of Bank of America
4  Corporation) are parties to such an agreement with Defendant Balboa (also a
5  subsidiary of Bank of America Corporation until June 2011).

6      50.   Force-placed insurance policies are not underwritten on an individual
7  policy basis.   Rather, servicers' contracts with force-placed insurance providers
8  require or at least permit the insurer to automatically issue these policies when a
9  borrower's insurance coverage is not maintained.

10      51.   Servicers often go so far as to actually outsource their insurance
11  processing to the force-placed insurance provider.   Balboa, for instance, provides
12  Bank of America and BAC Home Loans Servicing with "state of the art insurance
13  tracking."   *See*  http://www.balboainsurance.com/LenderProducts/LenderPlaced
14  Hazard/tabid/169/Default.aspx.   The provider then continuously monitors the
15  servicer's mortgage portfolio and verifies the existence of insurance on each
16  mortgaged property.   In the event that borrowers do not maintain adequate
17  insurance coverage, the insurer promptly issues an insurance certificate on the
18  property on behalf and for the benefit of the servicer.   Thus, where these servicers
19  receive commissions from force-placed insurance providers (which are ultimately
20  charged to borrowers), they are performing no service for the commissions they
21  receive other than simply providing the referral.   *See* Exhibit Y, Ties to Insurers,
22  *supra*.

23      52.   Force-placed insurer subsidiaries are highly profitable businesses.
24  "Among a published ranking of companies with the strongest operating insurance
25  subsidiaries, several bank holding companies stand out . . . . Companies with
26  insurance subsidiaries providing force-placed property insurance were at the top of
27  the list.   These included Assurant Inc. and Bank of America."   *See*
28  http://www.mainstreet.com/print/18604.

FIRST AMENDED CLASS ACTION COMPLAINT

1    53.   Further, "[t]he incentives and potential for abuse in the administration

2  of LPI are great.  Consumers do not request the insurance, but are forced to pay for

3  it.   The cost of LPI [lender placed insurance] is much higher than a policy the

4  borrower would purchase on his or her own.  Lenders have incentive to force-place

5  the insurance because the premium includes a commission to the lender and, in

6  some cases, the insurance is reinsured through a captive reinsurer of the lender,

7  resulting in additional revenue to the lender from the force-placement of the

8  coverage." *See* Birnbaum Testimony, attached hereto as Exhibit V.

9    54.   In addition, "The prices for residential property LPI are significantly

10  excessive.  In 2009, insurers paid only 16% of net premium in claims and in 2010

11  the ratio was 17%.  Incredibly, lenders get a commission—totaling hundreds of

12  millions of dollars—out of these premiums, despite the fact that the insurance is

13  placed to protect the lenders' collateral.  The premiums also include the costs of

14  tracking all the loans in the lenders' portfolios to identify those loans without

15  insurance—so the lenders' cost of tracking all loans is passed only to those

16  consumers paying for force-place [sic] insurance." *Id.*

17    55.   While servicers profit greatly from the business of force-placed

18  insurance, upon information and belief, they maintain a shroud of secrecy and do

19  not separately report their income from payments received from providers of force-

20  placed insurance.  However, according to a recent article published by *American*

21  *Banker*, "a cursory review of force-placed insurers' financials suggests that the

22  business brings servicers hundreds of millions of dollars every year." *See* Exhibit

23  Y, Ties to Insurers (noting that servicers demand generous commissions and other

24  payments in return for their referrals).

25    56.   Servicers commonly attempt to justify the high price of force-placed

26  insurance policies by pointing to the higher risk associated with the lack of

27  individual policy underwriting.  However, as *American Banker* noted:

28        Though part of the extra expense can be explained by the

- 14 -

FIRST AMENDED CLASS ACTION COMPLAINT

> higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

*See* Exhibit Y, Ties to Insurers, *supra.*

57.    Force-placed insurance providers have tools to assess risk and minimize unexpected risk of loss.  As stated succinctly in January of 2007 by John Meadows (described on Balboa's website as a "Lender-Placed Insurance Veteran" http://www.balboainsurance.com/AboutBalboa/PressRoom/tabid/158/Default.aspx ), "Leveraging technologies and data elements that are available in most servicer's systems, an innovative lender-placed carrier can offer products that take into account relevant property-specific risk characteristics to determine premium rates." *See* John Meadows, *"Evaluate Processes And Controls To Ensure Insurance Efficiencies,"* Servicing Management, January 2007, attached hereto as Exhibit Z.

