1  **ROSMAN & GERMAIN LLP**
   Daniel L. Germain (State Bar No. 143334)
2  16311 Ventura Boulevard, Suite 1200
   Encino, CA  91436-2152
3  Telephone: (818) 788-0877
   Facsimile: (818) 788-0885
4
5  *Counsel for Plaintiff and the Proposed Class*
6  *[Additional counsel listed on signature page]*
7
8
9             **UNITED STATES DISTRICT COURT**
10            **CENTRAL DISTRICT OF CALIFORNIA**
11
   CHRISTOPHER GUSTAFSON,              )  Case No.: SACV-11-00915-JST-AN
12 individually and on behalf of all   )
   others similarly situated,          )  **SECOND AMENDED CLASS**
13                                     )  **ACTION COMPLAINT**
14              Plaintiff,             )
                                       )  JURY TRIAL DEMANDED
15     v.                              )
                                       )
16                                     )
   BAC HOME LOANS SERVICING, LP,       )
17 BANK OF AMERICA, N.A., and          )
   BALBOA INSURANCE COMPANY            )
18                                     )
19                                     )
              Defendants.             )
20 _____   )
21            **INTRODUCTION**
22      1.      This is a proposed class action brought by Plaintiff Christopher
23 Gustafson (referred to herein as "Plaintiff") on behalf of himself and all other
24 persons who have or had a residential mortgage loan or line of credit owned and/or
25 serviced by Defendants Bank of America, N.A. ("Bank of America") or BAC
26 Home Loans Servicing, LP ("BAC Home Loans Servicing") and, in connection
27 therewith, were required to pay for "force-placed" hazard insurance on the secured
28

1    property between June 16, 2007 and the present (the Class Period").

2        2.     In the event that borrowers fail to maintain their hazard insurance

3    policies, rather than attempt to maintain delinquent borrowers' *existing* policies,

4    mortgage loan servicers choose to replace borrowers' insurance policies with more

5    expensive ones, known as "force-placed" insurance policies. Such policies provide

6    less coverage and are substantially more costly than the borrowers' original

7    policies, while providing lucrative financial benefits to lenders, servicers and/or

8    their affiliates, including the force-place insurers. Further, such policies often

9    provide unnecessary or duplicative coverage, in that they are improperly backdated

10    to collect premiums for time periods during which the mortgagor has absolutely no

11    risk of loss. In all respects, this conduct attributable to all Defendants herein is

12    without justification serving only to enrich all of the Defendants at the cost of

13    borrowers.

14        3.     Throughout the Class Period, Defendants have engaged in unlawful,

15    abusive and unfair practices with respect to force-placed insurance, including,

16    among others and as described in further detail below: (a) providing force-placed

17    insurance from their own affiliates at a substantial high cost to the borrower; (b)

18    receiving fees, payments, commission and/or other things of value from providers

19    of force-placed insurance; and (c) forcing borrowers to pay for unnecessary

20    insurance.

21        4.     Defendants' unlawful actions include, *inter alia*, purchasing

22    unconscionably high-priced insurance policies, entering into pre-arranged

23    agreements to acquire force-placed insurance without any regard whatsoever for

24    competitive pricing, entering into pre-arranged agreements that yield exorbitant

25    force-placed insurance prices in order to maximize their own profits to the

26    detriment of borrowers, backdating the force-placed insurance policies to charge

27    for retroactive coverage, and giving and receiving "commissions" or "kickbacks"

28

for the procurement of the force-placed policies. These actions constitute a pattern of exploitative profiteering and self-dealing against the interest of Plaintiff and the Class.

5.     This scheme is in violation of the mortgage contracts of Plaintiff and the Class members.  Further, this conduct has resulted in the unjust enrichment of Defendant Balboa Insurance Company ("Balboa") with whom Plaintiff has never had a contractual relationship.

6.     In this action, Plaintiff challenges Defendants' unlawful conduct and seeks statutory and compensatory damages, as well as restitution for Defendants' unjust enrichment.

**JURISDICTION AND VENUE**

7.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff is a citizen of the State of Illinois.   Defendants are citizens of different states.   The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the Class.

