1  **ROSMAN & GERMAIN LLP**
2  Daniel L. Germain (State Bar No. 143334)
   16311 Ventura Boulevard, Suite 1200
3  Encino, CA 91436-2152
4  Telephone: (818) 788-0877
   Facsimile: (818) 788-0885
5  *Counsel for Plaintiffs and the Proposed Class*
6  *[Additional counsel listed on signature page]*

7           **UNITED STATES DISTRICT COURT**

8           **CENTRAL DISTRICT OF CALIFORNIA**

9  CHRISTOPHER GUSTAFSON, ZAHID )    Case No.: SACV-11-00915-JST-AN
10 FRAZ, BUSHRA FRAZ and JASON )
   AIELLO, individually and on behalf of all )   **THIRD AMENDED CLASS**
11 others similarly situated, )              **ACTION COMPLAINT**
12                              )
            Plaintiffs, )
13                         )    **JURY TRIAL DEMANDED**
14     v.                  )
15 BAC HOME LOANS SERVICING, LP, )
16 BANK OF AMERICA, N.A.(individually )
   and as successor-in-interest to )
17 Countrywide Home Loans Servicing LP), )
18 BALBOA INSURANCE COMPANY, )
   BANC OF AMERICA INSURANCE )
19 SERVICES, INC., NEWPORT )
20 MANAGEMENT CORPORATION, )
   MERITPLAN INSURANCE COMPANY, )
21 QBE INSURANCE CORPORATION )
22 (individually and as successor-in interest to)
   Balboa Insurance Company), QBE FIRST )
23 INSURANCE AGENCY, INC. )
24 (individually and as successor-in interest to)
   Balboa Insurance Company) and JOHN )
25 DOES 1-10 )
26          Defendants. )
           _____ )
27

**INTRODUCTION**

1.   This is a proposed class action brought by Plaintiff Christopher Gustafson, Jason Aiello and Zahid and Bushra Fraz (referred to herein as "Plaintiffs") on behalf of themselves and all other persons who have or had a residential mortgage loan or line of credit owned and/or serviced by Defendants Bank of America, N.A. ("BANA") or BAC Home Loans Servicing, LP ("BACHLS") (together "BOA")[1] and, in connection therewith, were required to pay for lender-placed or "force-placed" hazard insurance policies provided by Balboa[2] Insurance Company ("Balboa") and/or QBE Insurance Corporation (QBE Corp.") and/or QBE First Insurance Agency, Inc. ("QBE First") (together "QBE") and/or other force-placed insurance provider subsidiaries or affiliates of Defendant Balboa and Defendant QBE Insurance Corporation including Banc of America Insurance Services, Inc. ("BAISI"), Newport Management Corporation ("Newport") and Meritplan Insurance Agency, Inc. ("Meritplan")(collectively "Defendants") on the secured property between June 16, 2007 and the present (the Class Period").

---

[1]   Plaintiffs bring this action against the Bank of America Defendants in their individual capacities and as successors-in-interest to Countrywide Financial Corporation following Bank of America Corp.'s purchase of Countrywide Financial Corporation on July 1, 2008. *See* Bank of America Press Release dated July 1, 2008 attached hereto as Exhibit 1; Certificate of Amendment to the Certificate of Limited Partnership filed with the Secretary of State of Texas dated April 21, 2009 changing the name of Countrywide Home Loans Servicing LP to BAC Home Loans Servicing, LP attached as Exhibit 2.

[2]   Any reference herein to any defendant includes its subsidiaries, affiliates, assigns, successors and predecessors-in-interest.

2.     Lenders require borrowers to purchase and agree to maintain hazard insurance coverage on the secured property as a condition to funding.  Plaintiffs were all required to obtain and maintain hazard insurance as a condition of their mortgages. *See, e.g.*, Christopher A. Gustafson Mortgage, dated  2, 2002("Gustafson Mortgage") attached hereto as Exhibit 3;  Fraz and Bushra Deed of Trust dated May 12, 2005 ("Fraz 977 Mortgage") attached hereto as Exhibit 4; Zahid and Bushra Fraz Deed of Trust dated February 21, 2006 ("Fraz 875 Mortgage") attached hereto as Exhibit 5; Jason Aiello Deed of Trust dated  February 13, 2006  ("Aiello Mortgage") attached hereto as Exhibit 6.  In other words, hazard insurance must be obtained and in place for a borrower's home purchase and associated loan to close.

3.     In the event that borrowers fail to maintain their hazard insurance policies, rather than attempt to maintain delinquent borrowers' existing policies, mortgage loan servicers choose to replace borrowers' insurance policies with more expensive ones, known as "force-placed" insurance policies.  Such policies provide less coverage and are substantially more costly than the borrowers' original policies, while providing lucrative financial benefits to lenders, servicers and/or their affiliates, including the force-place insurance providers. In some instances borrowers are charged retroactively for coverage before the borrower is notified of the force-placement of the coverage. Further, such policies often provide unnecessary or duplicative coverage, in that they are improperly backdated to collect premiums for time periods during which the mortgagor has absolutely no risk of loss.  In all respects, this conduct attributable to all Defendants herein is without justification serving only to enrich all of the Defendants at a significant cost to the borrowers.

4.     Defendants acted together to exploit BOA's ability to force-place insurance to reap additional, unjustified profits in the form of fees, commissions, rebates, ceded reinsurance premiums and other forms of consideration at the expense

3

of borrowers whose hazard insurance was force placed. These fees and charges were not legitimately related to the cost of the force-placed insurance or the purposes for which force-placed insurance is purchased – to protect the lender's interest in the property.  The premiums paid by Plaintiffs and Class members included amounts not attributable to cost of providing force-placed insurance, but are expenses associated with servicing the loans.  Thus, the small percentage of borrowers who paid for force-placed insurance, were shouldering the costs of monitoring the entire loan portfolio, and in effect amount to a subsidy paid to BOA by borrowers whose insurance was force-placed, that is a kickback to BOA. *See* Testimony of Birny Birnbaum on Behalf of the Center for Economic Justice for the Florida Office of Insurance Regulation on July 3, 2012 attached hereto as Exhibit 7 ("Birnbaum Florida Testimony").

5. The web of relationships among the Defendants and the arrangements between them funneled profits to BOA which were generated through their collusive activities.  Each defendant participated in the scheme with the knowledge and collusion of the other participants as described in greater detail herein.

6. As one journalist observed:

> In the pantheon of modern-day mortgage abuses, force-placed insurance hasn't attracted much attention. But it generates hundreds of millions of dollars a year in fees and commissions for insurance companies, banks and other financial institutions.  Policies are sometimes backdated to cover periods that have already passed.

> In essence, critics say, high-priced insurance policies cover a time when no events happened. And often, the mortgage company and the force-placed-insurance company are affiliated, with the mortgage company receiving a "service fee" in return for the business. But homeowners don't know that."

*See* Dave Lieber, *Everyone Profits Off Force-Placed Insurance, Except Homeowner*, Star-Telegram (Oct. 1, 2011), available at: http://www.star-

4

telegram.com/2011/10/01/3412434/ everyone-profits-off-force-placed.html, attached hereto as Exhibit 8.

7.     Recently, the force-placed insurance practices of lenders, servicers and insurance companies have, in fact, come under increased scrutiny.  The New York Department of Financial Services recently convened hearings to investigate the force-placed insurance industry.  Superintendent Benjamin Lawsky noted in his opening statement that the Department's initial inquiry uncovered "serious concerns and red flags" which included 1) exponentially higher premiums for force-placed insurance than regular homeowners insurance; 2) extraordinarily low loss ratios; 3) harm to distressed borrowers; 4) lack of competition in the market; 5) force-placed insurance has become a major profit center for both banks and insurers; and 6) "tight relationships between banks, their subsidiaries and insurers."  As the Superintendent Lawsky of New York's Financial Services Department summarized, the net result of these practices:

> Take the form of large commissions being paid by insurers to the banks for what appears to be very little.  In other cases, banks have set up reinsurance subsidiaries who take over the risk from the insurance companies.  Thus, the banks pay high premiums for coverage that is highly profitable and then those profits revert right back to the banks through reinsurance agreements.

*     *     *     *

> In sum, when you combine [the] close and intricate web of relationships between banks and insurance companies on the one hand, with high premiums, low loss ratios and lack of competition on the other hand, it raises serious issues and questions….

Opening Statement of Benjamin M. Lawsky, Superintendent of Financial Services, May 17, 2012 attached hereto as Exhibit 9.

5

8.     In this action, Plaintiffs challenge, among other things and as further described herein,  BOA's  practice of purchasing force-placed hazard insurance from Defendants Balboa, QBE Corp. and QBE First and/or other subsidiaries of Defendant Balboa or QBE, including Meritplan, BAISI and Newport,  pursuant to agreements that return a financial benefit to BOA or its affiliates that is unrelated to any contractual or other *bona fide* interest in protecting the Lender's interest in the loan, and which results in the force-placement of unnecessary insurance and unauthorized, unjustified and unfairly inflated costs to the borrower for force-placed hazard insurance in violation of law.