58.    Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property.  However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.  *See* Exhibit Y, Ties to Insurers.

**Defendants Often Charge Borrowers for Redundant or Otherwise Unnecessary Insurance**

59.    Unnecessary or inappropriately priced hazard insurance arises when a servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative and/or in amounts greater than required by law or their mortgage agreements.

60.    Motivated by the lucrative financial incentive associated with force-placing insurance, upon information and belief, Defendants have commonly required borrowers to pay for unnecessary insurance coverage.  Such examples

FIRST AMENDED CLASS ACTION COMPLAINT

include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of time for which no risk of loss any longer exists; and (c) requiring borrowers to pay for force-placed insurance policies covering periods of time following a lapse of previous insurance despite the fact that the lender's interest in the property was covered for such time pursuant to either a "standard mortgage clause,"[4] or, upon information and belief, a Lender's Loss Payable Endorsement in the previous policy, either of which continues the Lender's coverage following a lapse for non-payment of premium.

61.     Simply put, force-placed hazard insurance policies should not be backdated. The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature." *See, e.g.*, Exhibit Y, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "'should not be back-dated to collect premiums for a time period that has already passed'"). Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper.

62.     Moreover, the overwhelming majority of mortgages contain a requirement that the borrower purchase property insurance containing a "standard mortgage clause,"[5] and, further, upon information and belief, many hazard insurance policies contain a "Lender's Loss Payable Endorsement," pursuant to

---

[4]     *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 31-42 (1997).

[5]     *See* Fannie Mae standard contracts for all fifty states, available at https://www.efanniemae.com/sf/formsdocs/documents/secinstruments/; *see also* standard form contract for Pennsylvania, attached hereto as Exhibit CC.

FIRST AMENDED CLASS ACTION COMPLAINT

1  which coverage for the lender continues even after the insured has failed to pay

2  premiums.   Accordingly, force-placing insurance policies effective immediately

3  following the termination of the borrower's policy and charging borrowers

4  expensive premiums for such insurance is unlawful and unfair because borrowers

5  are charged for needless and duplicative insurance coverage.

6        **Government Response**

7        63.    United States attorneys general are cognizant of and have taken action

8  concerning servicers' abusive practices relating to force-placed insurance.

9  Recently, a coalition of all 50 United States attorneys general proposed a

10 settlement agreement with servicers to address numerous problems that have

11 surfaced during the foreclosure crisis. *See* Jeff Horowitz, *Attorneys General Draw*

12 *a Bead on Banks' Force-Placed Insurance Policies*, American Banker (March 10,

13 2011), attached hereto as Exhibit AA. "Their targets are the five biggest mortgage

14 lenders—Bank of America, JPMorgan Chase, Wells Fargo, Citigroup and Ally

15 Financial (previously GMAC)." *See* Dave Lieber, *Everyone profits off force-*

16 *placed insurance, except homeowner,* Star-Telegram (October 1, 2011), attached

17 hereto as Exhibit BB.

18       64.    Among other terms, the proposed settlement would essentially

19 prohibit servicers from profiting from force-placed insurance. Specifically, under

20 the proposed settlement, mortgage servicers: (a) are prohibited from force-placing

21 insurance when the servicer knows or has reason to know that the borrower has a

22 policy in effect that meets the minimum requirement of the loan documents; (b)

23 cannot force-place insurance that is in excess of the lender's interest in the

24 mortgaged property; (c) are prohibited from purchasing the force-placed insurance

25 from a subsidiary, affiliate, or any entity in which they have an ownership interest;

26 (d) are prohibited from splitting fees, giving or accepting kickbacks or referral

27 fees, or accepting anything of value in relation to the purchase or placement of the

28 force-placed insurance; (e) must make reasonable efforts to continue or reestablish

- 17 -

the borrower's *existing* insurance policy if there is a lapse in payment; and (f) must purchase the force-placed insurance for a commercially reasonable price. *See* Proposed Settlement Agreement, attached as Exhibit DD hereto.

**RESPA Prohibits Kickbacks for Referrals and Fee-Splitting Related to Forced-placed Insurance Policies**

65.    As Brian Sullivan, spokesman for the Department of Housing and Urban Development ("HUD"), has opined, "It is clear that RESPA prohibits fee splitting and unearned fees for services that are not performed." *See* Exhibit Y, Ties to Insurers, *supra*.