8.     In addition, this Court has diversity jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1332(a).  The matter in controversy is greater than $75,000 and this matter is between citizens of different states.  This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants regularly conduct business in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

**PARTIES**

**Plaintiff**

10.     Plaintiff Christopher Gustafson resides in Rock Island County, IL.

1    <u>Plaintiff Gustafson's Mortgage Transactions</u>

2        11.    On or about July 10, 2002, Plaintiff Christopher Gustafson purchased

3    a property located at 519 14th Avenue, Silvis, IL with a first-lien mortgage loan

4    provided by American Bank & Trust Company ("ABT"), securing the principal

5    indebtedness of $53,700.00.  *See* Plaintiff Gustafson's 2002 ABT First Mortgage

6    ("First Mortgage"), attached as Exhibit A hereto.  On that same day, the First

7    Mortgage was purchased by the Illinois Housing Development Authority.  *See*

8    Assignment, attached as Exhibit B hereto.

9        12.    The First Mortgage is the operative mortgage for the claims asserted

10   in this Complaint.  The First Mortgage required Plaintiff Gustafson to maintain

11   hazard insurance on the secured property for closing and as a condition of the loan

12   and, further, required that all insurance policies include a "standard mortgage

13   clause."[1]  *See* First Mortgage ¶ 5.

14       13.    Also on July 10, 2002, Plaintiff Gustafson obtained a second

15   mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL

16   securing the principal indebtedness of $3,500.00.  *See* Plaintiff Gustafson's 2002

17   ABT Second Mortgage ("Second Mortgage"), attached as Exhibit C hereto.

18       14.    On or about May 17, 2004, Plaintiff Gustafson obtained a mortgage

19   from ABT on the property located at 519 14th Avenue, Silvis, IL securing the

20   principal indebtedness of $5,072.00.  *See* Plaintiff Gustafson's 2004 ABT Third

21   Mortgage ("Third Mortgage"), attached as Exhibit D hereto.  Plaintiff Gustafson's

22

23   _____

24   [1]    A standard mortgage clause or lender's loss payable endorsement typically
     continues coverage for the lender even after the insured has failed to pay

25   premiums.  *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss

26   Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 2-3, 18-
     23 (1997).

27

28

1  Second Mortgage was subordinated to the Third Mortgage. *See* Plaintiff Gustafson
2  2004 Subordination Agreement, attached as Exhibit E hereto.

3      15.   On or about September 19, 2005, Plaintiff Gustafson obtained a
4  mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL
5  securing the principal indebtedness of $23,638.65. *See* Gustafson 2005 ABT
6  Fourth Mortgage ("Fourth Mortgage"), attached as Exhibit F hereto.  On or about
7  September 23, 2005, ABT released the Second Mortgage and the Third Mortgage.
8  *See* Exhibits G and H respectively, attached hereto.

9      16.   Plaintiff Gustafson subsequently encountered financial difficulties,
10  relocated from his residence located at 519 14th Avenue, Silvis, IL to the residence
11  of his parents, located at 115 27th Avenue, East Moline, IL, and rented his
12  property located at 519 14th Avenue, Silvis, IL to a tenant.

13      17.   Subsequently, on or about August 15, 2007, Plaintiff Gustafson
14  obtained a mortgage from ABT on the property located at 519 14th Avenue, Silvis,
15  IL securing the principal indebtedness of $42,067.45. *See* Gustafson 2007 ABT
16  Fifth Mortgage ("Fifth Mortgage"), attached as Exhibit I hereto[2].  In connection
17  with the Fifth Mortgage, Plaintiff Gustafson executed in favor of ABT an
18  Assignment of Leases and Rents. *See* Exhibit J hereto.  On or about August 30,
19  2007, ABT released the Fourth Mortgage. *See* Exhibit K hereto.

20      18.   Plaintiff Gustafson fell behind on his mortgage payments and, on
21  January 12, 2011, the Illinois Housing Development Authority filed a *lis pendens*
22  notice of foreclosure with respect to the First Mortgage. *See* Exhibit L, attached

23  _____

24  [2]    On September 4, 2007, the Fifth Mortgage was re-recorded, as the initial
25  recorded mortgage incorrectly listed the property address as being that of Plaintiff
26  Gustafson's parents.  For purposes of clarity, both recorded copies of the Fifth
   Mortgage are included in the attached exhibit.
27

28

1   hereto.

2       19.   Unable to catch up on his mortgage payments and seeking to avoid
3   foreclosure, on or about June 13, 2011, Plaintiff Gustafson refinanced the First
4   Mortgage and the Fifth Mortgage with a mortgage from IH Mississippi Valley
5   Credit Union on the property located at 519 14th Avenue, Silvis, IL, securing the
6   principal indebtedness of $63,177.60. *See* Gustafson 2011 Sixth Mortgage ("Sixth
7   Mortgage"), attached as Exhibit M hereto; Release of First Mortgage, attached as
8   Exhibit N hereto; Release of Fifth Mortgage, attached as Exhibit O hereto; and
9   Release of Assignment of Leases and Rents, attached as Exhibit P hereto.