9.     In connection with government investigations of force-placed insurance practices of banks, mortgage loan servicers and force-placed insurance providers and the negative effects on consumers resulting from those practices, many such entities, including Defendants, are currently the subject of government investigation.  These investigations have resulted in law enforcement officials issuing subpoenas to mortgage lenders, servicers, and insurers, including Defendants Balboa Insurance Company, Meritplan Insurance Company, and QBE Insurance Company. *See Under Interrogation,* American Banker (Jan. 27, 2012), http://www.americanbanker.com/news/force-placed-insurance-subpoenas-10461 59-1.html, attached hereto as Exhibit 10; Gretchen Morgenson, *Hazard Insurance With Its Own Perils,* N.Y. Times (Jan. 21, 2012), available at http://www.nytimes.com/2012/01/22/business/ hazard-insurance-with-its-own-perils-fair-game.html, attached hereto as Exhibit 11.

10.     The New York Department of Financial Services conducted fact finding hearings in furtherance of its investigation into on May 17, 18 and 21, 2012 during which the force-placed insurance practices of Balboa, QBE, QBEFirst, their affiliates and subsidiaries and their bank partners were among the topics addressed by witnesses

6

and in written testimony.  *See e.g.* Written Testimony of Nicholas Pastor and Matthew Freeman On behalf Of  QBE Insurance Corporation and QBE FIRST Insurance Agency, Inc. dated May 1, 2012 submitted to the New York Department of Financial Services In Advance of Non-Adjudicatory Hearings to be Held Pursuant to Financial Services Law Sections 305 and 306 ("QBE Testimony")  attached hereto as Exhibit 12; Testimony of Tim Burdick in Response to the April 12, 2012 Notice of Hearing Issued By the New York State Department of Financial Services ("BAISI Testimony") attached hereto as Exhibit 13; Testimony of Stephen Smith in Response to the April 12, 2012 Notice of Hearing Issued By the New York State Department of Financial Services ("BANA Testimony") attached hereto as Exhibit 14;  Testimony of Jeffrey White and John Meadows On Behalf of Balboa Insurance Company dated May 1, 2012 Submitted to be Held Pursuant to Financial Services Law Sections 305 and 306 ("Balboa Testimony") attached hereto as Exhibit 15; Testimony of Birny Birnbaum on behalf of the Center for Economic Justice, Public Hearing on Force-Placed Insurance before the New York Department of Financial Services, May 21, 2012 ("Birnbaum NYDFS Testimony") attached hereto as Exhibit 16; and Testimony of J. Robert Hunter, of the Consumer Federation of America dated May 17, 2012 ("Hunter NYDFS Testimony") attached hereto as Exhibit 17.

11.     Bank of America drew the particular attention of the New York Financial Services Department at the May hearings where Superintendent Lawsky noted that it was the only major bank that was directly affiliated with a force-placed insurer, Balboa.  *See* Jeff Horwitz, *Force-Placed Insurance Payments Target of New York Hearing*, 2012 WLNR 10405638, Vol. 177, Issue F319 attached hereto as Exhibit 18.

12.     Throughout the Class Period, Defendants have engaged in individually and in concert with one another, unlawful, abusive and unfair practices with respect to force-placed insurance, including, among others and as described in further detail

below: (a) force-placing insurance according to pre-arranged agreements from their own affiliates at a substantial high cost to the borrower; (b) charging class members unreasonably high amounts for FPI, which amounts include unreasonable expenses unrelated to the provision of FPI and which result from collusion among affiliates involved in the process (c) receiving fees, payments, commissions and/or other things of value from providers of force-placed insurance; (d) forcing borrowers to pay for duplicative insurance coverage; (d) improperly exploiting the ability to manage and gain access to escrow funds in breach of fiduciary obligations to increase profits to lenders, servicers and insurance providers; (e) using the mail and wires to conduct a scheme to defraud Plaintiffs and the Class by taking advantage of the lender's contractual authority to force-place hazard insurance and to create and manage escrow funds; (f) misrepresenting that Defendants were force-placing hazard insurance on Plaintiffs and Class members' properties to secure their interests and omitting to inform Plaintiffs and the Class that they were force-placing hazard insurance on their homes to not only protect the lender's interest, as contemplated by the mortgage contracts, but in such a manner as to generate an unreasonable and unwarranted profit for each of the Defendants in violation of the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. 1962(c); and (g) conspiring to take advantage of their contractual authority to force-place Plaintiffs and Class members hazard insurance pursuant to pre-arranged agreements that return an undisclosed and improper financial benefit to each Defendants, their affiliates and subsidiaries in violation of RICO, 18 U.S.C. 1962(d).

13.   BOA's unlawful actions include as described in further detail below, *inter alia*, (a) designing and implementing a scheme to use its authority to force-place hazard insurance to protect a lender's interests in properties secured by mortgages to generate unjustified profits for itself and other scheme members which were not

disclosed to borrowers whose insurance was force-placed; (b) electing to purchase higher-priced insurance policies from its exclusive force-placed insurance providers and fellow scheme member(s) for their mutual benefit; (c) entering into pre-arranged collusive agreements to acquire force-placed insurance from Balboa and, after the sale of substantially all of Balboa's assets to QBE, from QBE and/or QBE First thereby diminishing any benefit to be gained by borrowers through open market or competitive purchasing environment; (d) entering into pre-arranged agreements with fellow scheme members designed to yield exorbitant force-placed insurance charges to class members in order to maximize their own profits without any regard whatsoever for competitive pricing to the detriment of borrowers; (e) working with fellow scheme members to backdate the force-placed insurance policies to charge for retroactive coverage; (f) giving and receiving "kickbacks" among scheme members in the form of purported fees, payments, commissions, "rebates" and/or other things of value from providers of force-placed insurance (including Balboa, BAISI, Newport, Meritplan, QBE and QBE First) for the procurement of the force-placed policies ; (g) improperly exploiting their ability to manage and gain access to escrow funds in breach of fiduciary obligations relating to the management of escrow funds in order to increase profits to its fellow scheme members; (h) using and agreeing to the use the mail and wires to execute a scheme to defraud borrowers through the force-placed insurance scheme; (i) misrepresenting the reasons for the high cost of force-placed insurance to Plaintiffs and Class members; (j) omitting to inform Plaintiffs and Class members that force-placed insurance practices did not only protect its interest in Plaintiffs' and Class members' properties but also generated unwarranted profits for itself and fellow scheme members; and (k) conspiring with co-Defendants Balboa, Newport, Meritplan, BAISI, QBE Corp. QBE First and their subsidiaries and/or affiliates to improperly profit from BOA's right to force-place Plaintiffs and Class

9

1    members' hazard insurance.   These actions constitute a pattern of exploitative

2    profiteering and self-dealing engaged in by BOA and its Co-Defendants, acting in

3    concert, against the interests of Plaintiffs and the Class.

4          14.    Plaintiffs assert herein the following claims against BOA: (1)

5    state/common law claims against BOA for  breach of its contractual obligations,

6    including its implied covenant of good faith and fair dealing, owed to Plaintiffs and

7    the other Class members; (2) state/common law claims against BOA for  breach its

8    fiduciary duties/misappropriation of escrow funds held and managed by BOA for the

9    purpose of paying Escrow Items in accordance with the terms of Plaintiffs' mortgages;

10   (3) claims for violation of the Racketeer Influenced and Corrupt Organizations Act, 18

11   U.S.C. § 1962(c),  as further described below (4) claims for violation of California

12   Business & Professions Code §§ 17200, *et seq*.;  and (5) claims for engaging in a

13   conspiracy to defraud Plaintiffs and the Class in violation of RICO 18 U.S.C

14   §1962(d).  BOA was an integral part of the force-placed insurance scheme described

15   herein and was aware, at all times of the roles and actions taken by other scheme

16   members in pursuit of the improper goal of the scheme.

17         15.    Defendants Balboa, Newport, Meritplan, BAISI, QBE Corp. and QBE

18   First's unlawful actions include (a) devising and colluding in Defendants' unlawful

19   scheme to defraud Plaintiffs and the Class; (b) aiding and abetting BOA's breach of

20   fiduciary duty pursuant to which they sold unconscionably high-priced, unnecessary

21   and duplicative force-placed hazard insurance coverage and related services, including

22   tracking BOA's loan portfolio and binding and obligating Plaintiffs and Class

23   members, through the improper utilization of access to escrow funds, to pay for the

24   improper force-placed insurance to maximize Defendants' profits to the detriment of

25   borrowers;  (c) using and agreeing to the use of mails and wires to in furtherance of

26   the scheme to defraud; (d)  misrepresenting the reasons for the high cost of force-

27

10

placed insurance; (e) omitting to inform Plaintiffs and Class members that they would be improperly profiting from the force-placed insurance; (d) misrepresenting to Plaintiffs and Class Members that they were authorized to force-place high cost, unnecessary, and duplicative insurance in the manner described herein; and (e) conspiring with co-defendants BANA and BACHLS and their subsidiaries and/or affiliates to improperly profit from BOA's right to force-place Plaintiffs and Class members' hazard insurance. Balboa, Newport, Meritplan, BAISI, QBE Corp. and QBE First were aware, at all times, of the true nature and purpose of the scheme described herein and took action, along with all other Defendants, in furtherance of the improper goal of the scheme.