66.    RESPA is the primary federal law regulating residential mortgage settlement services. HUD is charged with enforcing RESPA and has promulgated the implementing rules for RESPA. *See* Regulation X, 24 C.F.R. § 3500.

67.    RESPA was enacted, in part, to curb the problem of kickbacks between real estate agents, lenders and other real estate settlement service providers. "It is the purpose of this chapter to effect certain changes in the settlement process for residential real estate that will result . . . in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b).

68.    A key component of RESPA is its dual prohibition of referral fees and fee-splitting between persons involved in real estate settlement services.

69.    The term "settlement service" is liberally defined in RESPA and Regulation X and includes the provision of services involving hazard, flood, or other casualty insurance. 24 C.F.R. § 3500.2(b).

70.    RESPA Section 8(a), 12 U.S.C. § 2607(a), provides:

> No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

- 18 -

FIRST AMENDED CLASS ACTION COMPLAINT

71.     RESPA Section 8(b), 12 U.S.C. § 2607(b), provides:

> No person shall give and no person shall accept any
> portion, split, or percentage of any charge made or
> received for the rendering of a real estate settlement
> service in connection with a transaction involving a
> federally related mortgage loan other than for services
> actually performed.

72.     Regulation X further explains, "A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section." 24 C.F.R. § 3500.14(c).

73.     The term "thing of value" is broadly defined in RESPA and further described in Regulation X as including:

> without limitation, monies, things, discounts, salaries,
> commissions, fees, duplicate payments of a charge, stock,
> dividends, distributions of partnership profits, franchise
> royalties, credits representing monies that may be paid at
> a future date, the opportunity to participate in a money-
> making program, retained or increased earnings,
> increased equity in a parent or subsidiary entity…The
> term payment is used as synonymous with the giving or
> receiving any "thing of value" and does not require
> transfer of money.

24. C.F.R. § 3500.14(d).

74.     Force-placed insurance business referred to insurers by a lender or servicer constitutes "business incident to or a part of a real estate settlement service" within the meaning of RESPA, 12 U.S.C. § 2607(a).  Under RESPA, therefore, Defendants are prohibited from: (a) referring force-placed insurance business to an affiliate without complying with the requirements of 12 U.S.C. § 2607(c)(4); and (b) accepting commissions or other things of value from force-placed insurance providers.

75.     Further, Defendants Bank of America and BAC Home Loans Servicing failed to provide adequate disclosure and failed to provide borrowers

FIRST AMENDED CLASS ACTION COMPLAINT

1   with any opportunity whatsoever to opt out of having their force-placed insurance

2   policy provided by an insurer from whom Defendants would receive a financial

3   benefit.

**Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance**

4
5

6   76.   As American Banker observed, "[w]hile servicers that partner with

7   force-placed insurers customarily perform little of the work in monitoring their

8   portfolios for lapses and writing policies, payments to them are simply a cost of

9   doing force-placed business." *See* Exhibit Y, Ties to Insurers, *supra*.  These costs

10  are ultimately paid by the borrowers.

11  77.   Indeed, industry analysts have opined that referral fees, commissions

12  and other payments to bank affiliates explain why insurers' overhead, which is

13  ultimately passed on to borrowers, is higher—implying paydays for servicers

14  amounting to hundreds of millions of dollars per year. *Id.*

15  78.   Bank of America's and BAC Home Loans Servicing's practices of

16  referring force-placed insurance business to affiliates or otherwise profiting from

17  the force-placement of insurance policies tend to keep premiums for force-placed

18  insurance artificially inflated over time because a percentage of borrowers'

19  premiums are not actually being paid to cover actual risk, but are simply funding

20  illegal kickbacks.  Amounts paid to servicers as commissions have become a part

21  of the cost of doing business for force-placed insurance providers.  As a result,

22  force-placed insurance premiums incorporate the payment of such kickbacks—to

23  the detriment of consumers.

24  79.   Defendants' conduct has threatened and, indeed, stifled competition.