10       20.   On or about August 10, 2011, Plaintiff Gustafson sold the property
11   located at 519 14th Avenue, Silvis, IL. *See* Warranty Deed, attached hereto as
12   Exhibit Q.

13        Plaintiff Gustafson's Force-Placed Insurance Policy

14       21.   In connection with his First Mortgage, Plaintiff Gustafson obtained a
15   homeowner's insurance policy from State Farm with a policy number of
16   73TK43223 ("State Farm Policy"). The premium for the policy for the period
17   from July 10, 2010 through July 10, 2011 was $614.00, paid through Plaintiff
18   Gustafson's escrow account. *See* Renewal Certificate, attached hereto as
19   Exhibit R.

20       22.   Upon information and belief, the State Farm Policy included a
21   standard mortgage clause, as required by the mortgage.

22       23.   Beginning in or about July 2010, Plaintiff Gustafson began receiving
23   correspondence from "Bank of America Home Loans," a division of Bank of
24   America, identifying BAC Home Loans Servicing as the new servicer for the loan.

25       24.   A Bank of America "Home Loan Summary" providing a "Home
26   loan overview as of 8/11/2010" and detailing "Escrow account expenses" reflects
27   an escrow account expense for "Homeowners insurance" to "State Farm Ins

28

1   Group" due annually, with a "next due date" of "07/10/2011." *See* Exhibit S
2   hereto.

3       25.     Despite the existence of the State Farm Policy, Bank of America sent
4   Plaintiff Gustafson a notice dated January 3, 2011, stating, in part, that it would
5   force-place insurance, back-dated to December 6, 2010, if it did not receive proof
6   of insurance by February 7, 2011. *See* Notice, attached hereto as Exhibit T. The
7   notice also stated, in part: "Lender-Placed Hazard Insurance may be purchased
8   from an affiliate of Bank of America, N.A. Bank of America, N.A. may receive a
9   commission or other compensation in connection with obtaining this coverage."
10  *See id.*

11      26.     Plaintiff Gustafson later received a Notice of Lender-Placed Insurance
12  from Bank of America, dated February 10, 2011, stating that force-placed
13  insurance had indeed been placed on the property through Defendant Balboa
14  Insurance Company, back-dated to December 6, 2010. *See* Notice of Lender-
15  Placed Insurance, attached as Exhibit U hereto. At the time of the force-
16  placement, Balboa was a subsidiary and/or affiliate of Bank of America. Balboa,
17  along with one other force-placed insurance titan, Assurant Inc., writes
18  approximately 99% of residential force-placed insurance. *See* July 28, 2011
19  Testimony of Birny Birnbaum, Executive Director of the Center for Economic
20  Justice, Before the U.S. House of Representatives Subcommittee on Insurance,
21  Housing and Community Opportunity Committee on Financial Services
22  ("Birnbaum Testimony"), attached hereto as Exhibit V.

23      27.     The force-placed insurance policy was provided by Defendant Balboa
24  Insurance Company ("Balboa") with a premium of $1,045.00—nearly twice
25  Plaintiff Gustafson's prior premium of $614.00—charged to Plaintiff Gustafson's
26  escrow account on or about February 8, 2011. *See* Plaintiff Gustafson's Escrow
27  Account Statement, attached as Exhibit W hereto. Additionally, the force-placed
28

insurance policy provided substantially less coverage than Plaintiff Gustafson's State Farm Policy, in that the force-placed insurance policy was intended for the protection of BAC Home Loans Servicing only and covered only the structure itself. *See* Notice of Lender-Placed Insurance, attached as Exhibit U hereto.

28.    Further, the amount of coverage for the force-placed insurance policy greatly exceeded the lender's interest in the property, in that it exceeded the outstanding principal balance on the loan. The coverage was $76,300.00, whereas the outstanding loan balance was only $47,946.00. The Notice of Lender-Placed Insurance stated that in order to lower the amount of coverage to the lender's interest in the property, Plaintiff Gustafson had to affirmatively opt to do so by returning to Bank of America a written form within thirty-five days from the date posted on the Notice. *Id.*

29.    The force-placed policies issued to cover Plaintiff's property by Defendant Balboa, the provider chosen by Defendant BAC pursuant to the scheme described herein, named "BAC Home Loans Servicing, LP" as the named insured, not Plaintiff. Thus, Plaintiff did not enter into a contract with Defendant Balboa. Indeed the "Notice of Lender-Placed Insurance" generated by BAC Home Loans Servicing and provided to Plaintiff specifically states "[t]here is no contract of insurance between the BORROWER and Balboa Insurance Company." Exhibit U.