16. Plaintiffs herein assert the following claims against BAISI, Balboa, Newport, Meritplan, QBE and QBE First and their subsidiaries and affiliates: (1) claims for aiding and abetting BOA's breach of fiduciary duty; (2) claims for violation of California Business & Professions Code §§ 17200, *et seq*.; (3) Claims for using the mail and wires to execute a scheme to defraud Plaintiffs and the Class in violation of RICO, 18 U.S.C. § 1962 (c) and claims under 18 U.S.C. § 1962(c) for conspiring with BOA to devise and execute a scheme to defraud Plaintiffs and the Class; and (4) Sate/common law claims for restitution/unjust enrichment and disgorgement. BAISI, Balboa, Newport, Meritplan, QBE and QBE First knowingly participated in the scheme described herein and, along with all other Defendants, and took action in furtherance of the improper goal of the scheme.

17. In this action, Plaintiffs challenge Defendants' unlawful conduct and seek statutory and compensatory damages, as well as restitution/disgorgement for Defendants' unjust enrichment.

18. In this action, Plaintiffs do not challenge the rates of their force-placed hazard insurance as excessive. Rather, Plaintiffs challenge, among other things, and

11

as further described herein, *Defendants'* decision to purchase force-placed hazard insurance from insurers that provide a financial benefit to Defendants and/or their affiliates and at rates that far exceed borrower-purchased hazard insurance (while providing substantially less coverage).

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 18. U.S.C. §§ 1961, 1962 and 1964.  This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiffs are citizens of different states.  Defendants are citizens of different states. The amount in controversy in this action exceeds $5,000,000, and there are more than 100 members in the Class.

20.     In addition, this Court has diversity jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a).  The matter in controversy is greater than $75,000 and this matter is between citizens of different states.  This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants regularly conduct business in this district, some of the plaintiffs' property is located in this district, and/or a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

**Plaintiffs**

22.     Plaintiff Christopher Gustafson resides in Rock Island County, IL.

**Plaintiff Gustafson's Mortgage Transactions**

23.     On or about July 10, 2002, Plaintiff Christopher Gustafson purchased a property located at 519 14th Avenue, Silvis, IL with a first-lien mortgage loan

provided by American Bank & Trust Company ("ABT"), securing the principal indebtedness of $53,700.00. *See* Gustafson Mortgage, Ex. 3. On that same day, the First Mortgage was purchased by the Illinois Housing Development Authority. *See* Assignment, attached as Exhibit 19 hereto.

24. The Gustafson Mortgage is the operative mortgage for the claims asserted in this Complaint. The Gustafson Mortgage required Plaintiff Gustafson to maintain hazard insurance on the secured property for closing and as a condition of the loan and, further, required that all insurance policies include a "standard mortgage clause."[3] *See* Gustafson Mortgage ¶ 5.

25. Also on July 10, 2002, Plaintiff Gustafson obtained a second mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the principal indebtedness of $3,500.00. *See* Plaintiff Gustafson's 2002 ABT Second Mortgage ("Gustafson Second Mortgage"), attached as Exhibit 20 hereto.

26. On or about May 17, 2004, Plaintiff Gustafson obtained a mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the principal indebtedness of $5,072.00. *See* Plaintiff Gustafson's 2004 ABT Third Mortgage ("Gustafson Third Mortgage"), attached as Exhibit 21 hereto. Plaintiff Gustafson's Second Mortgage was subordinated to the Gustafson Third Mortgage. *See* Plaintiff Gustafson 2004 Subordination Agreement, attached as Exhibit 22 hereto.

27. On or about September 19, 2005, Plaintiff Gustafson obtained a mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the

---

[3]    A standard mortgage clause or lender's loss payable endorsement typically continues coverage for the lender even after the insured has failed to pay premiums. *See* Patrick A. Randolph, Jr., A Mortgagee's Interest in Casualty Loss Proceeds: Evolving Rules and Risks, 32 REAL PROP. PROB. & TR. J. 1, 2-3, 18-23 (1997).

13

principal indebtedness of $23,638.65.  *See* Gustafson 2005 ABT Fourth Mortgage ("Gustafson Fourth Mortgage"), attached as Exhibit 23 hereto.  On or about September 23, 2005, ABT released the Second Mortgage and the Third Mortgage.  *See* Exhibits 24 and 25 respectively, attached hereto.

28.     Plaintiff Gustafson subsequently encountered financial difficulties, relocated from his residence located at 519 14th Avenue, Silvis, IL to the residence of his parents, located at 115 27th Avenue, East Moline, IL, and rented his property located at 519 14th Avenue, Silvis, IL to a tenant.

29.     Subsequently, on or about August 15, 2007, Plaintiff Gustafson obtained a mortgage from ABT on the property located at 519 14th Avenue, Silvis, IL securing the principal indebtedness of $42,067.45.  *See* Gustafson 2007 ABT Fifth Mortgage ("Gustafson Fifth Mortgage"), attached as Exhibit 26 hereto[4].  In connection with the Gustafson Fifth Mortgage, Plaintiff Gustafson executed in favor of ABT an Assignment of Leases and Rents.  *See* Exhibit 27 hereto.  On or about August 30, 2007, ABT released the Fourth Mortgage.  *See* Exhibit 28 hereto.

30.     Plaintiff Gustafson fell behind on his mortgage payments and, on January 12, 2011, the Illinois Housing Development Authority filed a *lis pendens* notice of foreclosure with respect to the First Mortgage.  *See* Exhibit 29, attached hereto.

31.     Unable to catch up on his mortgage payments and seeking to avoid foreclosure, on or about June 13, 2011, Plaintiff Gustafson refinanced the Gustafson Mortgage and the Gustafson Fifth Mortgage with a mortgage from IH Mississippi

---

[4]     On September 4, 2007, the Fifth Mortgage was re-recorded, as the initial recorded mortgage incorrectly listed the property address as being that of Plaintiff Gustafson's parents.  For purposes of clarity, both recorded copies of the Fifth Mortgage are included in the attached Exhibit 26.

14

Valley Credit Union on the property located at 519 14th Avenue, Silvis, IL, securing the principal indebtedness of $63,177.60. *See* Gustafson 2011 Sixth Mortgage ("Gustafson Sixth Mortgage"), attached as Exhibit 30 hereto; Release of Gustafson Mortgage, attached as Exhibit 31 hereto; Release of Gustafson Fifth Mortgage, attached as Exhibit 32 hereto; and Release of Assignment of Leases and Rents, attached as Exhibit 33 hereto.

32.    On or about August 10, 2011, Plaintiff Gustafson sold the property located at 519 14th Avenue, Silvis, IL. *See* Warranty Deed, attached hereto as Exhibit 34.

**Plaintiff Gustafson's Force-Placed Insurance Policy**

33.    In connection with the Gustafson Mortgage, Plaintiff Gustafson obtained a homeowner's insurance policy from State Farm with a policy number of 73TK43223 ("State Farm Policy").  The premium for the policy for the period from July 10, 2010 through July 10, 2011 was $614.00, paid through Plaintiff Gustafson's escrow account. *See* Renewal Certificate, attached hereto as Exhibit 35.

34.    The State Farm Policy included a standard mortgage clause, as required by the mortgage.

35.    In approximately July of 2010, Plaintiff Gustafson began receiving correspondence from "Bank of America Home Loans," a division of Bank of America, identifying BAC Home Loans Servicing as the new servicer for the loan.

36.    A Bank of America "Home Loan Summary"  providing a "Home loan overview as of 8/11/2010" and detailing "Escrow account expenses" reflects an escrow account expense for "Homeowners insurance" to "State Farm Ins Group" due annually, with a "next due date" of "07/10/2011." *See* Exhibit 36 hereto.

37.    Despite the existence of the State Farm Policy, Bank of America sent Plaintiff Gustafson a notice dated January 3, 2011, stating, in part, that it would force-

15

place insurance, back-dated to December 6, 2010, if it did not receive proof of insurance by February 7, 2011.  *See* Notice, attached hereto as Exhibit 37.  The notice also stated, in part: "Lender-Placed Hazard Insurance may be purchased from an affiliate of Bank of America, N.A.  Bank of America, N.A. may receive a commission or other compensation in connection with obtaining this coverage."  *See id.*

38.   Plaintiff Gustafson later received a Notice of Lender-Placed Insurance from Bank of America, dated February 10, 2011, stating that force-placed insurance had indeed been placed on the property through Defendant Balboa Insurance Company, back-dated to December 6, 2010.  *See* Notice of Lender-Placed Insurance, attached as Exhibit 38 hereto.  At the time of the force-placement, Balboa was a subsidiary and/or affiliate of Bank of America.  Balboa, along with one other force-placed insurance titan, Assurant Inc., writes approximately 99% of residential force-placed insurance in America.  *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services ("Birnbaum 2011Testimony"), attached hereto as Exhibit 39.