25  As the NAIC recently opined when asked whether pricing in the area of force-

26  placed insurance industry is competitive, servicers have "no incentive to select a

27  competitively priced product, but instead would be more concerned with selecting

28  one they know best protects the bank's interests or one where they are provided

FIRST AMENDED CLASS ACTION COMPLAINT

1  with an incentive or inducement to enter into the transaction." *See* Exhibit Y, Ties

2  to Insurers, *supra*.

3  **CLASS ACTION ALLEGATIONS**

4      80.    Plaintiff brings this action pursuant to Federal Rules of Civil

5  Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of himself and the

6  following Class:

7              all persons who have or had a residential mortgage loan
8              or line of credit owned and/or serviced by Bank of
               America, N.A. or BAC Home Loans Servicing, LP and,
9              in connection therewith, were required to pay for "force-
               placed" hazard insurance on the secured property
10             between June 16, 2007[6] and the present.

11     81.    The Class excludes Defendants and any entity in which Defendants

12  have a controlling interest, and their officers, directors, legal representatives,

13  successors and assigns.

14     82.    The Class is so numerous that joinder of all members is impracticable.

15     83.    A Class action is superior to all other available methods for the fair

16  and efficient adjudication of this controversy.

17     84.    Plaintiff's claims are typical of the claims of the Class.

18     85.    There are questions of law and fact common to the Class, including

19  but not limited to:

20             (a)    Whether Defendants Bank of America and BAC Home

21  Loans Servicing maintained a policy of referring force-placed insurance business

22  to affiliates;

23             (b)    Whether Defendants Bank of America and BAC Home

24  Loans Servicing received commission payments from force-placed insurance

25  _____

26  [6]    Plaintiff reserves his right to seek modification of the Class Period definition
27  in the likely event that further investigation/discovery reveals a more appropriate
    and broader time period.
28

FIRST AMENDED CLASS ACTION COMPLAINT

1   providers;

2              (c)     Whether Defendants Bank of America and BAC Home
3   Loans Servicing received payments in connection with force-placed insurance that
4   exceeded the value of any services actually performed;

5              (d)     Whether Defendants wrongfully backdated forced-placed
6   insurance policies;

7              (e)     Whether Defendants' conduct constituted an unfair,
8   unlawful or fraudulent business practice in violation of the California Business and
9   Professions Code, §§17200 et seq.;

10             (f)     Whether Defendants violated their implied covenant of
11  good faith and fair dealing;

12             (g)     Whether Defendants have been unjustly enriched; and

13             (h)     Whether Defendants are liable to Plaintiff and the Class
14  for damages and, if so, the measure of such damages.

15      86.    These and other questions of law and/or fact are common to the Class
16  and predominate over any questions affecting only individual Class members.

17      87.    The same common issues predominate with respect to all Class
18  members, regardless of whether their loans were originated by or merely serviced
19  by Defendants.

20      88.    Plaintiff will fairly and adequately represent and protect the interests
21  of the members of the Class.  Plaintiff has no claims antagonistic to those of the
22  Class.   Plaintiff has retained counsel competent and experienced in complex
23  nationwide class actions, including all aspects of litigation.  Plaintiff's counsel will
24  fairly, adequately and vigorously protect the interests of the Class.

25      89.    Class action status is warranted under Rule 23(b)(1)(A) because the
26  prosecution of separate actions by or against individual members of the Class
27  would create a risk of inconsistent or varying adjudications with respect to
28  individual members of the Class, which would establish incompatible standards of

- 22 -

FIRST AMENDED CLASS ACTION COMPLAINT

1  conduct for Defendants.

2       90.    Class action status is also warranted under Rule 23(b)(1)(B) because
3  the prosecution of separate actions by or against individual members of the Class
4  would create a risk of adjudications with respect to individual members of the
5  Class which would, as a practical matter, be dispositive of the interests of the other
6  members not parties to the adjudications or substantially impair or impede their
7  ability to protect their interests.

8       91.    Class action status is also warranted under Rule 23(b)(2) because
9  Defendants have acted or refused to act on grounds generally applicable to the
10 Class, thereby making appropriate final injunctive relief or corresponding
11 declaratory relief with respect to the Class as a whole.

12      92.    Class action status is also warranted under Rule 23(b)(3) because
13 questions of law or fact common to the members of the Class predominate over
14 any questions affecting only individual members, and a class action is superior to
15 other available methods for the fair and efficient adjudication of this controversy.