30.    While Plaintiff's mortgage contract, a standard form contract, allows the lender and, therefore, its servicing agent, to pay for property insurance costs when necessary and appropriate, and to be reimbursed by the borrower, *see* First Mortgage, attached hereto as Exhibit A, the mortgage contract does not authorize either the lender or the servicer to mark-up the actual costs of those services in order to make a profit at the borrower's expense.

**Defendants**

31.   Defendant Bank of America, N.A., a subsidiary of Bank of America Corporation, is a Delaware corporation with its principal place of business located in Charlotte, North Carolina.   Bank of America directly and/or through its subsidiaries, owns and services loans secured by mortgages on real estate located throughout the United States, including California.

32.   Defendant BAC Home Loans Servicing, LP (formerly known as Countrywide Home Loans Servicing, LP), a subsidiary of Bank of America Corporation, is a Texas limited partnership with its principal place of business in Calabasas, California.   BAC Home Loans Servicing services mortgage loans and provides mortgage services, including conducting foreclosures on mortgages, on behalf of holders of residential mortgages and mortgage loan asset-backed certificates.

33.   Defendant Balboa Insurance Company, formerly a subsidiary and/or affiliate of Bank of America, is a California corporation headquartered in Irvine, California.   Balboa provides force-placed insurance policies on real estate located throughout the United States, including California.   The relationship between Bank of America and its former subsidiary and/or affiliate Balboa Insurance Company was a non-competitive and exclusive relationship whereby both parties benefitted at the expense of the consumer by forcing consumers to pay for excessively-priced force-placed insurance policies well in excess of the actual cost of comparable policies in the open market.   The excessive mark-up in price of the Balboa Insurance Company force-placed insurance policy did not represent the actual cost of providing the insurance, but instead represented fees and commissions (or kickbacks) to Bank of America, N.A, BAC Home Loans Servicing and Balboa Insurance Company.

34.   The insurance policies that were forced placed by the Bank of

1   America Defendants through Defendant Balboa named the lender or servicer as the

2   named insured under the force-placed policies and did not include the borrower as

3   a named insured. *See* Exhibit U.

4   **FACTUAL ALLEGATIONS**

5        **Defendants' Operations**

6      35.   Bank of America describes itself as one of the world's largest

7   financial institutions, serving individual consumers, small- and middle-market

8   businesses and large corporations with a full range of banking, investing, asset

9   management and other financial and risk management products and services. *See*

10   http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irol-homepro file.

11      36.   Bank of America originates mortgage loans and acquires loans from

12   other lenders.  Each such loan is secured by a deed of trust on the underlying

13   property.  BAC Home Loans Servicing services such loans.

14      37.   Through its subsidiaries and affiliates, Bank of America operates

15   through 5,900 retail offices, has approximately 5,300 mortgage loan offices and is

16   the No. 1 mortgage loan servicer in the United States.  *See* Bank of America

17   Corporation, Annual Report (Form 10-K), at 1 (February 25, 2011).

18      38.   Until approximately June 1, 2011, Bank of America and BAC Home

19   Loans Servicing were affiliates of Balboa.  On June 1, 2011, Bank of America

20   announced the completion of the sale of Balboa and affiliated entities to QBE

21   Insurance Group ("QBE").  Notably, the terms of the sale included an agreement

22   that QBE will maintain long-term distribution agreements with Bank of America

23   for force-placed insurance.  *See* Press Release, Bank of America Corporation, *Bank*

24   *of America Completes Sale of Balboa Insurance Business to QBE* (June 1, 2011),

25   attached as Exhibit X hereto.

26      39.   Balboa maintains relationships with numerous lenders and provides

27   both insurance tracking services and force-placed insurance policies nationwide.

28

1    *See*   http://www.balboainsurance.com/LenderProducts/LenderPlacedHazard/tabid/
2    169/Default.aspx.

3           **Force-placed Insurance**

4         40.    In order to protect the mortgagee's interest in the secured property,
5    mortgage loan contracts typically allow the lender or third party servicer to "force-
6    place" insurance when the homeowner fails to maintain the insurance.

7         41.    The mortgage contract does not disclose, however, that the lender or
8    other servicer will receive a financial benefit in connection with the force-placed
9    insurance policy.  Instead, the contract misrepresents to borrowers that the cost
10   passed on them is necessary to protect the lender's interest in the secured property.