39.   The force-placed insurance policy was provided by Defendant Balboa Insurance Company ("Balboa") with a premium of $1,045.00—nearly twice Plaintiff Gustafson's prior premium of $614.00—charged to Plaintiff Gustafson's escrow account on or about February 8, 2011.  *See* Plaintiff Gustafson's Escrow Account Statement, attached as Exhibit 40 hereto.  Additionally, the force-placed insurance policy provided substantially less coverage than Plaintiff Gustafson's State Farm Policy, in that the force-placed insurance policy was intended for the protection of BAC Home Loans Servicing only and covered only the structure itself.  *See* Notice of Lender-Placed Insurance, attached as Exhibit 38 hereto.

40. Further, the amount of coverage for the force-placed insurance policy greatly exceeded the lender's interest in the property, in that it exceeded the outstanding principal balance on the loan. The coverage was $76,300.00, whereas the outstanding loan balance was only $47,946.00. The Notice of Lender-Placed Insurance stated that in order to lower the amount of coverage to the lender's interest in the property, Plaintiff Gustafson had to affirmatively opt to do so by returning to Bank of America a written form within thirty-five days from the date posted on the Notice. *Id.*

41. The force-placed policies issued to cover Plaintiff Gustafson's property by Defendant Balboa, the provider chosen by Defendant BAC pursuant to the scheme described herein, named "BAC Home Loans Servicing, LP" as the named insured, not Plaintiff. Thus, Plaintiff Gustafson did not enter into a contract with Defendant Balboa. Indeed the "Notice of Lender-Placed Insurance" generated by BAC Home Loans Servicing and provided to Plaintiff specifically states "[t]here is no contract of insurance between the BORROWER and Balboa Insurance Company." Exhibit 38.

42. While Plaintiff Gustafson's mortgage contract, a standard form contract, allows the lender and, therefore, its servicing agent, to pay for property insurance costs when necessary and appropriate, and to be reimbursed by the borrower, *see* Gustafson Mortgage, attached hereto as Exhibit 3(?), the mortgage contract does not authorize either the lender or the servicer to require the borrower to pay in excess of the net costs of those services in order for the lender and/or its affiliates to make a profit at the borrower's expense. Nor does the contract authorize the lender to negotiate with the insurer for the insurer to provide ancillary services to the lender where the cost of such services is built in to the premium for the force placed insurance.

17

**Plaintiffs Zahid and Bushra Fraz**

43.     Plaintiffs Zahid and Bushra Fraz are husband and wife ("the Frazes") and reside in San Bruno, California.

44.     The Frazes own(ed) two properties in San Bruno, California: 977 Masson Avenue, San Bruno, California 94066 (the "977 Property") and 875 Masson Avenue, San Bruno, California 94066 (the "875 Property").

**The Frazes' 977 Property Mortgage and Force-Placed Transactions**

45.     Beginning on or about July 10, 2000, the Frazes obtained a series of mortgages with Bank of America for their 977 Property.  ("977 Mortgages") which included a refinance loan through Benchmark entered on May 12, 2005, *see* Exhibit 4, believed to have been reassigned, sold or transferred to Countrywide Home Loans, Inc. on July 1, 2005, *see* Exhibit 41, and subject to a loan modification issued by Bank of America in October of 2009. Exhibit 42,

46.     On or around May 26, 2005, the Frazes declared 977 Mason Avenue as their primary residence, *see* Exhibit 43, and continue to maintain their primary residence at the 977 Property.

47.     The Frazes initially chose not to open an escrow account for hazard insurance and property taxes for the 977 Mortgages, and instead agreed to pay the expenses in full when due.  *See* Exhibit 44.

48.     Subsequent to receiving their Bank of America loan modification in 2009, on May 13, 2010, the Frazes opened an escrow account for the 977 Property. *See* Exhibit 45.

49.     In connection with their 977 Property Mortgage serviced by Bank of America, the Frazes were required by Bank of America to obtain and maintain hazard insurance.

18

50.     Recognizing this requirement, the Frazes maintained their own hazard insurance on the property through Farmers Insurance Company for the duration of his mortgage on the 977 Property.  *See* Exhibit 46.

51.     Despite the existence of the Farmers Policy, on or about June 10, 2010, the Frazes received a notice from Bank of America Home Loans informing them that they had not provided verification of acceptable hazard (homeowner's) insurance information, and gave the Frazes one month to provide proof of acceptable coverage (proof was due on July 15, 2010) or BAC Home Loans would purchase Lender-Placed Hazard Insurance at the Frazes' expense and charge them for the cost of the insurance. *See* Exhibit 47.  Included in the June 10, 2010 notice was a statement of "BAC HOME LOAN CUSTOMERS, HAZARD INSURANCE REQUIREMENTS," which explained what hazard insurance BAC Home Loans required, and BAC Home Loan's authority to force-place  if it chose to do so.  The notice also stated, in part: "Lender-Placed Hazard Insurance may be purchased from an affiliate of Bank of America, N.A.  Bank of America, N.A. may receive a commission or other compensation in connection with obtaining this coverage."  *See id*.

52.     The notification sent by Bank of America on June 10, 2010 informed the Frazes that the approximate cost of the Lender-Placed Insurance would be $1,435.00 – substantially more than what the Frazes were paying under their Farmers' Insurance policy.  *See id*.

53.     This coverage period for the force-placed insurance addressed in the June 10, 2010 Notice would be from April 27, 2010 until April 27, 2011.  *See id.*

54.     While the Frazes' contract, a standard form contract, allows the lender, and therefore, its servicing agent, to pay for property insurance costs when necessary and appropriate, and to be reimbursed by the borrower, the mortgage contract does not authorize either the lender or the servicer to require the borrower to pay in excess of

19

the net costs of those services in order for the lender and/or its affiliates to make a profit at the borrower's expense. Nor does the contract authorize the lender to negotiate with the insurer for the insurer to provide ancillary services to the lender where the cost of such services is built in to the premium for the force-placed insurance

**The Frazes' 875 Property Mortgage and Force-Placed Transactions**

55.     On December 22, 2005, the Frazes executed two Deeds of Trust for the 875 Property with Bank of America, N.A. as the lender. *See* Exhibits 48, 49.

56.     Similar to the 977 Property, hazard insurance was required to be obtained and maintained on the 875 Property, as detailed by the deeds of trust connected with the Frazes mortgages. *See id.* at ¶5.

57.     Pursuant to the requirements of their loans, the Frazes maintained their own insurance on the 875 Property through Farmers' Insurance Company throughout the duration of his mortgage at a rate of approximately $500 per year.

58.     At some point during 2009, despite the existence of the Farmers Insurance policy, Bank of America force-placed hazard insurance on the 875 Property on the Frazes' behalf.

59.     On May 23, 2010, the Frazes received a notice from Bank of America informing them that the Lender-Placed Insurance coverage that Bank of America purchased last year (2009) on the 875 Property would be re-issued for another year effective May 19, 2010. *See* Exhibit 50.

60.     The notification provided that the cost of coverage would be $1,711.00 – a substantially higher price than the Frazes were paying under their Farmers' Insurance policy. *See* Exhibit 51. The Frazes' paid this amount directly to BOA.

61.     Notably, the coverage was force-placed by Meritplan Insurance Company, an affiliate of Balboa. *See id.*

20

62.     While the premium for the force-placed insurance policy was substantially higher than a traditional insurance policy, the policy provided remarkably less coverage, in that it only covered the structure of the dwelling.  *See id.*

63.     While the Frazes' mortgage contract, a standard form contract, allows the lender, and therefore, its servicing agent, to pay for property insurance costs when necessary and appropriate, and to be reimbursed by the borrower, the mortgage contract does not authorize either the lender or the servicer to require the borrower to pay in excess of the net costs of those services in order for the lender and/or its affiliates to make a profit at the borrower's expense.  Nor does the contract authorize the lender to negotiate with the insurer for the insurer to provide ancillary services to the lender where the cost of such services is built in to the premium for the force placed insurance. The Frazes subsequently encountered financial difficulties, and were unable to make their mortgage payments.

64.     As a result, on or around October 4, 2011, Bank of America foreclosed on the Frazes' 875 Property, and Bank of America issued a Notice of Trustee's Sale. *See* Exhibit 52.

**Plaintiff Jason Aiello**

65.     Jason Aiello ("Mr. Aiello") is a resident of California.

66.     On or around February 13, 2006, Mr. Aiello entered into a mortgage agreement, or "Deed of Trust," with Countrywide Home Loans, Inc. ("Countrywide"). *See* Exhibit 6.

67.     Contained within Mr. Aiello's deed of trust was a provision detailing his responsibility for obtaining property insurance.  Specifically, the clause stated that borrowers were required to maintain hazard insurance on the property and if they failed to do so, the lender may obtain insurance cover, "at Lender's option and Borrower's expense."  *Id.*

21

68.     Since the inception of his mortgage, Countrywide force-placed hazard insurance on the property on Mr. Aiello's behalf.