16 **CLAIMS FOR RELIEF**

17 **COUNT ONE**

18 **(Against all Defendants)**

19 **VIOLATION OF RESPA, 12 U.S.C. § 2607**

20      93.    Plaintiff hereby incorporates by reference the preceding paragraphs as
21 if they were fully set forth herein.

22      94.    Throughout the Class Period, Defendants provided "settlement
23 services" in respect of "federally-related mortgage loans," as such terms are
24 defined by RESPA §§ 2602(1) and (3).

25      95.    Defendants unlawfully received "things of value," within the meaning
26 of RESPA § 2602(2), in connection with the referral of force-placed insurance
27 business.

28      96.    Such amounts constituted fees, kickbacks or things of value pursuant

1 | to agreements with force-placed insurance providers that business incident to real
2 | estate settlement services involving federally-related mortgage loans would be
3 | referred to such insurers.  Such practice violated RESPA, 12 U.S.C. 2607(a).

4 | 97.   Plaintiff and the Class members were, in fact, harmed by Defendants'
5 | unlawful scheme.

6 | 98.   First, Plaintiff and the Class members were, as a matter of law,
7 | entitled to purchase settlement services from providers that did not participate in
8 | unlawful kickback and/or fee-splitting schemes.  Congress has expressly provided
9 | for private enforcement of this protected right by empowering consumers to
10 | recover statutory damages from offending parties without proof of an overcharge.
11 | The plain, unambiguous language of RESPA section 8(d)(2) indicates that
12 | damages are based on the settlement service amount with no requirement that there
13 | have been an overcharge.  Plaintiff alleges that Defendants have accepted unlawful
14 | kickback payments and/or an unearned portion of settlement service charges in
15 | violation of RESPA—allegations and claims completely distinct and separate from
16 | whether the price they paid for settlement services was excessive.

17 | 99.   Second, though not necessary to prevail on their claims, Plaintiff and
18 | the Class were, in fact, overcharged for force-placed insurance.  Congress has
19 | already determined that the *aggregate* effect of an unlawful kickback/referral
20 | arrangement is to unnecessarily inflate the costs consumers pay for real estate
21 | settlement services and/or reduce competition among settlement service providers.
22 | Thus, kickbacks and unearned fees unnecessarily and artificially inflate settlement
23 | service charges.

24 | 100.  Defendants therefore violated RESPA, 12 U.S.C. 2607.  Pursuant to
25 | RESPA, 12 U.S.C. 2607(d), Defendants are liable to Plaintiff and the Class in an
26 | amount equal to three times the amounts they have paid or will have paid for force-
27 | placed insurance as of the date of judgment.

28 | 101.  In accordance with RESPA, 12 U.S.C. 2607(d), Plaintiff also seeks

FIRST AMENDED CLASS ACTION COMPLAINT

1  attorneys' fees and costs of suit.

2  ## COUNT TWO

3  ### (Against Defendants Bank of America and BAC Home Loans Servicing)

4  ### BREACH OF CONTRACT
5  ### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

6  102.   Plaintiff hereby incorporates by reference the preceding paragraphs as
7  if they were fully set forth herein.

8  103.   Every contract contains an implied covenant of good faith and fair
9  dealing.

10  104.   The mortgage contracts of Plaintiff and the Class contained an implied
11  covenant of good faith and fair dealing, pursuant to which Defendants were bound
12  to perform their obligations in good faith and to deal fairly with Plaintiff and the
13  Class.

14  105.   In all of its actions described herein, BAC Home Loans Servicing
15  acted on its own behalf and as the duly authorized agent of Bank of America or
16  other owner or assignee of the mortgage agreements of Plaintiff and the Class.
17  Defendants Bank of America and BAC Home Loans Servicing were contractually
18  obligated to service the loans of Plaintiff and the Class pursuant to the terms of
19  mortgage agreements.

20  106.   To the extent that the mortgage contracts of Plaintiff and the Class
21  permitted Defendants to unilaterally "force-place" insurance, Defendants were
22  obligated not to exercise their discretion to do so capriciously and in bad faith for
23  their own financial gain for the purposes of maximizing profits at borrowers'
24  expense.

25  107.   Defendants breached their duties of good faith and fair dealing in at
26  least the following respects, among others:

27          (a)    Failing to make any effort whatsoever to maintain
28

FIRST AMENDED CLASS ACTION COMPLAINT