11         42.    These lender-placed or "force-placed" insurance policies are almost
12   always more expensive than standard insurance coverage.  Reportedly, such
13   policies can cost as much as ten times more than standard policies.  While the
14   force-placed insurance policy is for the benefit of the lender, the cost is passed on
15   to the borrower (or passed on to holders of mortgage-backed securities).  *See* Jeff
16   Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*,
17   American Banker (November 10, 2010), attached hereto as Exhibit Y (referred to
18   herein as "Ties to Insurers").  *See also American Banker Wins Investigative*
19   *Journalism Award*, American Banker (March 18, 2011), attached as Exhibit EE
20   hereto.

21         43.    Once a servicer receives evidence that a borrower has obtained his/her
22   own insurance policy, the force-placed coverage is (or should be) fully or partially
23   canceled.

24         **Mortgage Loan Servicers Commonly Have Undisclosed**
25         **Lucrative Pre-Arranged Agreements to Refer Borrowers to**
          **Certain Force-Placed Insurance Providers**

26

27

28

44.     The force-placing of insurance policies can be a very lucrative business for servicers. Commonly, the servicer selects the provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit. The servicer benefits by placing the policy either: (a) with an affiliate, or (b) with a third party provider who has already agreed to share revenue with the servicer in the form a direct commission payment or through a "captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary/affiliate of the servicer.

45.     Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent." Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

46.     Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.

47.     Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:

# Sharing in the Profits

How servicers make money arranging force-placed coverage

## Commissions

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer

Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale





## Reinsurance

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

48.    Borrowers have no say or input into the carrier or terms of the force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer

49.    For their part, servicers have no incentive to comparison shop for the best rate.  Rather, servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums.

50.    Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.  Upon information and belief, Defendants Bank of America and BAC Home Loans Servicing (both subsidiaries of Bank of America

1   Corporation) are parties to such an agreement with Defendant Balboa (also a

2   subsidiary of Bank of America Corporation until June 2011).

3       51.   Force-placed insurance policies are not underwritten on an individual

4   policy basis.   Rather, servicers' contracts with force-placed insurance providers

5   require or at least permit the insurer to automatically issue these policies when a

6   borrower's insurance coverage is not maintained.

7       52.   Servicers often go so far as to actually outsource their insurance

8   processing to the force-placed insurance provider.   Balboa, for instance, provides

9   Bank of America and BAC Home Loans Servicing with "state of the art insurance

10  tracking."     See   http://www.balboainsurance.com/LenderProducts/LenderPlaced

11  Hazard/tabid/169/Default.aspx.     The provider then continuously monitors the

12  servicer's mortgage portfolio and verifies the existence of insurance on each

13  mortgaged property.   In the event that borrowers do not maintain adequate

14  insurance coverage, the insurer promptly issues an insurance certificate on the

15  property on behalf and for the benefit of the servicer.   Thus, where these servicers

16  receive commissions from force-placed insurance providers (which are ultimately

17  charged to borrowers), they are performing no service for the commissions they

18  receive other than simply providing the referral.   *See* Exhibit Y, Ties to Insurers,

19  *supra.*

20      53.   Force-placed insurer subsidiaries are highly profitable businesses.

21  "Among a published ranking of companies with the strongest operating insurance

22  subsidiaries, several bank holding companies stand out . . . . Companies with

23  insurance subsidiaries providing force-placed property insurance were at the top of

24  the list.     These included Assurant Inc. and Bank of America."     *See*

25  http://www.mainstreet.com/print/18604.

26      54.   Further, "[t]he incentives and potential for abuse in the administration

27  of LPI are great.   Consumers do not request the insurance, but are forced to pay for

28

it.  The cost of LPI [lender placed insurance] is much higher than a policy the borrower would purchase on his or her own.  Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage."  *See* Birnbaum Testimony, attached hereto as Exhibit V.

55.    In addition, "The prices for residential property LPI are significantly excessive.  In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%.  Incredibly, lenders get a commission—totaling hundreds of millions of dollars—out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral.  The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance—so the lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance."  *Id.*

56.    While servicers profit greatly from the business of force-placed insurance, upon information and belief, they maintain a shroud of secrecy and do not separately report their income from payments received from providers of force-placed insurance.  However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."  *See* Exhibit Y, Ties to Insurers (noting that servicers demand generous commissions and other payments in return for their referrals).

57.    Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting.  However, as *American Banker* noted:

> Though part of the extra expense can be explained by the
> higher risks associated with insuring the homes of

1
2
3

> delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand.