69.     In his monthly home loan statement from Countrywide on February 27, 2007, Mr. Aiello was informed that a payment of $7,374.00 to Balboa Lender Placed Coverage would be paid by Countrywide out of Mr. Aiello's escrow account due on December 15, 2007.  *See* Exhibit 53.  The force-placed coverage was effective from December 15, 2006 to December 15, 2007.

70.     Mr. Aiello's escrow account was, in fact, charged $7,374.00 for force-placed insurance thereby increasing the negative balance of the account and increasing his indebtedness under his mortgage pursuant to the terms of the mortgage agreement.

71.     On or around October 16, 2008, Countrywide notified Mr. Aiello that the force-placed coverage would be renewed for his residence on December 15, 2008, thereby indicating that a force-placed policy had already existed on the property at that time.

72.     The approximate cost of the hazard insurance force-placed in 2008 was $6,648.00, and provided less coverage than was previously in effect and would only protect Countrywide's interest in the property.

73.     Mr. Aiello's hazard insurance was also force-placed between 2008 and 2011.

74.     On or around December 20, 2011, Mr. Aiello received a notification from Bank of America that he was again being forced into lender-placed coverage as a result of allowing his homeowners insurance policy to lapse. *See* Exhibit 54.

75.     On that same date, Bank of America also sent Mr. Aiello a notice that it had purchased Lender-Placed Insurance coverage on his behalf, effective December 15, 2011.  This time, the policy purchased on Mr. Aiello's behalf was $6,835.00.

76.     On March 16, 2012, Bank of America sent another notice to Mr. Aiello informing him that Bank of America had purchased Lender-Placed Insurance at Mr. Aiello's expense.

77.     The force-placed policy was issued by Meritplan Insurance Company, and provided that Mr. Aiello would pay a premium of $3,651.00 for the period of December 15, 2011 to December 15, 2012.  *See* Exhibit 55.

78.     While Mr. Aiello's mortgage agreement, a standard form mortgage contract, allows the lender, and therefore, its servicing agent, to pay for property insurance costs when necessary and appropriate, and to be reimbursed by the borrower, the mortgage contract does not authorize either the lender or the servicer to require the borrower to pay in excess of the net costs of those services in order for the lender and/or its affiliates to make a profit at the borrower's expense.  Nor does the contract authorize the lender to negotiate with the insurer for the insurer to provide ancillary services to the lender where the cost of such services is built in to the premium for the force placed insurance.

**Defendants**

79.     Defendant Bank of America, N.A., a subsidiary of Bank of America Corporation, is a Delaware corporation with its principal place of business located in Charlotte, North Carolina.  Bank of America, N.A. directly and/or through its subsidiaries, owns and services loans secured by mortgages on real estate located throughout the United States, including California.  It is the primary entity used by Bank of America for its residential mortgage loan origination servicing activities. *See* Testimony of Stephen Smith in Response to the April 12, 2012 Notice of Hearing Issued by the New York State Department of Financial Services attached hereto as Exhibit 14.

23

80.     Defendant BAC Home Loans Servicing, LP (formerly known as Countrywide Home Loans Servicing, LP), a subsidiary of Bank of America Corporation, is a Texas limited partnership with its principal place of business in Calabasas, California.  BAC Home Loans Servicing services mortgage loans and provides mortgage services, including sending and monthly payment statements and collecting monthly payments, maintaining loan records, collecting and paying taxes and insurance premiums, managing escrow accounts, making sure that adequate hazard insurance is maintained on properties secured by mortgages it services, conducting foreclosures on mortgages, on behalf of holders of residential mortgages and mortgage loan asset-backed certificates.  On July 1, 2011, BACHLS was merged into BANA and became known as Bank of America, N.A. successor by merger to BAC Home Loans Servicing, LP.  *See* Exhibit 56.

81.     Defendant Balboa Insurance Company, formerly a subsidiary of Bank of America, is a California corporation headquartered in Irvine, California.  *See* Bank of America Corporation Form 10k filed on February 23, 2012, Exhibit 21.  Balboa provided force-placed insurance policies on real estate located throughout the United States, including California.  The relationship between Bank of America and its former subsidiary, Balboa Insurance Company, was a non-competitive and exclusive relationship whereby both parties benefitted at the expense of the consumer by forcing consumers to pay for high cost force-placed insurance policies which included in the premium costs not attributable to the insurance but rather costs of servicing the loan.  The excessively inflated price of the Balboa Insurance Company force-placed insurance policy did not represent the actual cost of providing the insurance, but instead represented and encompassed fees, commissions, "rebates" (or kickbacks) and other consideration for "faux" services purportedly provided by Bank of America, N.A and BAC Home Loans Servicing and Balboa Insurance Company.  Bank of

24

America sold virtually all of its insurance assets and liabilities to QBE Insurance Group on June 2, 2011.  The sale included "long term distribution agreements with Bank of America in connection with the lender-placed" insurance program.  *See* Press Release, Bank of America Completes Sale of Balboa Insurance Business to QBE attached hereto as Exhibit 57.

82.     Defendant Banc of America Insurance Services, Inc., a wholly owned subsidiary of Bank of America, N.A., with its principal place of business in Baltimore, Maryland, is registered with the California Secretary of State and is licensed as an insurance agency in California and numerous other states throughout the country. BAISI is an affiliate of Balboa and operated under an agency agreement with Balboa Insurance Company with respect to its lender placed insurance operations from July 1, 2005 – January 12, 2010.  *See* BAISI Testimony at 2.

83.     Defendant Meritplan Insurance Company is an active California Corporation.  (*See* California Corporate Information attached hereto as Exhibit 58) with its principal place of business in located in Irvine, California.  It was a wholly owned subsidiary of Balboa Insurance Company until the sale of Balbo to QBE.  *See* Report of the Examination of the Balboa Insurance Company as of December 31, 2008, filed on June 29, 2010 attached hereto as Exhibit 59.

84.     Defendant Newport Management Corporation is an active Arizona corporation.  Prior to sale of Balboa to QBE, Newport Management Corporation provided tracking services to its affiliate Balboa.  *See* Balboa Testimony at 7, Ex. 15. According to Newport's most recent annual report filed with the State of Arizona, it is an affiliate of QBE First.  *See* Newport Management Corporation Annual Report attached hereto as Exhibit 60.

85.     Despite that seeming geographic distribution BAISI, Balboa, Meritplan and Newport, a single executive, Tim Burdick, served concurrently as President of

Balboa, President of Meritplan,  Bank of America's Insurance Services Executive, and President of Newport, BAISI Testimony at 1, Ex. 13, coordinating some of the central activities of these three participants in the scheme.

86.     Defendant, QBE Insurance Corporation is an active Pennsylvania Corporation with its principal place of business in New York, New York.  *See* Pennsylvania Corporate Listing for QBE Insurance Corporation attached hereto as Exhibit 61.  QBE Corp. receives premiums on force-placed insurance but does not perform any other services with regard to its lender placed insurance program.

87.     Defendant QBE First Insurance Agency, Inc. is a Delaware Corporation with its headquarters in Atlanta Georgia.  QBE First is a leading provider of force-placed hazard insurance.  QBE First tracks and monitors portfolios for QBE Corp. and manages the placement of force-placed insurance for QBE Corp. *See* QBE Testimony at 7.  QBE First assumed management of Balboa's insurance operations as of June 1, 2011,the date of the sale of Balbo to QBE Insurance Group.  At the time of the sale most of the Bank of America employees who worked for Balboa in connection with its force-placed insurance program migrated to QBE and are now employed by QBE First or its affiliates.  *See* BAISI Testimony at 1.

88.     The insurance policies that were forced placed by the Bank of America Defendants through Defendants Balboa, QBE Insurance Corporation and/or QBE First named the lender or servicer as the named insured under the force-placed policies and did not include the borrower as a named insured.  *See e.g.* Exhibits 51, 55.

## FACTUAL ALLEGATIONS

### Defendants' Improper Force-Placed Insurance Scheme

#### Defendants' Force-Placed Insurance Operations

89.     Bank of America describes itself as one of the world's largest financial institutions, serving individual consumers, small- and middle-market businesses and

large corporations with a full range of banking, investing, asset management and other financial and risk management products and services. *See* http://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irol-homepro file.

90.     Bank of America originates mortgage loans and acquires loans from other lenders. Each such loan is secured by a deed of trust on the underlying property. BAC Home Loans Servicing services such loans.

91.     Through its subsidiaries and affiliates, Bank of America operates through 5,900 retail offices, has approximately 5,300 mortgage loan offices and is the No. 1 mortgage loan servicer in the United States. *See* Bank of America Corporation, Annual Report (Form 10-K), at 1 (February 25, 2011).

92.     Until approximately June 1, 2011, Bank of America and BAC Home Loans Servicing were affiliates of Balboa. On June 1, 2011, Bank of America announced the completion of the sale of Balboa and affiliated entities to QBE Insurance Group ("QBE"). Notably, the terms of the sale included an agreement that QBE will maintain long-term distribution agreements with Bank of America for force-placed insurance. *See* Press Release, Bank of America Corporation, *Bank of America Completes Sale of Balboa Insurance Business to QBE* (June 1, 2011), attached as Exhibit 57 hereto.