4  *See* Exhibit Y, Ties to Insurers, *supra.*

5       58.    Force-placed insurance providers have tools to assess risk and
6  minimize unexpected risk of loss.  As stated succinctly in January of 2007 by John
7  Meadows (described on Balboa's website as a "Lender-Placed Insurance Veteran"
8  http://www.balboainsurance.com/AboutBalboa/PressRoom/tabid/158/Default.aspx
9  ), "Leveraging technologies and data elements that are available in most servicer's
10 systems, an innovative lender-placed carrier can offer products that take into
11 account relevant property-specific risk characteristics to determine premium rates."
12 *See* John Meadows, *"Evaluate Processes And Controls To Ensure Insurance*
13 *Efficiencies,"* Servicing Management, January 2007, attached hereto as Exhibit Z.

14      59.    Servicers also attempt to blame the exorbitant cost of force-placed
15 insurance on the fact that the policy is issued without the benefit of a prior
16 inspection of the property.  However, according to the National Consumer Law
17 Center, as a general matter, insurers do not routinely inspect residential properties
18 in the course of underwriting.  *See* Exhibit Y, Ties to Insurers.

19 **Defendants Often Charge Borrowers for Redundant or Otherwise**
   **Unnecessary Insurance**
20
21      60.    Unnecessary or inappropriately priced hazard insurance arises when a
22 servicer forces borrowers to purchase and maintain hazard insurance for their
23 property that is unnecessary, duplicative and/or in amounts greater than required
24 by law or their mortgage agreements.

25      61.    Motivated by the lucrative financial incentive associated with force-
26 placing insurance, upon information and belief, Defendants have commonly
27 required borrowers to pay for unnecessary insurance coverage.  Such examples

28

include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of time for which no risk of loss any longer exists; and (c) requiring borrowers to pay for force-placed insurance policies covering periods of time following a lapse of previous insurance despite the fact that the lender's interest in the property was covered for such time pursuant to either a "standard mortgage clause,"[3] or, upon information and belief, a Lender's Loss Payable Endorsement in the previous policy, either of which continues the Lender's coverage following a lapse for non-payment of premium.

62.    Simply put, force-placed hazard insurance policies should not be backdated.  The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature."  *See, e.g.*, Exhibit Y, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "'should not be back-dated to collect premiums for a time period that has already passed'"). Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper.

63.    Moreover, the overwhelming majority of mortgages contain a requirement that the borrower purchase property insurance containing a "standard mortgage clause,"[4] and, further, upon information and belief, many hazard

---

[3]    *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 31-42 (1997).

[4]    *See* Fannie Mae standard contracts for all fifty states, available at https://www.efanniemae.com/sf/formsdocs/documents/secinstruments/; *see also*

insurance policies contain a "Lender's Loss Payable Endorsement," pursuant to which coverage for the lender continues even after the insured has failed to pay premiums. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage. The force-placed policies issued by Defendant Balboa pursuant to and in accordance with the scheme described herein thus generate improper windfalls to Defendant Balboa at the expense of borrowers with whom Defendant Balboa has no contractual relationship. The sole justification for the tactics described above is the unjust enrichment of Defendants herein, including Defendant Balboa.

**Government Response**

64. United States attorneys general are cognizant of and have taken action concerning servicers' abusive practices relating to force-placed insurance. Recently, a coalition of all 50 United States attorneys general proposed a settlement agreement with servicers to address numerous problems that have surfaced during the foreclosure crisis. *See* Jeff Horowitz, *Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies*, American Banker (March 10, 2011), attached hereto as Exhibit AA. "Their targets are the five biggest mortgage lenders—Bank of America, JPMorgan Chase, Wells Fargo, Citigroup and Ally Financial (previously GMAC)." *See* Dave Lieber, *Everyone profits off force-placed insurance, except homeowner,* Star-Telegram (October 1, 2011), attached hereto as Exhibit BB.

65. Among other terms, the proposed settlement would essentially

standard form contract for Pennsylvania, attached hereto as Exhibit CC.

prohibit servicers from profiting from force-placed insurance.  Specifically, under the proposed settlement, mortgage servicers: (a) are prohibited from force-placing insurance when the servicer knows or has reason to know that the borrower has a policy in effect that meets the minimum requirement of the loan documents; (b) cannot force-place insurance that is in excess of the lender's interest in the mortgaged property; (c) are prohibited from purchasing the force-placed insurance from a subsidiary, affiliate, or any entity in which they have an ownership interest; (d) must make reasonable efforts to continue or reestablish the borrower's *existing* insurance policy if there is a lapse in payment; and (e) must purchase the force-placed insurance for a commercially reasonable price.  *See* Proposed Settlement Agreement, attached as Exhibit DD hereto.

**Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance**

66.   As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business." *See* Exhibit Y, Ties to Insurers, *supra*.  These costs are ultimately paid by the borrowers and serve to unjustly enrich all Defendants, including those with whom the borrower has no contractual relationship such as Defendant Balboa.

67.   Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher—implying paydays for servicers amounting to hundreds of millions of dollars per year. *Id.*

68.   Bank of America's and BAC Home Loans Servicing's practices of referring force-placed insurance business to affiliates or otherwise profiting from the force-placement of insurance policies tend to keep premiums for force-placed

1    insurance artificially inflated over time because a percentage of borrowers'
2    premiums are not actually being paid to cover actual risk, but are simply funding
3    illegal kickbacks. Amounts paid to servicers as commissions have become a part
4    of the cost of doing business for force-placed insurance providers. As a result,
5    force-placed insurance premiums incorporate the payment of such kickbacks—to
6    the detriment of consumers.

7        69.    Defendants' conduct has threatened and, indeed, stifled competition.
8    As the NAIC recently opined when asked whether pricing in the area of force-
9    placed insurance industry is competitive, servicers have "no incentive to select a
10   competitively priced product, but instead would be more concerned with selecting
11   one they know best protects the bank's interests or one where they are provided
12   with an incentive or inducement to enter into the transaction." *See* Exhibit Y, Ties
13   to Insurers, *supra.*

14   **CLASS ACTION ALLEGATIONS**

15       70.    Plaintiff brings this action pursuant to Federal Rules of Civil
16   Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of himself and the
17   following Class:

18           all persons who have or had a residential mortgage loan
             or line of credit owned and/or serviced by Bank of
19           America, N.A. or BAC Home Loans Servicing, LP and,
20           in connection therewith, were required to pay for "force-
             placed" hazard insurance on the secured property
21           between June 16, 2007[5] and the present.

22       71.    The Class excludes Defendants and any entity in which Defendants

23

24   _____

25   [5]    Plaintiff reserves his right to seek modification of the Class Period definition
26   in the likely event that further investigation/discovery reveals a more appropriate
     and broader time period.

27

28

1  have a controlling interest, and their officers, directors, legal representatives,
2  successors and assigns.

3      72.    The Class is so numerous that joinder of all members is impracticable.

4      73.    A Class action is superior to all other available methods for the fair
5  and efficient adjudication of this controversy.

6      74.    Plaintiff's claims are typical of the claims of the Class.

7      75.    There are questions of law and fact common to the Class, including
8  but not limited to:

9          (a)    Whether Defendants Bank of America and BAC Home
10  Loans Servicing maintained a policy of referring force-placed insurance business
11  to affiliates;

12          (b)    Whether Defendants Bank of America and BAC Home
13  Loans Servicing received commission payments from force-placed insurance
14  providers;

15          (c)    Whether Defendants Bank of America and BAC Home
16  Loan Servicing received unauthorized and illicit payments in connection with
17  force-placed insurance that were unrelated to any bona fide service in connection
18  with the force-placed insurance and its purpose;

19          (d)    Whether Defendants wrongfully backdated forced-placed
20  insurance policies;

21          (e)    Whether Defendants violated their implied covenant of
22  good faith and fair dealing;

23          (f)    Whether Defendant Balboa has been unjustly enriched;
24  and

25          (g)    Whether Defendants are liable to Plaintiff and the Class
26  for damages and, if so, the measure of such damages.

27

28

1     76.    These and other questions of law and/or fact are common to the Class

2  and predominate over any questions affecting only individual Class members.

3     77.    The same common issues predominate with respect to all Class

4  members, regardless of whether their loans were originated by or merely serviced

5  by Defendants.

6     78.    Plaintiff will fairly and adequately represent and protect the interests

7  of the members of the Class.  Plaintiff has no claims antagonistic to those of the

8  Class.  Plaintiff has retained counsel competent and experienced in complex

9  nationwide class actions, including all aspects of litigation.  Plaintiff's counsel will

10  fairly, adequately and vigorously protect the interests of the Class.

11     79.    Class action status is warranted under Rule 23(b)(1)(A) because the

12  prosecution of separate actions by or against individual members of the Class

13  would create a risk of inconsistent or varying adjudications with respect to

14  individual members of the Class, which would establish incompatible standards of

15  conduct for Defendants.

16     80.    Class action status is also warranted under Rule 23(b)(1)(B) because

17  the prosecution of separate actions by or against individual members of the Class

18  would create a risk of adjudications with respect to individual members of the

19  Class which would, as a practical matter, be dispositive of the interests of the other

20  members not parties to the adjudications or substantially impair or impede their

21  ability to protect their interests.