93.     BAISI, Balboa, Meritplan and Newport, acted together as the force-placed insurance provider for BOA pursuant to the scheme described herein. *See* BAISI Testimony at 1, Exhibit 13.

94.     According to the testimony of Tim Burdick during the May 2012 hearings held by the New York Department of Financial Services, with respect to force-placed hazard insurance, BAISI served as an "insurance producer" for BOA. *Id.* at 2. Testimony at the hearings revealed, however, that BAISI did not "produce" or broker any insurance for BOA as, pursuant to its exclusive agreements with Balboa,

27

and after the sale of Balboa to QBE, with QBE. *See id.* at 1-3.  As such, it's true purpose was to provide a conduit for the receipt of kickbacks, commissions, rebates, earnouts and other consideration to BOA derived from the premiums paid by Plaintiffs and other borrowers whose insurance was force-placed.

95.    Balboa and Meritplan provided force-placed insurance. *See* Balboa Testimony at 3, Exhibit 15; BAISI Testimony at 1, Exhibit 13.  Newport tracked and monitored BOA's loan portfolio for the purpose of identifying loans with lapsed insurance.  Balboa and Meritplan then force-placed insurance on these loans.  Balboa Testimony at 7, Exhibit 15.

96.    The Defendants' scheme required the participation, knowledge and cooperation of each of the Defendants.  The task of each individual Defendant was streamlined due to the close relationships of each of the Defendants and to effectuate the scheme in an efficient manner.  Indeed, as noted above, Tim Burdick, who testified on behalf of BAISI at the New York hearings, served concurrently as Bank of America's Insurance Services Executive, President of Balboa, President of Meritplan and President of Newport. BAISI Testimony at 1, Exhibit 13.

97.    Balboa maintained relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide. *See* http://www.balboainsurance.com/LenderProducts/LenderPlacedHazard/tabid/169/Default.aspx.

98.    As a result of the sale of Balboa to QBE, the force-placed insurance activities formerly performed by Balboa are performed by affiliates of QBE Holdings Inc.. *See* BANA Testimony at 1, Exhibit 14.  Specifically, QBE First acts as BANA and BACHLS' vendor for force-placed insurance. *Id*. at 3.

28

**Defendants Force-Placed Insurance Authority Was Used to Generate Hidden and Unauthorized Profits**

99.     In order to ensure that the mortgagee's interest in the secured property is protected, mortgage loan contracts typically allow the lender or third-party servicer discretion to "force-place insurance" when the homeowner fails to maintain the insurance with the amounts disbursed for the procurement of such insurance becoming additional debt secured by the mortgage.  Plaintiffs' and Class members' mortgage loan contracts contains such provisions affording BOA the authority to force-place their insurance in the event of a lapse. Thus, the failure of a borrower to maintain hazard insurance was clearly contemplated by the mortgage contract and such a failure by the borrower does not result in a material failure to perform under the mortgage contract. The discretion afforded BOA, however, to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage itself. BOA routinely exceeds the bounds of reasonableness and the spirit, intent and letter of the mortgage contract by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property and through other conduct described herein with respect to the force placement of insurance.

100.    The mortgage contract does not disclose that the lender or other servicer will receive a financial benefit in connection with the force-placed insurance policy.

101.    Instead, the contract misrepresents to borrowers that the cost passed on to them is for the purpose of protecting the lender's interest in the secured property. *See, e.g.*, Exhibits 38, 46, 50.

102.    These lender-placed or "force-placed" insurance policies are almost always more expensive than standard insurance coverage, as evidenced by Plaintiffs' policies.  Reportedly, such policies can cost as much as ten times more than standard policies.  While the force-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower (or passed on to holders of mortgage-backed

29

securities). *See* Jeff Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, American Banker (November 10, 2010), attached hereto as Exhibit 62 (referred to herein as "Ties to Insurers"); *See also American Banker Wins Investigative Journalism Award*, American Banker (March 18, 2011), attached as Exhibit 63 hereto.

**Mortgage Loan Servicers Commonly Have Undisclosed Lucrative Pre-Arranged and Collusive Agreements to Refer Borrowers to Certain Force-Placed Insurance Providers**

103.   The force-placing of insurance policies can be a very lucrative business for servicers.  Commonly, the servicer selects the provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit for itself while also generating a financial benefit for the provider.  The servicer benefits by placing the policy either: (a) with an affiliate, or (b) with a third party provider who has already agreed to share revenue with the servicer in the form a direct commission payment or through a "captive reinsurance agreement" whereby "reinsurance" premiums are ceded to a subsidiary/affiliate of the servicer.

104.   Under the commission arrangement, the provider of the force-placed insurance policy pays a commission either directly to the servicer or to a subsidiary posing as an insurance "agent."  Typically, under such an arrangement, commissions are paid to a "licensed insurance agency" that is simply an affiliate or subsidiary of the servicer and exists only to collect the kickbacks or commissions collected from the force-placed insurance provider.

105.   Here, BOA used its own affiliates, Balboa, Meritplan in coordination with BAISI and Newport, to provide force-placed.  However, Balboa, Meritplan, BAISI and Newport did nothing to earn commissions or other consideration paid to them to "produce" insurance business because they were contractually guaranteed the

30

force-placed insurance business from BACHLS/BANA. S*ee* Birnbaum NYDFS Testimony at 20, Exhibit 16; Hunter NYDFS Testimony at 16, Exhibit 17.

106.   Indeed, as demonstrated at the recent hearings held in New York, while BOA claimed that it was paying its affiliated entities for traditional insurance brokerage services, Balboa, and its wholly owned subsidiaries and affiliates did not perform any of the traditional services for which an insurance producer would normally receive a commission. *Id.*

107.   QBE also cannot claim to have "earned" the payments and commissions for "producing" insurance for BOA as it entered into an exclusive 10 year contract with BOA for the provision of force-placed insurance. *See* Birnbaum Testimony at 20, Exhibit 16.

108.   Under the captive reinsurance arrangement, the provider of the force-placed insurance policy agrees to "reinsure" the force-placed insurance policy with a subsidiary or "captive reinsurer" of the referring servicer. In return for the subsidiary purportedly agreeing to assume a portion of the insurer's risk of loss, the insurer cedes to the subsidiary a portion of the premiums received on account of the policy.

109.   Illustrative of the typical kickback arrangements is the following graphic from *American Banker*:

31

**Sharing in the Profits**

How servicers make money arranging force-placed coverage

**Commissions**

To replace lapsed homeowners coverage, the servicer, working through a subsidiary, buys policy from insurer

Servicer advances premiums to insurer

Insurer pays portion of premium back to subsidiary as a commission

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

**Reinsurance**

To replace lapsed coverage, servicer buys policy on home from insurer

Servicer advances premiums to insurer

Subsidiary of servicer reinsures part of the policy, gets a cut of premiums

If necessary, subsidiary buys letter of credit from another party

Servicer bills borrower for the policy

If borrower defaults, cost of insurance is subtracted from proceeds to investors from foreclosure sale

110.    J. Robert Hunter of the Consumer Federation described these practices in his testimony before the New York Financial Services Department in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using "fronting" primary insurers to direct the coverage to lender-affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.

*See* Hunter NYDFS Testimony at 1, Exhibit 17.

111.    Indeed, as Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance stated:

32

> Servicers have financial incentives to force-place the insurance because the premiums include commissions and other considerations for the servicer. With some servicers, the insurance is reinsured through captive reinsurer of the servicer, resulting in additional revenue to the servicer from the force-placement coverage.

*See* Birnbaum NYDFS Testimony at 15, Exhibit 16.

112.   Borrowers have no say or input into the carrier or terms of the force-placed insurance policies.  The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.  *Id.*; *see also* Hunter NYDFS Testimony at 10, Ex. 17.

113.   For their part, servicers, like BOA have no incentive to comparison shop for the best rate.  Rather, servicers are financially motivated to refer borrowers to the provider that will provide the best financial benefit to the servicer in terms of commission and/or ceded reinsurance premiums that are established as part of the secret arrangements and profit-making deals between providers and affiliates. Further, because the servicer's "commission" and/or reinsurance premium is usually related to the size of the policy, the servicer actually has an incentive to purchase the highest price insurance, an interest diametrically opposed to that of the borrower. *See, e.g., id*; Hunter NYDFS Testimony at 1, Exhibit 17.

114.   Commonly, a mortgage loan servicer enters into an agreement with a provider, pursuant to which it refers borrowers exclusively to the provider for force-placed insurance.  Defendants Bank of America and BAC Home Loans Servicing (both subsidiaries of Bank of America Corporation) are parties to such an agreement with Defendant Balboa (also a subsidiary of Bank of America Corporation until June 2011) and thereafter entered into a similar deal with QBE after the sale.

33

115.   According to sworn testimony before the NYDFS, BOA manages about 20% of all mortgages in the US.  Prior to the sale of Balboa to QBE, BOA sent all of its business to Balboa.  *See* Oral Testimony offered on behalf of Balboa Insurance Company on May 17, 2012 for the New York Department of Financial Services available at http://www.totalwebcasting.com/view/?id=nysdfs.