22     81.    Class action status is also warranted under Rule 23(b)(2) because

23  Defendants have acted or refused to act on grounds generally applicable to the

24  Class, thereby making appropriate final injunctive relief or corresponding

25  declaratory relief with respect to the Class as a whole.

26     82.    Class action status is also warranted under Rule 23(b)(3) because

27  questions of law or fact common to the members of the Class predominate over

28

1 | any questions affecting only individual members, and a class action is superior to
2 | other available methods for the fair and efficient adjudication of this controversy.

### CLAIMS FOR RELIEF

### COUNT ONE

**(Against Defendants Bank of America and BAC Home Loans Servicing)**

**BREACH OF CONTRACT**
**(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)**

83.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

84.    Every contract contains an implied covenant of good faith and fair dealing.

85.    The mortgage contracts of Plaintiff and the Class contained an implied covenant of good faith and fair dealing, pursuant to which Defendants were bound to perform their obligations in good faith and to deal fairly with Plaintiff and the Class.

86.    In all of its actions described herein, BAC Home Loans Servicing acted on its own behalf and as the duly authorized agent of Bank of America or other owner or assignee of the mortgage agreements of Plaintiff and the Class. Defendants Bank of America and BAC Home Loans Servicing were contractually obligated to service the loans of Plaintiff and the Class pursuant to the terms of mortgage agreements.

87.    To the extent that the mortgage contracts of Plaintiff and the Class permitted Defendants to unilaterally "force-place" insurance, Defendants were obligated not to exercise their discretion to do so capriciously and in bad faith for their own financial gain for the purposes of maximizing profits at borrowers' expense.

88.   Defendants breached their duties of good faith and fair dealing in at least the following respects, among others:

(a)   Failing to make any effort whatsoever to maintain borrowers' existing insurance policies and, instead—for the sole purpose of maximizing their own profits—forcing borrowers to pay for insurance policies from providers of Defendants' choice, such as Balboa.  These policies needlessly came with substantially greater premiums, while providing less coverage than borrowers' existing policies;

(b)   Using their discretion to choose a force-placed insurance provider and policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully forcing borrowers to pay for more than the cost of protecting the lender's interest in the secured property;

(c)   Failing to seek competitively priced insurance on the open market and instead selecting force-placed insurance providers according to pre-arranged secret deals whereby the insurance policies are continually purchased through the same companies;

(d)   Assessing excessive, unreasonable, and unnecessary insurance policy premiums against Plaintiff and the Class and misrepresenting the reason for the cost of the policies;

(e)   Backdating force-placed insurance policies to cover time periods which have already passed and for which there was already absolutely no risk of loss;

(f)   Misrepresenting in their force-placed insurance notices that borrowers were obligated to pay for backdated insurance coverage for periods during which the lender had no risk of loss due to the passing of time and/or the lender's coverage under a "standard mortgage clause" and/or a Lender's Loss Payable Endorsement;

1           (g)     Procuring force-placed insurance policies to cover time

2    periods during which the mortgagee is already covered pursuant to a Lender's Loss

3    Payable Endorsement; and

4           (h)     Failing to provide borrowers with any opportunity

5    whatsoever to opt out of having their force-placed insurance policies provided by

6    an insurer with whom Defendants had an affiliate relationship or commission

7    arrangement.

8         89.   As a direct, proximate, and legal result of the aforementioned

9    breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have

10   suffered damages.

**COUNT TWO**

**(Against Defendants Bank of America and BAC Home Loans Servicing)**

**BREACH OF CONTRACT**

14        90.   Plaintiff hereby incorporates by reference the preceding paragraphs as

15   if they were fully set forth herein.

16        91.   Defendants have serviced loans evidenced by substantially similar

17   standard form notes and mortgage contracts.

18        92.   In all of its actions described herein, BAC Home Loans Servicing

19   acted on its own behalf and as the duly authorized agent of Bank of America or

20   other owner or assignee of the mortgage agreements of Plaintiff and the Class.

21   Defendants Bank of America and BAC Home Loans Servicing were contractually

22   obligated to service the loans of Plaintiff and the Class members pursuant to the

23   terms of mortgage agreements.

24        93.   To the extent that the mortgage contracts of Plaintiff and the Class

25   members permitted Defendants to unilaterally "force-place" insurance, Defendants

26   were contractually permitted to do so only to the extent necessary to protect the

27   mortgagee's interest in the secured property.

28