116.   Following the sale of Balboa, QBE entered into similar contracts with BANA and BAC under which it was given an exclusive deal to provide all the force placed insurance for loans serviced by BACHLS/BANA for a period of ten years.  *Id.*

117.   As a kicker to the deal, Bank of America entered into another eight year relationship agreement between BOA and QBE which guaranteed a payment to BOA based on the volume of insurance premium derived by the Balboa book.  *Id.*

118.   Moreover, the agency agreement between Balboa and QBE includes a commission paid by QBE to Balboa for ten years.  *Id.*

119.   The net result of these exclusive deals, as stated by Superintendent Benjamin Lawsky, is that if a borrower is force-placed BOA earns both a profit share and an "earn out."  *See* Oral Testimony offered on behalf of Balboa Insurance Company on May 18, 2012 for the New York Department of Financial Services available at http://www.totalwebcasting.com/view/?id=nysdfs.

120.   As a result, as Superintendent Lawsky concluded , the system was rigged by the participants to keep premiums high. *Id.*

121.   Thus, the system was rigged by the participants so that they could earn maximum profits by force-placing hazard insurance in the form of kickbacks, commissions, rebates, and other consideration.

### The Incentives and Opportunities for Abuse in the Administration of Force-Placed Insurance Are Routinely Mined by Cooperating Participants in the Industry

122.   Force-placed insurance policies are not underwritten on an individual policy basis.  Rather, servicers' contracts with force-placed insurance providers require or at least permit the insurer to automatically issue these policies when a borrower's insurance coverage is not maintained.

123.   As J. Robert Hunter in his recent testimony before the New York Financial Services Department argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYFSD Testimony at 5, Exhibit 17.  Yet they do not, instead as a result of the arrangements between those participating in monitoring, placing and administering force-placed insurance consumers are gouged.

124.   Thus, for example, servicers often go so far as to actually outsource their insurance processing to the force-placed insurance provider.  Balboa, for instance, provides Bank of America and BAC Home Loans Servicing with "state of the art insurance                          tracking."                          *See* http://www.balboainsurance.com/LenderProducts/LenderPlaced Hazard/tabid/169/Default.aspx.   The provider then continuously monitors the servicer's mortgage portfolio and verifies the existence of insurance on each mortgaged property.  In the event that borrowers do not maintain adequate insurance coverage, the insurer promptly issues an insurance certificate on the property on behalf and for the benefit of the servicer.   Thus, while these servicers receive commissions from force-placed insurance providers (which are ultimately charged to borrowers), they are performing no service for the commissions they receive other than simply providing the referral. *See* Exhibit 62, Ties to Insurers, *supra*.

35

125.   BOA did not monitor its loan portfolio to track insurance coverage. Balboa "outsourced" the tracking and monitoring services to its affiliate Newport. Balboa NYDFS Testimony at 7, Exhibit 15.

126.   Force-placed insurer subsidiaries are highly profitable businesses. "Among a published ranking of companies with the strongest operating insurance subsidiaries, several bank holding companies stand out . . . . Companies with insurance subsidiaries providing force-placed property insurance were at the top of the list.   These included Assurant Inc. and Bank of America." *See* http://www.mainstreet.com/print/18604.

127.   Further, "[t]he incentives and potential for abuse in the administration of LPI are great.   Consumers do not request the insurance, but are forced to pay for it. The cost of LPI [lender placed insurance] is much higher than a policy the borrower would purchase on his or her own.   Lenders have incentive to force-place the insurance because the premium includes a commission to the lender and, in some cases, the insurance is reinsured through a captive reinsurer of the lender, resulting in additional revenue to the lender from the force-placement of the coverage." *See* July 28, 2011 Testimony of Birny Birnbaum, Executive Director of the Center for Economic Justice, Before the U.S. House of Representatives Subcommittee on Insurance, Housing and Community Opportunity Committee on Financial Services., attached hereto as Exhibit 39.

128.   In addition, "[t]he prices for residential property LPI are significantly excessive.   In 2009, insurers paid only 16% of net premium in claims and in 2010 the ratio was 17%.   Incredibly, lenders get a commission—totaling hundreds of millions of dollars—out of these premiums, despite the fact that the insurance is placed to protect the lenders' collateral.   The premiums also include the costs of tracking all the loans in the lenders' portfolios to identify those loans without insurance—so the

36

lenders' cost of tracking all loans is passed only to those consumers paying for force-place [sic] insurance." *Id.*

129.   While servicers and lenders profit greatly from the force-placed insurance scheme as part and parcel of their effort to maintain a shroud of secrecy over the scheme, services do not separately report their income from payments received from providers of force-placed insurance.  However, according to a recent article published by *American Banker*, "a cursory review of force-placed insurers' financials suggests that the business brings servicers hundreds of millions of dollars every year."  *See* Exhibit 62, Ties to Insurers (noting that servicers demand generous commissions and other payments in return for their referrals).

130.   Servicers commonly attempt to justify the high price of force-placed insurance policies by pointing to the higher risk associated with the lack of individual policy underwriting.  However, as *American Banker* noted:

> Though part of the extra expense can be explained by the higher risks associated with insuring the homes of delinquent borrowers, force-placed policies generate profit margins unheard of elsewhere in the insurance industry— even after accounting for the generous commissions and other payments that servicers demand.

*Id.*, Ties to Insurers, *supra*.

131.   Force-placed insurance providers have tools to assess risk and minimize unexpected risk of loss.  As stated succinctly in January of 2007 by John Meadows (described on Balboa's website as a "Lender-Placed Insurance Veteran" http://www.balboainsurance.com/AboutBalboa/PressRoom/tabid/158/Default.aspx), "Leveraging technologies and data elements that are available in most servicer's systems, an innovative lender-placed carrier can offer products that take into account relevant property-specific risk characteristics to determine premium rates."  *See* John

Meadows, *"Evaluate Processes And Controls To Ensure Insurance Efficiencies,"* Servicing Management, January 2007, attached hereto as Exhibit 64.

132.    Servicers also attempt to blame the exorbitant cost of force-placed insurance on the fact that the policy is issued without the benefit of a prior inspection of the property.  However, according to the National Consumer Law Center, as a general matter, insurers do not routinely inspect residential properties in the course of underwriting.  *See* Exhibit 62, Ties to Insurers.

133.    As Birny Birnbaum of the Center for Economic Justice testified, servicer explanations for the high cost of force-placed insurance are "unsupported by any evidence."  *See* Birnbaum NYDFS Testimony at 1, Exhibit 16.  Loss ratios have been historically low.

134.    Birny Birnbaum, in his testimony before the New York Department of Financial Services, presented statistics collected by the NAIC reflecting nationwide loss ratios for LPI hazard insurance during the 2004-2011 period as being, on average, more than thirty-five points higher than the ratios for commercially available homeowners policies.  *See* Birnbaum NYDFS Testimony at 9, Ex. 16.  When confined to the period from 2007-2011, the disparity between LPI hazard insurance loss ratios and those of commercially available homeowners policies was nearly 42 points.  *Id.*

135.    Moreover, because the policies are not individually underwritten, the force-placed insurer is spared the costs associated with individual underwriting.  *See* Birnbaum NYDFS Testimony at 26, Exhibit 16.

**Defendants Often Charge Borrowers for Redundant or Otherwise Unnecessary Insurance**

136.    Unnecessary or inappropriately priced hazard insurance arises when a servicer forces borrowers to purchase and maintain hazard insurance for their property that is unnecessary, duplicative and/or in amounts greater than required by law or their mortgage agreements.

38

137.   Motivated by the lucrative financial incentive associated with force-placing insurance and belief, Defendants have commonly required borrowers to pay for unnecessary insurance coverage.  Such examples include, without limitation: (a) requiring borrowers to pay for insurance coverage that exceeds the amount necessary to protect the mortgagee's interest in the secured property; (b) backdating force-placed insurance policies so that they cover time periods already passed when the policy is placed, thus requiring borrowers to pay for retroactive coverage for by-gone periods of time for which no risk of loss any longer exists; and (c) requiring borrowers to pay for force-placed insurance policies covering periods of time following a lapse of previous insurance despite the fact that the lender's interest in the property was covered for such time pursuant to standard clauses in prior policies which extend coverage for a period of time beyond the cancellation date.

138.   Simply put, force-placed hazard insurance policies should not be backdated.  The National Association of Insurance Commissioners ("NAIC") has indicated that insurance is "prospective in nature."  *See*, *e.g.*, Exhibit 62, Ties to Insurers, *supra* (quoting the NAIC as stating that insurance policies "'should not be back-dated to collect premiums for a time period that has already passed'").  Requiring borrowers to pay for backdated insurance coverage to cover time periods during which there is already no risk of loss is improper.

139.   Another reason backdating is improper is that the overwhelming majority of mortgages, including Plaintiffs' mortgages, contain a requirement that the borrower purchase property insurance containing a "standard mortgage clause,"[5] and, further,

---

[5]   *See* Fannie Mae standard contracts for all fifty states, available at https://www.efanniemae.com/sf/formsdocs/documents/secinstruments/; *see also* standard form contract for California, attached hereto as Exhibit 65.

39

many hazard insurance policies contain a "Lender's Loss Payable Endorsement." These clauses provide coverage for the lender even after the insured has failed to pay premiums and/or the policy reaches the expiration date. Accordingly, force-placing insurance policies effective immediately following the termination of the borrower's policy and charging borrowers expensive premiums for such insurance is unlawful and unfair because borrowers are charged for needless and duplicative insurance coverage. The force-placed policies issued by Defendants Balboa, Meritplan and QBE, pursuant to and in accordance with the scheme described herein thus generate improper windfalls to those insurance provider Defendants at the expense of borrowers with whom Defendants Balboa, Meritplan and QBE have no contractual relationship. The sole justification for the tactics described above is the unjust enrichment of Defendants herein, including those insurance providers with whom Plaintiffs have no contractual relationship, as well as, the defendants providing tracking and "producing" services, i.e. Newport and BAISI, with whom Plaintiffs also have no direct financial relationship.

**Government Response**

140. As has been mentioned throughout the complaint, force-placed insurance practices of mortgage lenders and servicers, insurance providers and insurance producers are currently the subject of a number of government investigations prompted by concerns that consumers are being gouged when they are force-placed in insurance following a lapse in their policies. *See* Exhibit 11.

141. Thus, state attorneys general are cognizant of and have taken action concerning servicers' abusive practices concerning force-placed insurance. Recently, a coalition of forty-nine (49) state attorneys general entered into an historic joint state-federal settlement agreement with the country's five largest loan servicers, including JPMorgan Chase ("National Mortgage Settlement") to address numerous problems

40

that have surfaced during the foreclosure crisis. *See* www.nationalmortgagesettlement.com/, the official website established by the government relating to the settlement. *See also* Jeff Horowitz, Attorneys General Draw a Bead on Banks' Force-Placed Insurance Policies, American Banker (Mar. 10, 2011, 12:25 PM), http://www. americanbanker.com/issues/176_48/ags-force-placed-insurance-034213-1.html, attached hereto as Exhibit 66.

142. Among other terms, the settlement essentially prohibits servicers from profiting from force-placed insurance. Specifically, under the settlement, mortgage servicers: (a) shall not obtain force-placed insurance unless there is a reasonable basis to believe the borrower has not paid for property insurance; (b) cannot force-place insurance that is in excess of the replacement cost of the improvements on the secured property; (c) must work with the borrower to continue or reestablish the existing homeowner's policy; (d) shall continue to make payments if there is a lapse in payment and the payments are escrowed regardless of homeowner payment; and (e) must purchase the force-placed insurance for a commercially reasonable price. *Id.*; *see also* Consent Judgment, United States of America v. Bank of America Corp., Civ. No. 1:12-cv-00361-RMC (D.D.C. Apr. 14, 2012) (ECF No. 14 Section VII).

143. Notably, state insurance commissioners and federal regulators have investigated and condemned captive reinsurance arrangements in the title insurance industry—which also had a relatively low level of losses—as nothing more than sham transactions designed to funnel unlawful kickbacks for business referrals. *See, e.g.*, Broderick Perkins, Title Insurance Industry in Hot Water with Regulators Again, San Jose Business Journal (May 22, 2005), available at http://www.bizjournals.com/sanjose/stores/2005/05/23/story4.html.

144. Indeed, while announcing a $37.8 million settlement with nine title insurers, then Florida Insurance Commissioner John Garamendi stated, "[t]his

reinsurance scheme appears to be nothing more than a form of commercial bribery." *See* Press Release, Florida Department of Insurance (July 20, 2005), available at http://www.departmentofinsurance.ca.gov/ 0400-news/0100-press-releases/0080-2005/release069-05.cfm.  As a result, a number of providers have abandoned such arrangements altogether.

145.   Fannie Mae has changed its polices to curb bank and servicers' improper practices.  It issued a Service Guide Announcement on March 14, 2012 "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds.  *See* Fannie Mae Servicing Guide Announcement SVC-2012-04 attached hereto as Exhibit 67.  The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry (such as those engaged in by Defendants) including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id*. at 4.

146.   The New York State Department of Financial Services' recent hearings on force-placed insurance practices have resulted in government action and findings that borrowers were overcharged for force-placed insurance.  On June 12, 2012, Governor Cuomo's official website announced, "DFS Investigation Indicates Insurance Companies Overcharged for Force-Placed Insurance."  Available at http://www.governor.ny.gov/press/06122012DFS.  It stated:

42

> The evidence of higher than necessary insurance premiums was made clear at a recent DFS hearing.  Also, the DFS discovered that the force-placed insurance market lacks the sort of competition that would keep premiums down.  In New York, two companies have 90% of the market.  In addition, the hearings made clear that force placed insurance costs are having a terrible impact on homeowners, while banks and insurers are profiting off the payments.

*Id.*

### Defendants' Practices Artificially Inflate Premiums for Force-Placed Insurance

147.   As American Banker observed, "[w]hile servicers that partner with force-placed insurers customarily perform little of the work in monitoring their portfolios for lapses and writing policies, payments to them are simply a cost of doing force-placed business."  *See* Exhibit 62, *supra*.  These costs are ultimately paid by the borrowers and serve to unjustly enrich all Defendants, including those with whom the borrower has no contractual relationship such as Defendants Balboa, Meritplan, QBE, Newport and BAISI.

148.   Indeed, industry analysts have opined that referral fees, commissions and other payments to bank affiliates explain why insurers' overhead, which is ultimately passed on to borrowers, is higher—implying paydays for servicers amounting to hundreds of millions of dollars per year.  *Id.*

149.   Bank of America's and BAC Home Loans Servicing's practices of referring force-placed insurance business to affiliates or otherwise profiting from the force-placement of insurance policies tend to keep premiums for force-placed insurance artificially inflated over time because a percentage of borrowers' premiums are not actually being paid to cover actual risk, but are simply funding illegal kickbacks.  Amounts paid to servicers as commissions have become a part of the cost

43

of doing business for force-placed insurance providers.  As a result, force-placed insurance premiums incorporate the payment of such kickbacks—to the detriment of consumers.

150.   Further, Defendants' conduct has threatened and, indeed, stifled competition.  As the NAIC recently opined when asked whether pricing in the area of force-placed insurance industry is competitive, servicers have "no incentive to select a competitively priced product, but instead would be more concerned with selecting one they know best protects the bank's interests or one where they are provided with an incentive or inducement to enter into the transaction."  *See* Exhibit 62, *supra*.  This suppression of competition and subsequent harm to borrowers is a direct result of the scheme alleged herein.

## RICO ALLEGATIONS

### The BOA Force-Placed Insurance Enterprise

151.   Plaintiffs, Class members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

152.   Based on Plaintiffs' current knowledge, the following persons constitute a group of individual persons associated who constitute a RICO enterprise that is referred to herein as the "BOA Force-Placed Insurance Enterprise": Bank of America, N.A., BAC Home Loans Servicing, LP, Balboa Insurance Company, Banc of America Insurance Services, Inc., Meritplan Insurance Agency, Inc., Newport Management Company, QBE Insurance Corporation and QBE First Insurance Agency, Inc. and other insurance producers and entities involved in force-placing insurance on behalf of BOA not named as defendants herein who assist the named defendants to effectuate their scheme to defraud Plaintiffs and other borrowers who were required to pay for force-placed hazard insurance.

44

153.   The BOA Force-Placed Insurance Enterprise is an ongoing organization that engages in, and whose activities effect, interstate commerce.

154.   While each of the Defendants participated in and are members and are a part of the BOA Force-Placed Insurance Enterprise, they also have an existence separate and distinct from the enterprise. The structure of the enterprise is reflected in the allegations herein.  In particular, BOA implemented a plan to exploit its authority as a loan servicer acting on behalf of the mortgagees who owned Plaintiffs' and Class members' mortgages to force-place hazard insurance to protect its interest in Plaintiffs' and Class members' mortgaged properties, to purchase high-priced insurance from its exclusive providers, Meritplan, Balboa, and (after the sale of Balboa) QBE, and in the process used its own affiliates to funnel improper kickbacks in the form of fees, commissions, "rebates" and other consideration to it, and thereby generate a profit for itself and the other enterprise participants at Plaintiffs and other borrowers' expense causing injury to Plaintiffs' and borrowers' business or property.

**Conduct of the RICO Enterprise**

155.   As members of the BOA Force-Placed Insurance Enterprise, Defendants engaged in the following conduct in furtherance of aims and objectives of the enterprise:

> (a)   BOA exercised (and abused) its authority to force-place Plaintiffs and other borrowers' hazard insurance granted it under the terms of the mortgage contracts for lenders for whom they serviced mortgage loans.  Rather than renewing Plaintiffs' and other borrowers existing policies or obtaining the insurance at a commercially reasonable price, BOA force-placed the insurance with its exclusive providers, thus choosing a more expensive policy to enrich itself at Plaintiffs and Class members' expense.

45